# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

IVAN L. ROBINSON,

      Defendant

Criminal Action No. 16-98 (CKK)

## MEMORANDUM OPINION
(June 23, 2017)

In this criminal action, Defendant Ivan L. Robinson is charged with 61 counts of knowingly and intentionally distributing a controlled substance, oxycodone, by writing prescriptions for that drug outside the usual course of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), as well as 18 U.S.C. § 2. Defendant is also charged with two counts of money laundering and aiding and abetting. Defendant has moved under Federal Rule of Criminal Procedure 12(b)(3) to suppress certain statements Defendant made to United States Drug Enforcement Administration ("DEA") agents that were allegedly procured unconstitutionally. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court DENIES Defendant's [57] Motion to Suppress.

---

[1] The Court's consideration has focused on the following documents:
- Def.'s Mot. to Suppress Statements Taken in Violation of the United States Constitution ("Def.'s Mot."), ECF No. 57; and
- Gov.'s Reply in Opp'n to Mot. to Suppress Statement ("Gov.'s Opp'n"), ECF No. 59.

# I. FINDINGS OF FACT

The Court held an evidentiary hearing on Defendant's motion on May 31, 2017 and June 1, 2017. The Court then granted Defendant's motion to reconvene that hearing on June 16, 2017 for additional testimony. The Court has considered the evidence presented at all three days of the hearing. In doing so, the Court considered the demeanor and behavior of the witnesses on the stand, the witnesses' manner of testifying, whether the witnesses impressed the Court as truthful, whether the witnesses impressed the Court as having an accurate memory and recollection, whether the witnesses had any motive for not telling the truth, whether the witnesses had a full opportunity to observe the matters about which they testified, and whether the witnesses had any interest in the outcome of the case, or friendship or hostility to the other persons concerned with the case. The Court also considered the reasonableness or unreasonableness and the probability or improbability of the testimony of the witnesses in determining whether to accept it as true and accurate, as well as whether the testimony was contradicted or supported by other credible evidence. The Court has also considered the pleadings and the entire record in this case. The Court credits the testimony of the witnesses Shirley Powell, Karen Arikpo, Latonya Coates and Jerome Lee as follows.

The Court makes the following findings of fact. The Court will first make findings of fact that are relevant to the Defendant's motion and undisputed and/or uncontroverted by any evidence, and then make findings as to facts that are relevant and disputed or controverted by some evidence.

**A. The Undisputed or Uncontroverted Relevant Evidence**

On June 19, 2013, Defendant Ivan Lamont Robinson approached on foot a chiropractor's office located at 2041 Martin Luther King Avenue in Southeast Washington D.C. (the "2041 MLK Office"). May 31, 2017 Hr'g Tr. at 17:2-8, 18:6-8. The 2041 MLK Office is one of multiple offices Defendant had registered with the DEA as a location of his practice. May 31, 2017 Hr'g Tr. at 15:15-23, 113:10-15.

Defendant arrived at the 2041 MLK Office sometime shortly after 10:00 a.m. June 16, 2017 Hr'g Tr. at 101:4-11. By the time he arrived, DEA and Metropolitan Police Department ("MPD") officers were in the process of executing a search warrant inside the building. May 31, 2017 Hr'g Tr. at 15:12-23. Shirley Powell, a Diversion Investigator with the DEA, was standing outside of the 2041 MLK Office with an MPD officer. May 31, 2017 Hr'g Tr. at 16:21-17:1. Investigator Powell wore a jacket with the letters "DEA" on it. May 31, 2017 Hr'g Tr. at 17:21-18:1. She was not armed and she had no arrest powers. May 31, 2017 Hr'g Tr. at 13:2-7, 41:15-17. The MPD officer was uniformed and armed. May 31, 2017 Hr'g Tr. at 16:23-24, 60:10-15. There were also marked and unmarked police cars parked in the vicinity. May 31, 2017 Hr'g Tr. at 46:6-8. There were no lights or sirens on, and the street was not cordoned off, but the police had created a perimeter around the search and were directing traffic at times. May 31, 2017 Hr'g Tr. at 47:3-4; June 1, 2017 Hr'g Tr. at 58:6-8. Individuals who tried to enter the 2041 MLK Office during the search, such as patients, were being stopped, asked to identify themselves, and asked if they would agree to be interviewed and photographed. June 16, 2017 Hr'g Tr. at 99:6-22, 109:1-18.

Detective Jerome Lee with the Arlington County Police Department was one of the individuals helping to execute the search warrant inside the 2041 MLK Office when Defendant was seen approaching by Investigator Powell. June 16, 2017 Hr'g Tr. at 71:19-21, 73:2-5. Investigator Powell called Detective Lee and told him to come outside, which he did. June 16, 2017 Hr'g Tr. at 73:18-21. Detective Lee wore a jacket that said "Police Officer," and was armed. June 16, 2017 Hr'g Tr. at 74:15-18.

Although the exact details of the initial conversation that Detective Lee and Investigator Powell had with the Defendant are not completely clear, the Court credits the following testimony. Detective Lee told the Defendant that they were "just here to execute a search warrant on your premises" and, importantly, that "we are not here to arrest you." June 16, 2017 Hr'g Tr. at 75:4-5. Investigator Powell told Defendant that they were "conducting a search warrant and [she] wanted to know if he didn't mind being interviewed." May 31, 2017 Hr'g Tr. at 18:14-15. Powell presented Defendant with her credentials. May 31, 2017 Hr'g Tr. at 18:19-20. Defendant responded "no problem." May 31, 2017 Hr'g Tr. at 19:1. The Court finds that at this point Defendant had an opportunity to decline to be interviewed and walk away, but opted not to.

Detective Lee asked Defendant to come inside so that he could make a copy of his identification. June 16, 2017 Hr'g Tr. at 75:5-8. When they had entered the building, Defendant reached into his pocket to retrieve his ID. June 16, 2017 Hr'g Tr. at 75:11-14, 75:24-76:1. At that point, Detective Lee told the Defendant that he needed to pat him down for safety purposes to make sure that he did not have any weapons. June 16, 2017 Hr'g Tr. at 75:12-14, 76:1-2. During the pat down, Detective Lee felt a bulge that he concluded was currency and

told Defendant to take it out of his pocket.  June 16, 2017 Hr'g Tr. at 105:16-18.  Defendant then reached into his own pockets and removed their contents, including the currency, his identification and other cards, two condoms, house keys and a cell phone, and placed them on a countertop in the vestibule.  June 16, 2017 Hr'g Tr. at 105:24-25, 106:6-11.  Detective Lee told Defendant that these items would be photographed and then returned to him, with the exception of the currency and the cell phone, which would be seized pursuant to the search warrant.  June 16, 2017 Hr'g Tr. at 78:3-79:16, 116:9-18.  Another law enforcement agent took Defendant's picture, in the same manner that other individuals on the premises were being photographed.  June 16, 2017 Hr'g Tr. at 108:10-109:22.  Detective Lee never handcuffed or otherwise restrained the Defendant.  June 16, 2017 Hr'g Tr. at 86:15-17.

By all accounts, there was a considerable law enforcement presence—including approximately 20 individuals—at the 2041 MLK Office executing the search warrant.  May 31, 2017 Hr'g Tr. at 59:8-11; June 1, 2017 Hr'g Tr. at 58:1-2.  That operation was being conducted in a calm and orderly fashion.  June 1, 2017 Hr'g Tr. at 60:11-16.  In addition to witnessing the search of the 2041 MLK Office, there was testimony that Defendant was also aware that search warrants were being executed at other locations that day, including Defendant's home, and two other business locations identified on Defendant's DEA registration, including a nearby dentist's office (2021 Martin Luther King Avenue, Washington D.C., or the "2021 MLK Office").  May 31, 2017 Hr'g Tr. at 112:14-114:2; June 1, 2017 Hr'g Tr. at 67:11-12, 67:16-69:4.

Detective Lee told Defendant that after he made a copy of his identification and took pictures of the items that Defendant had removed from his pockets, Defendant was "free to leave," "allowed to leave," and that he "could leave at any time."  June 16, 2017 Hr'g Tr. at

5

84:3-8. He explicitly told the Defendant that he did not have to stay on the premises during the execution of the search warrant, but that if he left, it was DEA policy that he would not be allowed to reenter the building during the execution of the warrant. June 16, 2017 Hr'g Tr. at 84:3-11. Defendant indicated that he wanted to stay to watch the warrant being executed. June 16, 2017 Hr'g Tr. at 84:12-17. Defendant was not surrounded by other law enforcement agents while this conversation took place. June 16, 2017 Hr'g Tr. at 88:14-17. Investigator Powell was nearby, but stood several feet back from the Defendant and Detective Lee. June 16, 2017 Hr'g Tr. at 88:1-22. After Defendant had decided to stay, he and Detective Lee, in reference to the two condoms that Defendant had produced, engaged in a casual conversation about their respective sex lives. June 16, 2017 Hr'g Tr. at 84:21-85:7. Detective Lee eventually asked Defendant "do you mind if my partners interview you?" June 16, 2017 Hr'g Tr. at 85:18-20. Defendant replied "no problem, I will talk to them." June 16, 2017 Hr'g Tr. at 85:18-20. The Court finds that Defendant again at this point had a clear opportunity to leave and not be interviewed, but voluntarily opted to stay.

Defendant chose where the interview would take place within the 2041 MLK Office, and he led Investigator Powell to that location. May 31, 2017 Hr'g Tr. at 19:5-17, 23:6-16, 100:7-10; June 1, 2017 Hr'g Tr. at 34:3-5. He chose the office of a colleague. May 31, 2017 Hr'g Tr. at 69:11-16. Defendant's own office was being searched at the time. May 31, 2017 Hr'g Tr. at 69:24-70:3. The items that Detective Lee had told Defendant would be returned to him had not yet been returned by the time he went into this office for the interview. June 16, 2017 Hr'g Tr. at 127:23-128:2. Defendant also did not have his car keys, but not because they had been seized from the Defendant's person, but instead because he had left them in his car. *See* Gov.'s Ex. 8.

Discussion did not begin immediately after Defendant and Investigator Powell arrived at the office Defendant had chosen for the interview. May 31, 2017 Hr'g Tr. at 23:17-21. Investigator Powell told Defendant that she wanted to wait for a DEA agent, Karen Arikpo (née Karen Taylor) to arrive before beginning. May 31, 2017 Hr'g Tr. at 23:17-21. Neither Investigator Powell nor Defendant spoke during the time they were waiting. May 31, 2017 Hr'g Tr. at 24:2-14. Defendant sat in a chair near the door, and Investigator Powell sat in a chair further into the office against a wall. May 31, 2017 Hr'g Tr. at 25:21-22. An MPD officer was also in the office, and stood by the door, but enough room remained that Defendant could have passed through the open door without the officer needing to move. May 31, 2017 Hr'g Tr. at 24:15-17, 71:13-20, 100:15-23. Defendant chose where to sit on his own. May 31, 2017 Hr'g Tr. at 25:24-26:3. While the two waited for Agent Arikpo, the door to the office remained open. May 31, 2017 Hr'g Tr. at 24:22-23. Defendant was not handcuffed or otherwise restrained in any way. May 31, 2017 Hr'g Tr. at 24:18-21; June 1, 2017 Hr'g Tr. at 20:23-21:4. The Court finds that during this period Defendant had an opportunity to reconsider his decision to agree to be interviewed and to walk away—as he had already been told he was free to do—but again opted to stay.

Agent Arikpo arrived approximately ten minutes later from the Defendant's home. May 31, 2017 Hr'g Tr. at 24:9-11. When she arrived, Agent Arikpo identified herself and presented her credentials to the Defendant. May 31, 2017 Hr'g Tr. at 26:16-17, 117:1-5. Agent Arikpo is employed by the MPD, but is also a Tactical Diversion Officer with the DEA Washington Field Office. May 31, 2017 Hr'g Tr. at 111:7-10. She was wearing a vest with the letters "MPD" on it, also referred to as "raid gear." May 31, 2017 Hr'g Tr. at 26:17-19, 117:4-5; June 1, 2017

Hr'g Tr. at 75:17-76:1. Unlike Investigator Powell, Agent Arikpo has arrest powers and was armed. May 31, 2017 Hr'g Tr. at 41:18-21, 111:21-22; June 1, 2017 Hr'g Tr. at 76:2-5. Once Agent Arikpo arrived, or perhaps shortly before that time, the MPD officer left the office. May 31, 2017 Hr'g Tr. at 26:22-25.

When Agent Arikpo walked into the office she said "Hello I'm Detective [Arikpo] with the Metropolitan Police Department." May 31, 2017 Hr'g Tr. at 117:4-5. Defendant responded "Hello" and "I think I remember you." May 31, 2017 Hr'g Tr. at 117:6-7. Agent Arikpo answered "You probably do." May 31, 2017 Hr'g Tr. at 117:7. Agent Arikpo testified that Defendant may have recognized her from a previous instance when she had visited his practice in response to a complaint. June 1, 2017 Hr'g Tr. at 80:2-81:4. Investigator Powell then told Defendant why they were there and that they "just wanted to talk to him about some things that had been going on with the practice." May 31, 2017 Hr'g Tr. at 117:10-13. The Defendant responded "okay" and that "he had nothing to hide." May 31, 2017 Hr'g Tr. at 117:16. No one stood or sat between Defendant and the door. May 31, 2017 Hr'g Tr. at 27:4-8, 29:22-30:1. Defendant was not read *Miranda* rights. May 31, 2017 Hr'g Tr. at 118:7-12; June 1, 2017 Hr'g Tr. at 81:8-10.

At the evidentiary hearing, the parties focused considerably on several answers that Defendant gave to certain questions during the ensuing interview. Both parties attempted to portray these answers as not being responsive to the interviewers' questions. *See, e.g.*, May 31, 2017 Hr'g Tr. at 28:20-22, 84:25-85:2. The Court rejects this characterization of Defendant's responses. The Court finds that the responses Defendant gave were rationally connected to the questions posed and merely provided additional details to his answers. For example, when

asked about his occupation, Defendant responded that he was a nurse practitioner but also volunteered information about his prior military involvement, claiming that he was the "first African or black male to take down a Mexican cartel." May 31, 2017 Hr'g Tr. at 28:24-29:4; June 1, 2017 Hr'g Tr. at 28:16-32:1. The Court finds that Defendant's response was a reasonable supplement to his answer about his occupation. The Court interprets the statement as an attempt on Defendant's part to impress or ingratiate himself with his interviewers by playing on a well-established symbiotic relationship between law enforcement and the military. This interpretation is buttressed by Agent Arikpo's description of the Defendant, which the Court credits, as "very sure of himself" and "kind of cocky" during the interview. June 1, 2017 Hr'g Tr. at 23:23-24:1. It is also consistent with Investigator Powell's description of the Defendant, which the Court also credits, as "excited to talk to us" and "excited to be in the presence of law enforcement expressing his association with being in the military as a law enforcement special forces or something to that nature." May 31, 2017 Hr'g Tr. at 103:22-25.

Similarly, when asked whether he had children, Defendant responded that he had six children, but also volunteered that he loves having sex because it helps him to eliminate stress. May 31, 2017 Hr'g Tr. at 79:20-24. This additional information is not irrelevant or nonresponsive—it is an explanation for why Defendant has six children, and one that is in line with an attempt to impress or entertain his interviewers. This conclusion is buttressed by Detective Lee's testimony that the Defendant had just engaged in a similar conversation about his sex life before the interview began. June 16, 2017 Hr'g Tr. at 84:21-85:7. When testifying before the grand jury, Agent Arikpo stated that when she learned that Defendant had six children, she had a concern because she did not know when they were going to be finished with

the interview and whether anyone was available to take care of those children in the meantime. June 1, 2017 Hr'g Tr. at 93:4-94:3. She did not, however, articulate this concern to the Defendant. June 1, 2017 Hr'g Tr. at 94:24-95:2.

At another juncture during the interview, Defendant asked if Investigator Powell could "take him to the pharmacy to get his medication." May 31, 2017 Hr'g Tr. at 72:19-20. Investigator Powell responded that she "was not allowed to take [Defendant] to get his medication," but told Defendant "you can go on your own and get your medication." May 31, 2017 Hr'g Tr. at 72:17-73:12. Both Agent Arikpo and Investigator Powell testified that they told Defendant that he could leave and get his medication on his own, but that they could not take him. May 31, 2017 Hr'g Tr. at 72:17-73:12; June 1, 2017 Hr'g Tr. at 96:17-23. Defendant did not leave to go to the pharmacy at that point—he stayed and continued the interview. May 31, 2017 Hr'g Tr. at 73:13-14.

Other officials entered the room during the interview, including Nacieve Owens, a Special Agent with the United States Department of Defense, and Mark Donatelli, a representative of the District of Columbia Department of Health's Board of Nursing. May 31, 2017 Hr'g Tr. at 29:7-18. Each identified themselves and presented their credentials as they entered. May 31, 2017 Hr'g Tr. at 30:3-12. Donatelli asked Defendant questions during the interview, and at one point stated that the answers Defendant was providing were an "ill representation" of Defendant's actual practice. June 1, 2017 Hr'g Tr. at 82:16-22; Gov.'s Ex. 1 at 7.

Defendant told Investigator Powell and Agent Arikpo that he had "a back issue" and accordingly stood, stretched, and walked around the office during the interview. May 31, 2017

Hr'g Tr. at 30:15-19, 73:17-21.   Defendant raised his back issues to the investigators in describing his development of his practice's "spinal program."   Gov.'s Ex. 1 at 2.   He continued to talk and answer questions as he stood and stretched.   May 31, 2017 Hr'g Tr. at 73:20-21, 102:9-14.

The witnesses also testified that a "white substance" accrued at the corners of Defendant's mouth during the interview, and the Report of Investigation states that Defendant was "foaming at the mouth."   May 31, 2017 Hr'g Tr. at 73:22-74:1; Gov.'s Ex. 1 at 6.   Agent Arikpo associated this with Defendant having a dry mouth, in part because Defendant also did not lick his lips during the interview.   Gov.'s Ex. 1 at 6.   Accordingly, she offered Defendant water, which he accepted.   May 31, 2017 Hr'g Tr. at 31:3-16.

The Court does not conclude from these facts that Defendant was in any considerable state of pain, under the influence of any drugs or alcohol, or otherwise under an unusual degree of distress during the interview.   Overall, the witnesses testified that Defendant appeared calm, relaxed, patient, willing to be interviewed, and that he answered all of their questions coherently. May 31, 2017 Hr'g Tr. at 22:20-23, 25:15, 28:13-17, 35:17, 116:16-18.   They also testified that he gave fairly elaborate answers, as opposed to monosyllabic responses, and that he was not upset or aggressive.   May 31, 2017 Hr'g Tr. at 28:13-14; June 1, 2017 Hr'g Tr. at 24:19-25:4. Neither Investigator Powell nor Agent Arikpo asked Defendant if he was sober during the interview, or if he was able to understand what was going on, but both testified—and the Court credits—that nothing about his demeanor or his responses suggested to them that he was under the influence of drugs or alcohol or that he was unable to understand what was transpiring during the interview.   May 31, 2017 Hr'g Tr. at 28:15-17, 80:25-82:7; June 1, 2017 Hr'g Tr. at 24:2-6.

Near the end of the interview, Investigator Powell asked Defendant whether he would voluntarily surrender his DEA registration. May 31, 2017 Hr'g Tr. at 31:21-32:4. Investigator Powell had asked Defendant earlier in the interview if he would surrender his registration, but Defendant did not answer directly and instead went on to discuss his military history, and so she had temporarily dropped the issue. May 31, 2017 Hr'g Tr. at 82:11-85:13. When she raised it again, Investigator Powell explained the consequences of Defendant's decision. She explained that if Defendant did not voluntarily surrender his registration, a show cause order would be issued and an administrative process would be initiated by the DEA to revoke his registration. May 31, 2017 Hr'g Tr. at 85:14-19. No formal administrative complaint or grievance had been filed or was then pending against Defendant by the DEA or by the D.C. Department of Health. Investigator Powell also told Defendant that if he did voluntarily surrender his registration, he would still be able to write prescriptions for non-controlled substances. May 31, 2017 Hr'g Tr. at 85:20-23; June 1, 2017 Hr'g Tr. at 32:20-33:1. The Court does not interpret this conversation as presenting any "threats" or "promises." To the contrary, Investigator Powell was merely informing Defendant of the options before him.

Defendant agreed to voluntarily surrender his registration, and signed a "Voluntary Surrender of Controlled Substances Privileges" form, which states that "[w]ith the understanding that I am not required to surrender my controlled substances privileges, I freely and under no duress, implied or express, execute this document and choose to take the actions described herein." Gov.'s Ex. 2. Before Defendant signed this form, Investigator Powell read the form to Defendant, allowed Defendant time to read it himself, and asked Defendant if he had any questions about it. May 31, 2017 Hr'g Tr. at 34:12-25. He did not. May 31, 2017 Hr'g Tr. at

12

35:1-2.

Afterward, Defendant was told that the interview was over and asked if he had any questions. May 31, 2017 Hr'g Tr. at 87:4-6. He had no questions. May 31, 2017 Hr'g Tr. at 87:4-6. Defendant then got up and exited the room on his own. May 31, 2017 Hr'g Tr. at 36:2-7, 87:4-14. The investigators remained in the office. June 1, 2017 Hr'g Tr. at 33:20-24. The interview as a whole lasted between approximately 45 minutes and slightly over an hour, including the time spent reviewing the voluntary surrender form. May 31, 2017 Hr'g Tr. at 37:2-4.

Throughout, Defendant never asked to end the interview or to take a break. May 31, 2017 Hr'g Tr. at 101:21-102:3; June 1, 2017 Hr'g Tr. at 24:15-16. Nor did he ever ask for the assistance of a lawyer. May 31, 2017 Hr'g Tr. at 79:15-16; June 1, 2017 Hr'g Tr. at 24:17-18. Defendant was never told that he was under arrest, and in fact was told that he was not under arrest by Detective Lee. May 31, 2017 Hr'g Tr. at 27:24-28:1, 72:5-10. No law enforcement officer ever handcuffed or otherwise restrained Defendant, and no witness saw any law enforcement officer ever unholster his or her weapon or handcuffs. May 31, 2017 Hr'g Tr. at 99:13-100:1; June 16, 2017 Hr'g Tr. at 87:4-6.

After Defendant left the 2041 MLK Office, he went to his bank and withdrew $108,000 in cashier's checks. June 1, 2017 Hr'g Tr. at 36:2-20. In surveillance video footage of Defendant at the bank after the interview, Defendant does not appear to be disoriented, under the influence of drugs, shaken, in pain, or otherwise in any notable state. *See* Gov.'s Ex. 6. He smiles and generally appears calm and alert. The Court finds that the very act of going to the bank to withdraw large sums of money after being alerted to the government's execution of

13

search warrants at his home and places of business suggests a certain clarity of mind.

## B. The Disputed or Controverted Relevant Evidence

The Court also notes two relevant points that were the subject of competing evidence at the evidentiary hearing. First, some contradictory evidence was presented regarding how Defendant arrived at the 2041 MLK Office, and whether he was accompanied there by an MPD officer. Defendant introduced grand jury testimony of Agent Arikpo in which she had stated that she thought Defendant had been escorted by an MPD officer to the 2041 MLK Office from the 2021 MLK Office. June 1, 2017 Hr'g Tr. at 66:19-67:1, 71:15-73:16; Def.'s Ex. F at 10:7-14. However, Agent Arikpo did not actually see this occur—she based her statement on second hand information, which she recalled was given to her by Investigator Powell. June 1, 2017 Hr'g Tr. at 74:7-11.

However, Investigator Powell herself testified at the evidentiary hearing that she personally witnessed the Defendant approaching the 2041 MLK Office, and did not testify that he was accompanied by any law enforcement. She also clearly identified the direction from which Defendant approached at the evidentiary hearing on a demonstrative map of the area surrounding the office, which was later admitted. She testified that he approached from the opposite direction of where the 2021 MLK Office is located. May 31, 2017 Hr'g Tr. at 57:22-58:14, 97:2-98:24. Investigator Powell's testimony was corroborated to some extent by Detective Lee, who also testified that he witnessed the Defendant approaching the 2041 MLK Office and made no mention of him being accompanied by any law enforcement officer. June 16, 2017 Hr'g Tr. at 102:19-24.

The Court credits the testimony of Investigator Powell on this point. Agent Arikpo was

14

not at the 2021 or 2041 MLK Offices before the interview, and testified at the evidentiary hearing that her statement to the grand jury was merely a guess based on information provided to her second hand. June 1, 2017 Hr'g Tr. at 72:12-18, 74:7-11. Investigator Powell, on the other hand, was actually present at both offices, and witnessed Defendant approach the 2041 MLK Office. The Court finds Investigator Powell's recitation of the events, which was clear, specific and given without hesitation, more credible than Agent Arikpo's statement before the grand jury, because that statement was based on second hand information and assumptions, as she subsequently explained at the evidentiary hearing. June 1, 2017 Hr'g Tr. at 73:4-6 ("So I'm thinking and I'm guessing, and I'm trying to make a reasonable assumption of this is what happened that morning because I wasn't there.").

Second, contradictory testimony was presented as to whether the door to the office in which Defendant was interviewed remained open or closed during the interview. Investigator Powell and Agent Arikpo indicated that the door was closed after Agent Arikpo arrived, but that it was not locked. May 31, 2017 Hr'g Tr. at 27:9-11; June 1, 2017 Hr'g Tr. at 86:24-87:2. Detective Lee indicated that the door remained open. June 16, 2017 Hr'g Tr. at 124:8-9. The Court finds that although the door was open before the interview started, the door was closed for the majority of the interview. However, it was also clearly opened at times to allow law enforcement officials to enter and exit. To the extent this contradicts Detective Lee's recollection, the Court credits Investigator Powell and Agent Arikpo's testimony on this point because they were both in the interview the entire time, and both recalled that the door was closed.

## II. DISCUSSION

Defendant argues that the statements he made at this June 19, 2013 interview should be suppressed because they were obtained in violation of Defendant's *Miranda* rights or were made involuntarily. The Court disagrees with both contentions and will address each in turn.

### A. *Miranda*

First, Defendant argues that his statements should be suppressed because they were taken in violation of his *Miranda* rights. "In order to be able to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation." *Fare v. Michael C.*, 442 U.S. 707, 717 (1979); *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000) ("[T]he admissibility in evidence of any statement given during custodial interrogation of a suspect . . . depend[s] on whether the police provided the suspect with" *Miranda* warnings). "Miranda warnings are only required," however, "where a suspect in custody is subjected to interrogation." *United States v. Vinton*, 594 F.3d 14, 26 (D.C. Cir. 2010) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). It is undisputed that *Miranda* warnings were not given to Defendant before the statements at issue were made. Accordingly, the question before the Court is whether these statements were given during a "custodial interrogation."

A defendant is "in custody" for the purposes of *Miranda* when a reasonable person in the defendant's position would have understood that he was subject to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125

(1983)). The Court must determine whether, given the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted).

The Court concludes that a reasonable person in Defendant's position would have understood that he was not subject to a formal arrest or restraint of the degree associated with a formal arrest, and would have felt free to terminate the interview and leave. The following facts support the Court's conclusion. Defendant approached the 2041 MLK Office on his own. Upon arriving, Defendant was immediately informed that law enforcement agents were at the office solely to execute a search warrant, and that he was not under arrest. Defendant was not then peppered with any questions or ordered to submit to an interview. He was *asked* whether he "mind[ed] being interviewed." May 31, 2017 Hr'g Tr. at 18:14-20. Defendant had the opportunity to simply decline to be interviewed and walk away. Instead, he responded "no problem." May 31, 2017 Hr'g Tr. at 19:1.

Once inside the 2041 MLK Office, Detective Lee explicitly told Defendant that he was free to leave the office and that he did not need to stay during the execution of the search warrant. *See Howes*, 565 U.S. at 515 (finding that inmate was not in custody because, among other things, he "was told at the outset of the interrogation, and was reminded again thereafter, that he could leave"). Only when Defendant indicated that he would rather stay and watch the warrant be executed was Defendant then asked again whether he would "mind" being

17

interviewed.  Once again, Defendant clearly had the opportunity to decline and leave, and once again he responded "no problem."

Defendant himself chose the setting of the interview, and he led Investigator Powell to it. That setting was not a police station or any other characteristically police-dominated or coercive location, but was instead an office inside of Defendant's own place of work.  *See United States v. Delamarra*, 275 F. Supp. 1, 4 (D.D.C 1967) (holding that defendant was not in custody in part because "[h]e had not been requested to go to police headquarters or a precinct station; he was on the premises of his employer"); *United States v. Wilson*, 901 F. Supp. 172, 175 (S.D.N.Y. 1995) (finding that defendant was not in custody where he "freely agreed to an interview, which was conducted in an ordinary business conference room in a commercial firm, not even on government premises."); *United States v. Berlin*, 707 F. Supp. 832, 838 (E.D. Va. 1989) (finding that interview that "took place in [defendant's] office and lasted about forty minutes" was not custodial).  Defendant also chose where to sit inside of that office.

Although there was an MPD officer near the door during the ten minute period before the interview began, the door to the office remained open and there was sufficient room for Defendant to walk out of the office without that officer needing to move.  During this period Defendant had a thorough opportunity to reconsider his decision to be interviewed, get up, and leave through the same door he had entered of his own volition—something he had already been told he was allowed to do at any time.  Instead, he stayed.  When Agent Arikpo eventually arrived, Defendant again was not *ordered* to engage in an interview.  Instead, he was told that Agent Arikpo and Investigator Powell "just wanted to talk to him about some things that had been going on with the practice."  May 31, 2017 Hr'g Tr. at 117:10-13.  Yet again, Defendant

had the opportunity to decline and leave, but instead agreed to be interviewed.

Defendant's demeanor was calm and patient throughout the interview. All of the testimony and documentary evidence shows that he appeared to be willing, even eager, to engage in the interview. The interviewers' tones were also generally calm and conversational. No threats or promises were made to Defendant. Defendant was asked if he would voluntarily surrender his DEA registration, and told about the consequences of his decision either way, but the Court does not interpret this as a "threat" or a "promise." No formal administrative complaint or grievance had been filed or was then pending against Defendant by the DEA or by the D.C. Department of Health. Investigator Powell was merely asking Defendant to do something and telling him the implications—the accuracy of which are not disputed—of his decision.

The door to the office where the interview occurred was open before the interview began, and intermittently thereafter, and Defendant was offered water during the interview. *See Howes*, 565 U.S. at 515 (holding that inmate was not in custody in part because "[h]e was offered food and water, and the door to the conference room [where the interview occurred] was sometimes left open"). The interview as a whole was not particularly long, lasting somewhere between 45 minutes and a little over an hour, including the time spent reviewing the voluntary surrender form. *See id.* (holding that inmate was not in custody despite the fact that the "interview lasted for between five and seven hours"). Throughout, Defendant was never handcuffed or restrained in any way. *See id.* (holding that one factor indicating that inmate was not in custody was that he was not "physically restrained"); *United States v. Hughes*, 640 F.3d 428, 436 (1st Cir. 2011) (holding that the fact that "no meaningful physical restraint was applied

to the defendant" supported finding that interrogation was non-custodial); *Peterson*, 506 F. Supp. 2d at 23 (holding that "it cannot be disputed that the use of handcuffs is a significant factor" in determining whether a defendant is in custody). Some law enforcement agents involved in the interview and surrounding search warrant execution were armed, but no weapons were ever drawn or brandished. *See Hughes*, 640 F.3d at 436 (holding that the fact that officers' "weapons remained in their holsters" and "[n]o weapon was ever brandished . . . tends to support the district court's finding that the interrogation was non-custodial."). Defendant never asked to end the interview, requested a break, or inquired about the assistance of a lawyer. At one point, Defendant was even told that he could leave to get his medication from a pharmacy. Still, he remained. At oral argument Defense counsel all but conceded that, at least after this point, Defendant was not in custody.

Eventually, Defendant was told that the interview was over, and was asked if he had any questions. There is no testimony that Defendant asked any questions. Instead, he got up, opened the door, and walked out by himself, while his interviewers remained inside. *See Howes*, 565 U.S. at 509 (holding that one factor relevant to the question of custody is "the release of the interviewee at the end of the questioning").

In light of all of these circumstances, the Court concludes that Defendant was not in "custody." This is not to say, however, that *no facts* support Defendant's position. For example, the Court acknowledges that there were a fair number of law enforcement agents at the 2041 MLK Office who had, among other things, established a perimeter around the building. Upon being allowed to enter that building, Defendant was patted down and some of his possessions were seized. Defendant also had his picture taken. These facts tend to imply a

police-dominated atmosphere that could in theory suggest to an individual that he was not free to leave. However, these facts have less significance when viewed in the context of a search warrant execution that Defendant chose to be present for. However many officers were on the scene, the majority of those officers were not focused on Defendant during the interview. They were focused on executing a search warrant, and apparently were doing so in a calm and orderly fashion. *See United States v. Calloway*, 298 F. Supp. 2d 39, 49 (D.D.C. 2003) (holding that defendant was not in custody in part because "while there was a police presence at 721 Yuma Street due to officers' executing a valid search warrant . . . the officers' attention was focused on securing the residence and finding the weapon used in the assault . . . and was not substantially focused on the defendant, as it would have been in a formal arrest or its equivalent."). The pat down and the photograph taken of Defendant were in line with how other individuals at the 2041 MLK Office were being treated. Defendant was also told that the majority of the items taken from him—those not seized pursuant to the search warrant—were going to be returned to him after they were photographed. Contrary to Defendant's argument at the close of the evidentiary hearing, no item taken from Defendant physically prevented him from leaving the building or declining to be interviewed if that was his intention. In sum, when considered in conjunction with the fact that Defendant was explicitly told that the officers were there only to execute a search warrant, that he was not under arrest and that he was free to leave at any time, the Court concludes that a reasonable person in Defendant's position would not have interpreted the law enforcement presence or conduct at the 2041 MLK Office as indicating that he was subject to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury*, 511 U.S. at 322.

Additionally, the Court acknowledges that the Defendant asked Agent Arikpo and Investigator Powell if they could "take him to the pharmacy to get his medication," which could suggest a subjective belief on Defendant's behalf that he may not have been free to go on his own. But the question of whether a Defendant was in custody is an objective one, based on what a reasonable person would understand considering the totality of the circumstances. *See id.* at 323 ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."). Based on all the facts laid out above—including that Defendant was expressly told that he was not under arrest and was free to leave, was not restrained in any way, and had merely been asked if he was willing to be interviewed—the Court concludes that even if Defendant did genuinely hold this belief, it was not reasonable.[2]

Finally, although other courts in this circuit have determined that defendants were in custody during the execution of search warrants, the circumstances in those cases are *far* more extreme than the circumstances of this case. For example, in *United States v. Peterson*, the court determined that defendant was in custody when questioned by police officers during the execution of a search warrant where he had recently been arrested prior to the search, a SWAT team used a battering ram to enter through his front door, yelled "police with a warrant, everybody down," "had their weapons drawn, which included sub-machine guns, shotguns, and

---

[2] The Court does not interpret Agent Arikpo's grand jury testimony that she was concerned about whether there was anyone available to take care of Defendant's children as necessarily evidencing her belief that Defendant was not free to leave, but even if it did, the Court notes that she did not articulate this concern to Defendant, and accordingly it too does not affect the Court's determination as to the objective circumstances of the interview. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time.").

rifles," brought the defendant to a particular location of their choosing, and handcuffed him. 506 F. Supp. 2d at 24. In *United States v. Savoy*, the court found that defendant was in custody during the execution of a search warrant when armed FBI agents and police officers in "tactical gear" forcibly entered defendant's home at 6:00 a.m., handcuffed defendant and his family members, and defendant "had to be accompanied by agents to the restroom." 889 F. Supp. 2d 78, 106-10 (D.D.C. 2012). Finally, in *United States v. Richardson*, the court found that defendant was in custody during the execution of a search warrant when FBI agents used a battering ram to forcibly enter defendant's home at 6:00 a.m., ordered the defendant to "come out" with his "hands in the air," had their weapons drawn and aimed at defendant, handcuffed the defendant, and a detective escorted defendant to the bathroom and remained in it while she used the facilities. 36 F. Supp. 3d 120, 129-31 (D.D.C. 2014).

The facts of this case are nothing like the facts of *Peterson*, *Savoy* or *Richardson*. Law enforcement did not break down the door to the 2041 MLK Office and rush in with weapons drawn. No law enforcement officer ever unholstered their weapon or yelled at Defendant. Defendant was never handcuffed, and there is no evidence that any law enforcement agent ever had to escort Defendant to the bathroom or some other location within the building during the interview. Indeed, it was *Defendant* who chose the location for his interview and led Investigator Powell to it.

In sum, the Court concludes that Defendant was not in custody during the June 19, 2013 interview. Because Defendant was not in custody, *Miranda* warnings were not required. Defendant's motion to suppress on the basis of *Miranda* will accordingly be DENIED.

## B. Voluntariness

Defendant also argues that his statements should not be admitted because they were obtained involuntarily. A criminal defendant's statement is inadmissible "if under the totality of the circumstances it was involuntarily obtained." *United States v. Reed*, 522 F.3d 354, 358-59 (D.C. Cir. 2008) (quoting *United States v. Bradshaw*, 935 F.2d 295, 299 (D.C. Cir. 1991)). Voluntariness turns on whether "the 'defendant's will was overborne'" when he gave the statement." *United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). "[T]he test for this is whether the statement was a 'product of an essentially free and unconstrained choice by its maker.'" *Id.* (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961)). "The Government must establish the voluntariness of a confession by a preponderance of the evidence." *Reed*, 522 F.3d at 359.

Determining a statement's voluntariness is a legal question that "requires a careful evaluation of the circumstances of the interrogation." *Murdock*, 667 F.3d at 1305 (internal quotations omitted). Pertinent factors in this totality-of-the-circumstances analysis include the defendant's "age, education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning." *Id.* at 1305-06 (citing *Schneckloth*, 412 U.S. at 226). Failure to give *Miranda* warnings is "relevant" to the voluntariness inquiry, but it is "insufficient by itself to establish involuntariness." *Id.* at 1306. The D.C. Circuit has held that "egregious facts [are] necessary to establish that the statements . . . made during questioning [are] involuntary." *United States v. Hallford*, 816 F.3d 850, 863 (D.C. Cir. 2016) (quoting *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012)). "Statements made where the circumstances are 'less than 'egregious' are usually voluntary." *Id.* "[C]oercive police

activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

For many of the same reasons already discussed above regarding the non-custodial status of the interview, the Court finds that Defendant's statements were voluntary. As already mentioned, Defendant voluntarily agreed to be interviewed, despite having multiple opportunities to decline. *See Hallford*, 816 F.3d at 858 (finding statement voluntary where defendant "agreed to the interview" and "[t]he agents did not pressure him to do so in any way."). He also appeared eager to be interviewed, and provided extended, somewhat colorful answers to questions. There is no evidence of any police overreach, trickery, threats, promises, or coercion of any sort. The uncontroverted testimony was that Agent Arikpo and Investigator Powell's tones were calm and conversational. The interview was not particularly long, and when Agent Arikpo noticed that the Defendant might be suffering from a dry mouth, she offered him water. *See id.* (finding statement voluntary where "[t]he interview lasted less than an hour," "[t]he agents asked straightforward questions in conversational tones," "made no threats or promises," and defendant was offered food); *Hughes*, 640 F.3d at 438 (finding that statements made during an interview were voluntary where "[t]he tone of the interview was cordial, its length was reasonable, and the defendant was not deprived of any essentials.").

Again, the Court does not mean to suggest that there were no facts supporting Defendant's position on this issue. Although Investigator Powell and Agent Arikpo's tones were calm and conversational, there is evidence that at one point during the interview a representative from the D.C. Department of Health's Board of Nursing challenged Defendant's

answers as an "ill representation" of his practice. Defendant may have felt some degree of pressure from this statement, considering the Board's oversight of Defendant's license, but the Court finds that this falls far short of the type of "coercive" police activity that could plausibly render a statement involuntary. Moreover, there is testimony that Defendant needed to stand and stretch due to a back condition he has long suffered from. The Court does not find the fact that Defendant had to stand and stretch throughout the interview due to a back condition nearly the sort of "egregious" circumstances that could render questioning involuntary. Defendant did not tell the interviewers he was experiencing serious pain and needed to stop the interview, even temporarily. He continued to answer questions as he stood and stretched.

In sum, the Court concludes that Defendant's statements were not involuntary. His motion to suppress on this basis will also be DENIED.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that the government was not required to provide *Miranda* warnings prior to the interview on June 19, 2013 because Defendant was not in custody. The Court also concludes that the statements Defendant made at that interview were voluntary. Accordingly, the Court will DENY Defendant's Motion to Suppress. An appropriate Order accompanies this Memorandum Opinion.

/s

**COLLEEN KOLLAR-KOTELLY**
United States District Judge