**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Crim. No. 16-098 (CKK)** |
| | **:** | |
| **IVAN LAMONT ROBINSON,** | **:** | **ORAL ARGUMENT** |
| | **:** | **REQUESTED** |
| **Defendant.** | **:** | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**</u>
<u>**DEFENDANT'S MOTION FOR A NEW TRIAL**</u>

## TABLE OF CONTENTS

BACKGROUND ............................................................................................................... 1

LEGAL STANDARD ..................................................................................................... 3

ARGUMENT .................................................................................................................. 3

I.   Dr. Romanoff's Testimony Was Unreliable and Inadmissible Pursuant to Federal Rule of Evidence 702 ............................................................................................ 3

    A.   Background ............................................................................................... 4

    B.   Dr. Romanoff's Opinion Was Fundamentally Unreliable ....................... 6

        1.   Failure to Review All Paper Records........................................... 7

        2.   Incomplete and Unreliable Chart Review .................................... 8

II.  Dr. Robinson Is Entitled to a New Trial Due to Cumulative and Highly Prejudicial Evidentiary Errors ................................................................................ 11

    A.   The Court Erred in Admitting Evidence of Other Alleged Bad Acts With No Connection to the Charges in the Indictment .................................... 11

        1.   Improper Testimony by Pharmacists ......................................... 12

        2.   Improper Testimony About Dr. Robinson's Patient Volume and Income in Money Orders ............................................................. 14

    B.   The Government's Case Improperly Relied on the Racial Composition of Dr. Robinson's Patient Population........................................................ 19

III. The Court Erred in Admitting Statements Made by Dr. Robinson While in the Custody of the DEA Task Force ........................................................................ 23

IV.  Dr. Robinson Should Be Granted a New Trial Because Overt Prosecutorial Misconduct Prejudiced His Right to a Fair Trial ............................................... 26

    A.   Violations of *Brady*, *Napue*, and the Jencks Act Requires a New Trial .............. 27

    B.   The Prosecution's Failure to Instruct Robert Long About the Scope of His Testimony Also Constituted Prosecutorial Misconduct ....................... 29

    C.   *Brady* Concerns Remain Due to the Government's Continuing Review of Evidence................................................................................................ 31

V.   Prejudicial Legal Error in the Definition of Criminal Liability Under 21 U.S.C. § 841 Requires A New Trial .............................................................................. 31

A.      Legal Standard ........................................................................................... 32

B.      The Standard Presented to the Jury for Liability Under 21 U.S.C. § 841
        Was Legally Erroneous ............................................................................... 32

        1.      Background ....................................................................................... 32

        2.      Argument ........................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berkemer v. McCarty*,
  468 U.S. 420 (1984)...............................................................................................24, 25

*\*Daubert v. Dow v. Merrell Dow Pharms. Inc.*,
  509 U.S. 579 (1993).................................................................................................1, 7

*E.E.O.C. v. Bloomberg L.P.*,
  Civ. No. 07–8383(LAP), 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) .................................7

*Farag v. United States*,
  587 F. Supp. 2d 436 (E.D.N.Y. 2008) .................................................................................20

*Faulkner v. Arista Records LLC*,
  46 F. Supp. 3d 365 (S.D.N.Y. 2014)...............................................................................7, 8

*Fitzgerald v. Smith & Nephew, Inc.*,
  11 F. App'x 335 (4th Cir. 2001) .........................................................................................9

*\*Miranda v. Arizona*,
  384 U.S. 436 (1966).......................................................................................1, 23, 24

*Pennsylvania v. Muniz*,
  496 U.S. 582 (1990)........................................................................................................24

*Pritchard v. Dow Agro Sciences*,
  705 F. Supp. 2d 471 (W.D. Pa. 2010)...................................................................................7

*Rhode Island v. Innis*,
  446 U.S. 291 (1980)........................................................................................................24

*United States v. Howard*,
  245 F. Supp. 2d 24 (D.D.C. 2003) .......................................................................................3

*United States v. Cuong*,
  18 F.3d 1132 (4th Cir. 1994) ............................................................................................34

*United States v. Doe*,
  903 F.2d 16 (D.C. Cir. 1990).......................................................................................19, 20

*United States v. Feingold*,
  454 F.3d 1001 (9th Cir. 2006) ..........................................................................................34

*United States v. Kim*,
808 F. Supp. 2d 44 (D.D.C. 2011) .......................................................................36

*United States v. Martin*,
475 F.2d 943 (D.C. Cir. 1973) .............................................................................32

*United States v. McCord*,
509 F.2d 334 (D.C. Cir. 1974) .............................................................................27

*United States v. Mosquera-Murillo*,
153 F. Supp. 3d 130 (D.D.C. 2015) .....................................................................20

*United States v. Norris*,
873 F.2d 1519 (D.C. Cir. 1989) ......................................................................32, 35

*United States v. Stump*,
735 F.2d 273 (7th Cir. 1984) ...............................................................................34

*United States v. Vega*,
826 F.3d 514 (D.C. Cir. 2016) .............................................................................32

*United States v. Volkman*,
1:07-CR-060-03, 2011 WL 13128698 (S.D. Ohio Aug. 23, 2011), *aff'd United
States v. Volkman*, 797 F.3d 377 (6th Cir. 2015) ............................................33, 36

*United States v. Watson*,
171 F.3d 695 (D.C. Cir. 1999) .............................................................................11

*United States v. Zolot*,
968 F. Supp. 2d 411 (D. Mass. 2013) ..............................................................33, 34

**Statutes**

18 U.S.C. § 1957 ...............................................................................................................2

21 U.S.C. § 841..............................................................................................1, 31, 32, 34, 36, 37

**Other Authorities**

Fed. R. Crim. P. 33 .....................................................................................................1, 3, 37

Fed. R. Evid. 702 ........................................................................................................3, 4, 7

Defendant, Ivan Lamont Robinson respectfully moves this Court for a new trial pursuant to Fed. R. Crim. P. 33 due to numerous errors that individually and cumulatively caused substantial prejudice to Dr. Robinson. The Court should grant a new trial due to the following errors: (1) the government's expert, Dr. Mark Romanoff, was permitted to testify as to an unreliable opinion that did not satisfy the strictures of *Daubert v. Dow v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993); (2) highly prejudicial evidence, including of other alleged bad acts with no connection to the charges in the indictment and the racial makeup of Dr. Robinson's patient population, was admitted; (3) Dr. Robinson's statement made while in government custody and without *Miranda* warnings was erroneously admitted over defense objection; (4) the trial was infected with multiple violations of the government's disclosure obligations; and (5) the jury was erroneously instructed as to the definition of criminal liability under 21 U.S.C. § 841.

## BACKGROUND

Over several years, defendant Ivan Lamont Robinson, a licensed nurse practitioner, maintained a Washington, D.C. medical practice with offices in several locations, including at 2041 Martin Luther King Jr. Avenue, SE and 2021 Martin Luther King Jr. Avenue, SE. Aug. 1, 2017 Trial Tr. at 4369:10-19. Comprising thousands of patients with a range of medical needs, Dr. Robinson's practice grew over time to specialize in the care of patients with spinal injuries. Dr. Robinson treated his pain patients with a patented protocol including spinal decompression therapy, medication, exercise, and diet. Aug. 1, 2017 Trial Tr. at 4411:4-4412:7, 4637:8-16. Among the medications that patients received on this protocol was oxycodone in a dose of 30 milligrams. Aug. 2, 2017 Trial Tr. at 4628:25-4629:11.

In 2013, a DEA Task Force began an investigation into Dr. Robinson's practice. July 13, 2017 Trial Tr. at 749:8-750:3. The task force sent undercover agents posing as patients with significant back and spine injuries to attempt to obtain oxycodone prescriptions from Dr.

Robinson in March and April 2013. *Id.* at 799:24-800:20. Following those undercover operations, a search warrant was executed at five locations, including Dr. Robinson's two practices, on June 19, 2013. *Id.* at 852:14-25. During the execution of the warrant, Dr. Robinson was interviewed by DEA Task Force officers Karen Arikpo and Shirley Powell. *Id.* at 884:17-885:5. Following the execution of the search warrant, Dr. Robinson withdrew $108,000 from his account at Bank of America. July 14, 2017 Trial Tr. at 976:17-977:20; July 18, 2017 Trial Tr. at 1881:3-21.

Dr. Robinson was indicted on June 7, 2016 on fifty-five counts of prescribing oxycodone outside the legitimate practice of medicine and forfeiture allegations relating to the $108,000 withdrawn from his bank account, cash found on him at the time of the search warrant execution, and a 2012 Volvo. Dkt. 2 (June 7, 2016). The government subsequently obtained a superseding indictment on sixty-one counts of prescribing oxycodone outside the legitimate practice of medicine, two counts of money laundering pursuant to 18 U.S.C. § 1957, and similar forfeiture allegations. Dkt. 63 (Apr. 27, 2017). The individuals to whom the prescriptions were made included eight of the patients Dr. Robinson's practice served over the years: Christi Townsend; Chris Lusby; Kevin Copsey; Stephanie Dudzik; Jesse Goble; Denise Thomas; Tammy Raum; and Johnny R. Jones, Jr. July 28, 2017 Tr. at 3830:11-3833:3. The indictments also included charges arising from prescriptions written for two of the three undercover officers who visited Dr. Robinson's practice. *Id.* (The government later dropped eighteen of the oxycodone counts. *See* Dkt. 200 (July 26, 2017).)

Following a twenty-day trial, Dr. Robinson was found guilty of forty-two counts of prescribing oxycodone outside the legitimate practice of medicine and of the two money laundering counts. Dkt. 233 (Aug. 10, 2017). He was found not guilty of one count of

prescribing oxycodone outside the legitimate medical practice: the count involving a prescription to Denise Thomas on November 4, 2011.  *Id.* at 9.  The jury arrived at a split verdict on the forfeiture allegations, determining that the $108,000 and the 2012 Volvo were proceeds constituting or derived from Dr. Robinson's prescription of oxycodone and money laundering, while ten money orders totaling $3,330 and $997 in cash did not constitute such proceeds.  *Id.* at 14-17.

## LEGAL STANDARD

Motions seeking new trial are to be granted "if the interest of justice so requires." Fed. R. Crim. P. 33(a).  "Unlike a motion for judgment of acquittal, when ruling on a motion for a new trial 'the Court need not accept the evidence in the light most favorable to the government, and (it) may weigh the testimony and may consider the credibility of the witnesses.'"  *United States v. Howard*, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (citing *United States v. Edmonds*, 765 F. Supp. 1112, 1118-19 (D.D.C. 1991)) (alteration in original).

## ARGUMENT

**I.      Dr. Romanoff's Testimony Was Unreliable and Inadmissible Pursuant to Federal Rule of Evidence 702**

Dr. Mark Romanoff, the government's expert witness, testified for two and a half days of the twelve days of testimony put on by the government.  His testimony was the only testimony presented on the treatment given to patients Janice Whitby, Joshua Hosier, Kevin Wright, Linda Lopez, and Wayne Pointer (none of whom were named in the indictment or testified at trial); the only testimony that bore directly on the prescriptions received by indictment patient Johnny R. Jones Jr.; and the only testimony criticizing the treatment received by indictment patient Christi Townsend.  By his own admission, Dr. Romanoff's opinions rested entirely on a so-called "chart review" of a discrete set of Dr. Robinson's patient files.  However, despite acknowledging that

3

Dr. Robinson's complete paper files were appropriately considered as part of his analysis, Dr. Romanoff testified either without reviewing or reviewing only cursorily large portions of those paper files. This rendered his opinion inadmissible under Federal Rule of Evidence 702, and it should not have been presented to the jury. Furthermore, Dr. Romanoff improperly testified about the legitimacy of patients' prescriptions based only on his review of the medical records, failing to take into account testimony contradicting those medical records from the patients themselves. Given the significance of Dr. Romanoff's testimony to the government's case, the Court's errors with respect to Dr. Romanoff require a new trial.

A.    Background

Dr. Romanoff's grand jury testimony and expert reports referred generally to types of records reviewed for patients but did not identify those documents with specificity. *See, e.g.*, Chart Review of Ivan Robinson, FNP, at 1 (May 21, 2016) ("Documents were located in three locations: electronic medical record (Practice Fusion), on a laptop and also in paper files. This review includes documents from all of these sources where applicable."), Dkt. 51-3 (Mar. 7, 2017). The defense was provided in fall 2016 with a document production that included files labeled "Patient Files Reviewed by Dr. Romanoff." The files did not include Bates numbers or other methods of identifying the exhibits from which the documents came. *See, e.g.*, Gov't Ex. 312 (unstamped paper files of Christi Townsend). The defense accordingly moved for exclusion of Dr. Romanoff's testimony in November 2016 in part based on his failure to review all relevant information or identify particular portions of the records as the basis for his opinion. *See* Dkt. 33 at 11-12 & n.4 (Nov. 22, 2016).

In February 2017 defense counsel identified, during a visit to the DEA evidence room, several boxes of medical records that had not previously been provided to them and requested that those boxes be copied and sent to them. Feb. 13, 2017 Hr'g Tr. at 7:16-8:15. Counsel for

the government informed the Court that he did not know whether the medical records in those boxes—ultimately labeled as government's exhibits 26 and 27, among others—would be used at trial. *Id.* at 9:23-10:23.  In those boxes were medical records that pertained to patients in the indictment. *See, e.g.*, Def. Ex. L (additional medical records of Stephanie Dudzik).

Following its ruling on the defense's first motion *in limine*, the Court inquired with the defense at a status conference on June 26, 2017 as to whether any issues still needed to be addressed at the *Daubert* hearing.  The defense noted that "there's an overall argument here based on the work that [Dr. Romanoff] has done in this case is insufficient to render the somewhat sweeping opinions that he plans to issue and that's a reliability issue that is really at the heart of Daubert."  June 26, 2017 Hr'g Tr. at 22:23-23:2.  The defense further noted that it wished to further explore the nature of the work that Dr. Romanoff had done. *Id.* at 23:6-10.  The Court accordingly directed that the Daubert hearing would address what Dr. Romanoff "did in order to render his opinion that they claim is insufficient." *Id.* at 30:9-21.

At the Daubert hearing itself, the defense requested before beginning cross-examination to be permitted to "ask [Dr. Romanoff] about what he reviewed particularly with respect to each patient" in order to support their point that Dr. Romanoff had not reviewed all the required evidence for each patient or specified the basis for his opinion on each patient.  July 6, 2017 Hr'g Tr. at 41:20-42:6, 42:15-20.  The Court refused to permit this questioning and later refused to allow the defense to ask any questions outside the issue of whether "chart reviews" are appropriate ways to review records as a general matter. *Id.* at 42:21-43:8, 52:23-55:4.  Dr. Romanoff did testify generally that he "requested all the records pertinent to each patient" including handwritten forms or paperwork and that he considered such material in his review. *Id.* at 58:10-59:18.

At trial, after a day and a half of direct examination testimony, Dr. Romanoff revealed on cross-examination that he had not reviewed medical records from Defense Exhibits L, M, N, O, P, Q, R, S, or T before beginning his testimony.  Those exhibits totaled 233 pages, whereas the paper records that he had reviewed and based his opinion upon totaled only 120 pages.  *See* Gov't Exs. 312-326, 329-334, 337-340, 343-344, 347-350, 371-376, 379-383, 386, 391-392.  He had reviewed some of the files only before completing his direct examination and others not at all.  *See* July 31, 2017 Trial Tr. at 4139:13-4144:9.  Dr. Romanoff admitted that he would have wanted to see all of the charts for each patient before formulating his opinion, and indeed that it would have been "helpful" to see the medical records provided in the defense exhibits before opining on the validity of the prescriptions to these patients.  *Id.* at 4146:19-4147:11.  Furthermore, before being presented with a set of medical records for non-indictment patients Abbey Dockstadter, Janice Whitby, Joshua Hosier, Kevin Wright, Linda Lopez, and Wayne Pointer while being cross-examined, Dr. Romanoff had never seen those records other than patient MRIs.  Aug. 1, 2017 Trial Tr. at 4263:16-4264:14.  He agreed that these were the types of materials he would have considered when doing a chart review.  *Id.*  Nonetheless, he then went on to state in support of his failure to read or consider those records that he didn't "feel that the provider looked at" the paper medical records.  *Id.* at 4232:12-25.  Dr. Romanoff provided no basis whatsoever for this speculative—and highly prejudicial—assertion.

B.      Dr. Romanoff's Opinion Was Fundamentally Unreliable

The testimony of an expert is admissible only if: (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles

and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993).

1.    Failure to Review All Paper Records

Numerous courts have found that "an expert report lacked reliability where the expert did not review data he believed to be unavailable, when the data was, in fact, produced." *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 380 (S.D.N.Y. 2014) (citing *Lippe v. Bairnco Corp.*, 288 B.R. 678, 694 (S.D.N.Y.2003) *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 182 (S.D.N.Y. 2006)); *see also Pritchard v. Dow Agro Sciences*, 705 F. Supp. 2d 471, 490 (W.D. Pa. 2010) (finding expert testimony unreliable in product liability matter based in part on expert's "admitted failure to review all of [patient's] medical records"). It is fundamental that, if an expert goes so far as to admit that he would have liked to see particular documents before forming his opinion and that they are the types of documents he would have reviewed, as Dr. Romanoff did here, then his opinion and testimony cannot be based on sufficient facts or data. The mere fact that the government failed to locate and present him with these records—which had been sitting in its own evidence room for three years—does not render his opinion reliable.

Dr. Romanoff ultimately testified that the additional medical records presented to him by the defense did not change his opinion in part because he didn't "feel the provider looked at them." Aug. 1, 2017 Tr. at 4232:14-22, 4266:10-4267:1, 4281:9-22. This does not retroactively render his opinion reliable for several reasons. First, his failure to ensure that he had received all the relevant medical records is itself a reliability flaw. *See Faulkner*, 46 F. Supp. 3d at 381 (finding that "lawyer error" in selecting documents for an expert caused opinion to be "based on insufficient facts and data" when expert failed to "confirm[] that the records he reviewed were representative" of the available documents); *E.E.O.C. v. Bloomberg L.P.*, Civ. No. 07–

7

8383(LAP), 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010). Despite Dr. Romanoff's assertions in his initial reports that a good faith effort had been made to locate all of the relevant documents, in fact he personally did not participate in the location or selection of the paper documents with which he was presented and did not represent that his review was comprehensive: "I don't know that I have them all. I have what they gave me." July 31, 2017 Tr. at 4136:5-4137:8. Second, the out-of-hand manner in which Dr. Romanoff dismissed the additional medical records with which he was presented demonstrates that his conclusions were motivated rather than unbiased. Two portions of Dr. Romanoff's testimony highlight his failure to properly consider these additional records. First, when given six sets of medical records for the patients not identified in the indictment, which he was seeing for the first time, he flipped through them in mere minutes on the stand before concluding that they did not change his opinion, *See* Aug. 1, 2017 Tr. at 4263:12-4264:14, 4266:10-4267:1, 4281:9-22. Second, Dr. Romanoff's statement that Dr. Robinson didn't look at the paper medical records was made completely without basis. *Id.* at 4232:12-25. Dr. Romanoff did not speak with Dr. Robinson or any of his staff or review their testimony. He had no knowledge of the manner in which Dr. Robinson's records were kept. *Id.* at 4232:12-4233:6. And in fact there was no distinction between the paper records that the government shared with him and which he considered as part of his analysis and those that he decreed Dr. Robinson did not look at aside from the fact that he was not given the latter by the government. *See id.* at 4233:7-24. When "methodology [is] aimed at achieving one result," *Faulkner*, 46 F. Supp. 3d at 381, an expert's testimony is unreliable and should not have been put before the jury.

2.     Incomplete and Unreliable Chart Review

Dr. Romanoff's testimony was also improperly admitted insofar as he drew conclusions about the overall legitimacy of Dr. Robinson's prescriptions to particular patients based solely on

medical records.  Even setting aside the fact that Dr. Romanoff did not have all of the paper medical records, as detailed above, his methodology was in this case both under- and over-inclusive, as Dr. Romanoff disregarded crucial patient testimony about Dr. Robinson's treatment but based his opinion in large part on Practice Fusion files that were not relied on by the practice.

Although chart review may be a generally accepted method of evaluating treatment of a patient, even such standard medical methods of arriving at an expert opinion may be unreliable in particular circumstances.  *See Fitzgerald v. Smith & Nephew, Inc.*, 11 F. App'x 335, 341 (4th Cir. 2001).  If the "approach taken" by the expert "prevented him from becoming knowledgeable about material facts that were essential" to arriving at the opinion, the opinion may be excluded for a lack of reliability.  *Id.*  Here, patients testified, for example, that Dr. Robinson did perform physical examinations on them.  *See, e.g.*, July 24, 2017 Trial Tr. at 2717:19-2718:1 (testimony of Christi Townsend that Dr. Robinson "checked everywhere down [her] spine" on her first visit); July 26, 2017 Trial Tr. at 3254:22-24 (testimony of Denise Thomas that Dr. Robinson "felt for [her] back and hip pain" at her first visit).  Despite this, Dr. Romanoff testified that there was "no evidence" of a physical examination in Christi Townsend's records and therefore that she and Dr. Robinson lacked a patient-provider relationship.  *See* July 28, 2017 Trial Tr. at 3904:25-3905:19, 3922:9-3923:16, 3928:8-12.  He testified even more broadly about Denise Thomas that there was "*no* evidence at this point in time on 11-4-2011 that [Ms. Thomas] had any interactions whatsoever with this provider."  July 31, 2017 Trial Tr. at 4006:20-25.  Dr. Romanoff's approach disregarded evidence that was plainly available to him in the form of patient testimony and that a reasonable expert would have taken into account where it contradicted records.  Such a methodology renders his opinion unreliable.

Dr. Romanoff also relied very heavily on records from Dr. Robinson's electronic Practice

Fusion system in generating his opinions.  Over the course of the trial, it was established that Dr.

Robinson and his staff did not meaningfully use electronic Practice Fusion records in his daily

clinical practice.  Moreover, there was no evidence presented that Dr. Robinson ever  directly

accessed Practice Fusion.  Monica Watson and E'rika Brock, members of Dr. Robinson's staff,

testified to that effect during a voir dire of defense witnesses prior to Dr. Romanoff's testimony.

*See, e.g.*, July 25, 2017 Trial Tr. at 2858:21-2859:5 (testimony of Monica Watson that Dr.

Robinson "used paper records wherever he was treating patients").  Yet Dr. Romanoff opined at

length that Dr. Robinson's Practice Fusion records were deficient and contained "cloned"

material or inapplicable material and that these deficiencies caused Dr. Robinson's prescriptions

to be invalid.  *See, e.g.*, July 28 Trial Tr. at 3909:24-3913:1 (testifying that the appearance of a

repeated diagnosis in Practice Fusion was not proper medical practice).  By using the Practice

Fusion records as the primary evidence of Dr. Robinson's actions while disregarding paper

records and patient testimony about what actually took place, Dr. Romanoff cherry-picked the

least reliable reflection of Dr. Robinson's practice.  This is not the methodology of a reliable

expert.

Dr. Romanoff was the government's closing witness and its only expert witness.  His

opinions were a centerpiece of the government's closing as controlling "[t]he only element that is

in dispute."  *See* Aug. 7, 2017 Trial Tr. at 5023:20-5027:13.  In fact, counsel for the government

explicitly noted that the jury "heard from one expert in this case."[1]  *Id.* at 5023:24.  And the jury

---

[1]  The government's comment that the jury "heard from one expert in this case" also constituted
impermissible burden shifting, as it implied that the defense had an obligation to call witnesses.
Aug. 7, 2017 Trial Tr. at 5023:24.  This is, of course, incorrect.  The government has the burden

convicted on numerous charges, including those related to Christi Townsend and Johnny R. Jones Jr. where the only inculpatory information presented about Dr. Robinson's medical care of the patient was introduced through Dr. Romanoff.[2]  Accordingly, the admission of Dr. Romanoff's testimony undermines the validity of Dr. Robinson's trial and constitutes reversible error.

## II.   Dr. Robinson Is Entitled to a New Trial Due to Cumulative and Highly Prejudicial Evidentiary Errors

### A.   The Court Erred in Admitting Evidence of Other Alleged Bad Acts With No Connection to the Charges in the Indictment

Throughout the course of the trial, the Court permitted the government to introduce evidence about Dr. Robinson's "overall" practice—generalizations about unidentified patients who allegedly received prescriptions for unspecified injuries.  This evidence invited the jury to speculate about possible illegal conduct committed by Dr. Robinson that was not charged in the indictment.  Most glaringly, the Court permitted the government to have various pharmacists testify about decisions they made not to fill Dr. Robinson's prescription that were based on the appearance and number of unidentified patients.  The government also repeatedly introduced

---

to prove its case beyond a reasonable doubt whether the defense calls any witnesses, expert or lay.

[2]  The government further compounded the prejudicial effect of this evidence by misconstruing the evidence about Ms. Townsend in closing.  *See United States v. Watson*, 171 F.3d 695, 699 (D.C. Cir. 1999) ("It is error for counsel to make statements in closing argument unsupported by evidence, to misstate admitted evidence, or to misquote a witness' testimony.").  During closing argument, the prosecution argued that "Christi Townsend said that the defendant never asked her how she was doing."  Aug. 7, 2017 Trial Tr. at 5035:16-22.  By contrast, during her testimony, Ms. Townsend testified that she discussed her pain with Dr. Robinson "[c]onstantly."  July 24, 2017 Trial Tr. at 2718:14.  This misstatement was material to the government's case against Dr. Robinson.  The nature of Dr. Robinson's interactions was critical to the prosecutions' argument in seeking to convict Dr. Robinson.  The prosecution tied this failure to the legitimacy of the prescriptions these patients received.  *See* Aug. 7, 2017 Trial Tr. at 5027:8-12 ("You'll recall Dr. Romanoff said that without this therapeutic relationship, with this patient/provider relationship, that the prescriptions written, if they're written without that relationship, that's not a medical transaction.").

evidence of the number of patients seen by Dr. Robinson, the number of money orders purchased in Dr. Robinson's neighborhood, and the number of money orders Dr. Robinson received. This evidence was irrelevant to the indicted charges and extremely prejudicial to Dr. Robinson. The admission of this evidence alone requires a new trial.

        1.        Improper Testimony by Pharmacists

Over the defense's objections, the government was permitted to call four pharmacists who testified about their decisions to stop filling Dr. Robinson's prescriptions. On direct examination each of them spoke in generalities about both the volume of prescriptions they were receiving and the types of patients or prescriptions that caused them to become uncomfortable. For example, DeLisa Winston, chief pharmacist at Grubbs pharmacy, was permitted to testify in general about the volume of prescriptions written by Dr. Robinson:

> Q: What other observations did you make about the type of prescriptions that you were seeing?
>
> A: The types of prescriptions?
>
> Q: Well, what was the drug?
>
> A: Oxycodone. Basically, one of the reasons that I did reach out was because the patients were receiving the exact same medications. **So there were a lot of oxycodone prescriptions.** They were usually 30 milligrams, and they typically would be the same quantities for each patient.

*See* July 18, 2017 Trial Tr. at 1717:9-17. Vincent Ippolito of Northgate Pharmacy asserted that he received "multiple prescriptions" from Dr. Robinson "in any given day," and that Dr. Robinson's patients were "fairly healthy" and "young." *Id.* at 1729:18-1730:6. Joseph Penzenstadler of Accokeek Drug & Healthcare testified that Dr. Robinson's patients "all seemed to be younger" and that Dr. Robinson's practice was "too sketchy for us to deal with." *Id.* at

1812:1-14.  On redirect examination by the government, Mr. Penzenstadler testified regarding

the number of prescriptions he filled overall:

> Q. Of all those prescriptions, how many were for oxycodone?
>
> A. 38.
>
> Q. And --
>
> A. 38 -- wait -- 39 -- 40. Including on the second page the
> oxycodone 15 and the Percocet.
>
> Q. And how many were for a drug other than oxycodone?
>
> A. Six.

*Id.* at 1818:17-25.  Finally, pharmacist Karen Thompson was permitted to testify that:

> We just stopped filling because it was kind of questionable. A lot
> of the patients were young, in their early 20s. A lot of them male.
> They didn't seem to have any physical ailments. And it was just
> the volume of prescriptions we were getting it was just kind of
> questionable. I didn't think the oxycodone was being used for, like,
> a legitimate medical use.

July 20, 2017 Trial Tr. at 2318:16-22.

With the exception of the redirect testimony of DeLisa Winston, who identified Chris

Lusby as one patient who attempted to fill a prescription, *none* of the testimony from the

pharmacists was tied to prescriptions in the indictment, patients in the indictment, or even to any

particular patient at all.  *See* July 8, 2017 Trial Tr. at 1724:1-18 (Winston redirect).  That patients

were "young" or appeared "healthy" to the pharmacists, or that they were mostly male, has no

proper bearing on whether the prescriptions in the indictment were written within the bounds of

legitimate medical practice.

The government has argued in the past that this testimony is relevant because it

demonstrates Dr. Robinson's state of mind insofar as he was aware that pharmacists were

refusing to fill his prescriptions.  Although Ms. Thompson testified that she spoke with Dr.

Robinson on one occasion, *see* July 20, 2017 Trial Tr. at 2319:19-2320:7, there was no

testimony—none—that Dr. Robinson was ever told by either patients or pharmacists that his

prescriptions were being refused.  As a result, the admission of the testimony cannot be justified

on these grounds.  Nor did the government use the evidence that way in closing.  Instead, counsel

stated that the pharmacist testimony proved that "something was not right" and that there were

"red flags" in Dr. Robinson's practice.  Aug. 7, 2017 Trial Tr. at 5065:1-5067:17.

In short, both at trial and during the government's closing argument, the government used

the pharmacists' testimony essentially as expert testimony on whether Dr. Robinson's practice

was legitimate.  Yet the pharmacists were not noticed as expert witnesses, they were not

qualified to issue expert opinions about the legitimacy of prescription writing, as opposed to

prescription dispensing, and they lacked either a reliable methodology or sufficient facts and data

to support an opinion that Dr. Robinson's practice was improper.

2.      Improper Testimony About Dr. Robinson's Patient Volume and Income in
        Money Orders

The government elicited testimony from numerous fact witnesses with no knowledge of

the medical treatment Dr. Robinson  provided to his patients.  The testimony of these non-

medical witnesses did not go to the critical issue of Dr. Robinson's liability under the governing

standard.  Instead, they served only to suggest that Dr. Robinson saw many patients and made

significant amounts of money from his medical practice.  This evidence was irrelevant and

unduly prejudicial to Dr. Robinson.

First, the number of patients seen by Dr. Robinson is not relevant to whether Dr.

Robinson illegally prescribed oxycodone.  From the outset of this case, the government

repeatedly relied on evidence of patient volume—volume unconnected to any alleged illegal

prescriptions.  As the Court made clear, the government was permitted to use volume evidence

only "to support the conclusion that particular patients were issued prescriptions illegally, and not in an attempt to prove that Defendant acted illegally with all of the patients in his entire practice." Order at 5, Dkt. 130 (June 26, 2017). Despite this admonition, the government elicited testimony about the volume of patients who saw Dr. Robinson without any link between those patients and any illegal prescriptions. The government elicited testimony that "a lot of cars" parked at the bank across the street before walking over to Dr. Robinson's office. July 18, 2017 Trial Tr. at 1875:7-1876:2. Agent Jerome Lee testified that there was "a crowd" in Dr. Robinson's office and that "there was [*sic*] no seats available." July 20, 2017 Trial Tr. at 2341:6-22. The prosecution read a letter to the jury noting that Dr. Robinson could "accommodate up to 40 spinal care clients per day." July 18, 2017 Trial Tr. at 1640:2-3.

At no point in the trial did the government make any connection between the number of patients who visited Dr. Robinson's practice and the legitimacy of the prescriptions issued to any particular patients. This evidence served only to show prejudice Dr. Robinson by suggesting to the jury that each of these patients received illegal prescriptions for oxycodone, despite not a single piece of evidence that any of these patients received any prescription, proper or improper, from Dr. Robinson. Consequently, the introduction of this evidence directly contravened the Court's order and unfairly prejudiced Dr. Robinson.

Second, the government improperly argued that the number of money orders purchased proximate to Dr. Robinson's office was probative of his guilt, despite the absence of any evidence of a connection between these money orders and any unlawful prescriptions. For example, pharmacist Sahr Bockai Jr. testified that before Dr. Robinson's practice was shut down, Mr. Bockai sold as much as $11,000 in $370 money orders per day to as many as 30 patients. July 14, 2017 Trial Tr. at 1218:2-25. After this testimony, the Court recognized that the

15

government still "need[ed] a better nexus" to link the money orders to illegal prescriptions.  July 18, 2017 Trial Tr. at 1837:11-12.  The government never proffered any evidence that the money orders sold by Mr. Bockai, other than those sold to the undercover agents, were in any way linked to prescriptions for oxycodone.  In fact, the Western Union records presented by the government, which were considerably less in volume than Mr. Bockai's testimony, demonstrated clearly that Mr. Bockai's testimony was either in error or that the money orders he recalled selling were not being given to Dr. Robinson.  *See* July 28, 2017 Trial Tr. at 3751:14-3755:23 (testimony of Investigator Lofton that the maximum dollar amount of $370 money orders sold per day was $5186, to 14 patients).  Despite failing to draw such a link, the government improperly argued that these money orders were evidence that "something was not right."  Aug. 7, 2017 Trial Tr. at 5068:13.

Despite these failures of proof, the government argued that the number of Dr. Robinson's patients who purchased money orders was evidence that his whole practice was unlawful.  The government argued that there was "something wrong" with the sale of any money orders to Dr. Robinson's patients, and that "after the search warrant of the defendant's office was served in June 2013, money order sales went down."  Aug. 7, 2017 Trial Tr. at 5068:13-19.  The government's argument that the volume of these money orders showed that "something was not right" unfairly prejudiced Dr. Robinson.

Third, the government argued that the number of money orders received by Dr. Robinson's office was indicative of the number of illegal oxycodone prescriptions he issued.  The Court held that such evidence was relevant "to the extent it shows that Defendant received funds from the illegal sale of prescriptions during the relevant time frame[.]"  Dkt. 130 (June 26, 2017).  The government told the jury that "[a]s long as they had that money order, they would

get their prescription."  Aug. 7, 2017 Trial Tr. at 5172:25-5173:1.  Despite the government's

contention that every money order Dr. Robinson received represented an illegal prescription, the

government could not muster any evidence to suggest that.

As an initial matter, the government could not show which money orders were connected

with which prescriptions because it did not know how much patients paid Dr. Robinson for a

visit to his office.  In its opening statement, the government said that money orders purchased by

the patients in the indictment would be relevant evidence in the case, "whether it be $350, $370."

July 13, 2017 Trial Tr. at 719:10.  The testimony of bank employees reflected that the

denominations "would be 340 to 370."  July 19, 2017 Trial Tr. at 1925:10; *see also id.* at

1942:25-1943:1 ("the money orders ranged anywhere from, like, 340 to 370, 375 maybe").

Likewise, the testimony of patients revealed that many of them paid Dr. Robinson in varied

amounts.  *See* July 25, 2017 Trial Tr. at 2913:24 (Chris Lusby: "300 and something dollars"); *id.*

at 2954:12 (Kevin Copsey: "Roughly, it was, like, 250"); *id.* at 3108:19 (Stephanie Dudzik:

"between 175 and 275"); July 26, 2017 Trial Tr. at 3179:1 (Jesse Goble: "375"); *id.* at 3233:25

(Denise Thomas: "$300").

Despite this evidence that prescriptions were issued in various amounts and there was no

consistency in the amount that patients paid, the Court found that "there is enough link between

$370 money orders and patients receiving prescriptions for oxycodone from the Defendant for

Investigator Lofton's testimony about $370 money orders to at least be relevant."  Order at 2,

dkt. 204 (July 27, 2017).  The Court based its ruling, in part, on "testimony that a pharmacy

across the street from Defendant's clinic—to which Defendant directed his patients to go—was

selling $370 money orders to many of Defendant's patients on a daily basis."  *Id.*  As discussed

above, however, Mr. Bockai's testimony could not link the money orders he sold to Dr.

17

Robinson.  The only testimony elicited as to why Mr. Bockai believed his customers were Dr. Robinson's patients was that they were "not from the area."  *See* July 14, 2017 Trial Tr. at 1225:11-1226:25.  This is insufficient to show that Dr. Robinson "received funds from the illegal sale of prescriptions," as required by the standard set by the Court.

Despite having failed to meet this standard, the government nevertheless elicited testimony from Investigator Lofton about the volume of $370 money orders deposited into Dr. Robinson's accounts at PNC Bank and Bank of America, as well as the total number of $370 money orders.  The Court had ruled that only the prescriptions of the indicted patients and the 404(b) patients analyzed by Dr. Romanoff could be introduced, because without Dr. Romanoff's opinion, there was no basis for finding that any prescriptions were issued unlawfully.  Nonetheless, Investigator Lofton testified about more than 500 money orders received by Dr. Robinson's practice.  July 27, 2017 Trial Tr. at 3701:15-3702:3.  This represented far more prescriptions than could be attributed to the patients the Court permitted the government to discuss, and the government used these money orders as a back door to introduce evidence about hundreds of prescriptions, leading to impressions of Dr. Robinson's overall practice, that the Court had found were unfairly prejudicial.  The testimony of Investigator Lofton, Mr. Bockai, and the bank employees that Dr. Robinson's practice received money orders in various denominations—without any connection to allegedly illegal prescriptions for oxycodone—unfairly prejudiced Dr. Robinson by allowing the government to argue that his entire practice was unlawful.

In closing, the government urged the jury to page through the hundreds of money orders: "When you go into the jury deliberation room, you're going to have a binder from Western Union that has all these money orders in it.  You're going to have a binder from PNC Bank that

has these money orders in it.  I urge you to go through that and look at how many of them were actually stamped. . . .  He wanted them left blank so that there could be no way to trace them to these particular patients."  Aug. 7, 2017 Trial Tr. at 5060:16-25.  The government told the jury, "When you go in the back, though, you'll have a binder from Western Union that contains the range that Detective Lofton originally used in her investigation, which I believe was 340 to 375, so you can see for yourselves how many money orders really came out of that Western Union." *Id.* at 5170:9-14.  This argument was contrary to the Court's order and unfairly prejudiced Dr. Robinson.

To ensure that the government did not unfairly prejudice Dr. Robinson, the Court ordered that before the government make any argument based on volume, "we're going to go through as to whether they have a basis to make any argument."  July 18, 2017 Trial Tr. at 1801:1-3. Nevertheless, without any forewarning to the defense or the Court, the government argued that the volume of patients seen by Dr. Robinson, the number of money orders sold by a nearby pharmacy, and the number of money orders received by Dr. Robinson were evidence that he illegally sold oxycodone hundreds of times.

B.    The Government's Case Improperly Relied on the Racial Composition of Dr. Robinson's Patient Population

Dr. Robinson is entitled to a new trial due to the government's improper reliance on the racial makeup of his patient population to establish guilt.  The D.C. Circuit has held that evidence or prosecutorial remarks that allude to race are improper.  *See United States v. Doe*, 903 F.2d 16, 26 (D.C. Cir. 1990) ("Even if brief, use of race as a factor in closing argument [is] improper.") (internal quotation marks omitted); *id.* at 20 (expert testimony was irrelevant because it had "no bearing upon any claimed defense or other issue at trial, and was openly allusive in linking the drug charges to appellants solely on the basis" of ancestry); *see also*

*United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 212 (D.D.C. 2015).  Such evidence runs afoul of a criminal defendant's right to a fair trial because "[u]ndeniably, prosecutorial remarks kindling racial or ethnic predilections can violently affect a juror's impartiality."  *Doe*, 903 F.2d at 28 (internal quotation marks omitted).  Similarly, so-called "racial incongruity" arguments, where a person of any race is allegedly "out of place" in a particular geographic area, are never a sufficient basis for forming a suspicion of criminal activity.  *See Farag v. United States*, 587 F. Supp. 2d 436, 463 (E.D.N.Y. 2008) ("Those courts that have squarely addressed the incongruity argument have uniformly rejected it.") (citing cases).  The evidence introduced by the government used racial incongruity and other coded racial references in order to prejudice the jury.

Dr. Robinson moved *in limine* to exclude all testimony concerning the locations or distance from which certain individuals traveled to visit his office and the racial composition of his practice.  *See* Dkt. 74 (May 3, 2017).  Dr. Robinson argued *in limine* that testimony about Dr. Robinson's patient population "differ[ing] from the surrounding neighborhood" would encourage the jury to consider as substantive evidence the racial composition of Dr. Robinson's practice in assessing whether he failed to practice medicine in good faith.  Dr. Robinson argued that such evidence should be precluded because it was irrelevant and would cause substantial prejudice to Dr. Robinson.  *Id.* at 2-3.

In response, the government stated that "observations about the racial composition of [Dr. Robinson's] practice might be offered by some witnesses," but conceded that such evidence "is not probative of any relevant factor in this prosecution."  Dkt. 85 at 3 (May 17, 2017).  The Court subsequently granted Dr. Robinson's motion in part, declaring: "The jury should not be

invited to base its decision in any way on the race of Defendant's patients." Dkt. 137 at 2 (June 30, 2017).

The government's evidence and argument referring to the racial composition of Dr. Robinson's medical practice and its incongruity to the surrounding neighborhood constituted prejudicial error that requires a new trial. Despite the Court's ruling, the government repeatedly made reference to the composition of Dr. Robinson's patient population in a way that invited the jury to base its decision on racial stereotypes and bias.

The location of Dr. Robinson's practice was not in dispute. Nevertheless, the government specifically asked seven of Dr. Robinson's patients to testify about Dr. Robinson's office being on Martin Luther King, Jr. Avenue or near the "Big Chair." *See, e.g.*, July 27, 2017 Trial Tr. at 3508:21-23, 3512:22-24 (repeatedly asking about Martin Luther King, Jr. Avenue) (R. Long); July 26, 2017 Trial Tr. at 3379:8-11, 3436:14-16 (repeatedly asking about Martin Luther King, Jr. Avenue) (T. Raum). Moreover, the government drew attention over multiple days at trial to the "Big Chair" as a "distinctive landmark" of Anacostia, a primarily African-American Southeast D.C. neighborhood. For example, the following exchanges occurred during the government's questioning of Dr. Robinson's patients:

- "Q: Do you remember a landmark near the building that was somewhat prominent and unusual? A: There was a bank right across the street. . . . Q: Do you remember a furniture store that had a big chair out front?" *See* July 24, 2017 Trial Tr. at 2616:15-2617:2 (C. Townsend);

- "Q: And so the Big Chair was what, a landmark?" July 25, 2017 Trial Tr. at 2909:10 (C. Lusby);

- "Q: Do you remember a feature, something that drew your attention to the particular area? A: A bank across the street. . . . Q: Did you see a big chair when you were out there? A: A big chair out in front of the bank? Q: No.  In that area where you went.  It's okay.  You remember Martin Luther King Jr. Avenue?" *Id.* at 2944:7-16 (K. Copsey);

- "Q: Do you remember any distinctive landmark in the area about where Mr. Ivan Robinson's practice was located?" July 26, 2017 Trial Tr. at 3176:11-13 (J. Goble);

- "Is the Big chair a prominent landmark you're referring to?" *Id.* at 3227:7-15 (D. Thomas).

The government also elicited testimony that the individuals associated with Dr. Robinson's medical office were "not from the neighborhood."  *See* July 14, 2017 Trial Tr. 1225:11-14; July 17, 2017 Trial Tr. at 1399:8-15 (bank employee testified "just based on the type of customer that was coming in, it didn't appear that they either worked or lived in the area").  And during the trial and in closing argument, the government emphasized the distance traveled by Dr. Robinson's patients.  *See* Aug. 7, 2017 Trial Tr. at 5045:7-8 ("He said that he traveled all the way from Mechanicsville, Maryland, over an hour away . . . ."); *see also, e.g.*, July 26, 2017 Trial Tr. at 3414:18-19 ("Q: And that's why you traveled so far, right, to Washington, D.C.?") (T. Raum); July 18, 2017 Trial Tr. at 1876:10-13 ("Q: Was there anything else unusual that you noticed about all these vehicles?  A: Most of them were Maryland tags. And we were in D.C.  But there would be Maryland tags.").

The government's evidence and argument invited the jury to base its decision on stereotypes about the Anacostia neighborhood and people who are "not from the neighborhood." The government's evidence about the location of Dr. Robinson's practice as near the "Big Chair" and calling Dr. Robinson's patients "not from the neighborhood" was prejudicial and improper

here.  The government's repeated use of location invited the jury to see geography as a proxy for race, particularly given that the "Big Chair" and the surrounding neighborhood were entirely irrelevant to any facts in issue.  Even veiled references to race are improper in a criminal trial where they bear no relevance to the issues.  Therefore, the government's evidence and argument ran afoul of Dr. Robinson's right to a fair trial.

### III.   The Court Erred in Admitting Statements Made by Dr. Robinson While in the Custody of the DEA Task Force

Dr. Robinson, stripped of his possessions and car keys and having had his mug shot taken, surrounded by law enforcement, gave statements to the DEA that were taken in violation of his *Miranda* rights.  The evidence to support this conclusion was presented during three days of pre-trial suppression hearings and was highlighted during Dr. Robinson's four-week trial.  Because the Court admitted Dr. Robinson's statements over his objections and because Dr. Robinson's statements to the DEA formed the core evidence of the government's version of how Dr. Robinson practiced, this Court should grant a new trial.

The government conducted near-simultaneous raids on multiple locations associated with Dr. Robinson on June 19, 2013.  These raids were conducted so the DEA could seize Dr. Robinson's property and interrogate him about his medical practice.  May 31, 2017 Hr'g Tr.  at 54:19-55:10 (D.I. Powell testifying that "the plan was for him to be home" and to attempt to get him to surrender his DEA license).  It is undisputed that agents associated with the DEA interrogated Dr. Robinson during that search.  *See* July 13, 2017 Trial Tr. at 887:2-13, 893:7-10.  It is similarly undisputed that Dr. Robinson was not provided a *Miranda* warning.  *Id.* at 889:1-10.  The only question before the Court is whether Dr. Robinson was "in custody" for Miranda purposes when the statements were made.

Dr. Robinson's statements were inadmissible because he was not adequately apprised of his right against self-incrimination prior to undergoing custodial interrogation. *See, e.g.*, *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S. Ct. 2638, 2643-44 (1990). A person is in "custody" under *Miranda* when he "has been . . . deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Whether a person is in custody depends upon "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980).

Dr. Robinson was clearly in custody because the actions of the agents and police would lead a reasonable person to believe he was in custody and because Dr. Robinson believed he was in custody. The agents' questioning was an interrogation because they admitted under examination that the purpose of their questioning of Dr. Robinson was to elicit a confession and get Dr. Robinson to relinquish his DEA license. The government agents admitted they made no attempt to provide *Miranda* warnings to Dr. Robinson, and so the statements he made while in custodial interrogation are inadmissible.

From the moment Dr. Robinson arrived at his offices on the morning of his June 19, 2013 interrogation, the atmosphere was dominated by the presence of law enforcement. After parking his car near his offices at 2021 and 2041 Martin Luther King, Jr. Avenue Southwest Dr. Robinson saw each office being raided. May 31, 2017 Hr'g Tr. at 53:11-17 (D.I. Powell testifying there was a cordon around the buildings to control who could enter the search area).

The street in front of his office and area around it had a significant number of marked and unmarked police cars.  *Id.* at 46:2-3 (D.I. Powell testifying "we had vehicles all over the place, not specifically on [MLK Ave]").  The police who initially raided his offices wore in flak jackets and had weapons.  *Id.* at 48:23-25.  Approximately thirty-seven officers and agents flooded the two offices during the search.  *Id.* at 52:12-15 ("there were so many people, I cannot recall"); June 22, 2017 Hr'g Tr. at 98:23-99:2 (Agent Lee testifying that there were thirty-seven officers).  There were police officers in uniform at the door to his office.  Dr. Robinson was approached by one of those officers and co-lead case agent D.I. Shirley Powell while still on the sidewalk, before he even entered his office. May 31, 2017 Hr'g Tr. at 56:3-6, 60:2-11.

Upon his arrival, Dr. Robinson was subjected to the hallmarks of involuntary detention. Agents frisked Dr. Robinson; seized his driver's license, military identification, credit cards, cash, and paperwork; and took his mugshot.  June 22, 2017 Hr'g Tr. at 75:11-14; 90:13-91:7; 106:1-16; 107:19-21; 108:20-25; 112:4-11; 114:3-115:1, 117:1-8.  In addition, D.I. Powell never told Dr. Robinson that he was *not* under arrest.  May 31, 2017 Hr'g Tr. at 72:8-10.  After taking all of Dr. Robinson's possessions, Agent Lee told Dr. Robinson he was free to leave but if he left he could not come back.  June 22, 2017 Hr'g Tr. at 122:13-18, 123:17-21.  In other words, Agent Lee told Dr. Robinson he could leave if he wanted to give up his driver's license, military identification, car keys, and the $997 in cash that had just been seized and catalogued.  This was not a meaningful choice.  It was a coercive tactic that forced Dr. Robinson to remain with Agent Lee and constituted custody.  *See Berkemer*, 468 U.S. at 442.

Having effectively deprived Dr. Robinson of any means to depart from the scene, agents questioned Dr. Robinson in another doctor's small office.  An unidentified police officer stood in the doorway, obstructing Dr. Robinson's ability to leave.  May 31, 2017 Hr'g Tr. at 70:18-21.

Agent Arikpo and D.I. Powell were in the room, leading the interrogation.  They asked questions of Dr. Robinson about his prescribing practices that they hoped would elicit a confession.  Agent Nacieve Owens joined for part of the interrogation, as did Agent Mark Donatelli.  July 14, 2017 Trial Tr. at 1045:20-1046:25.  These agents assisted in the interrogation, specifically questioning Dr. Robinson about his medical practice and calling him a liar in response to Dr. Robinson's answers.  *See id.* at 1063:16-1065:16.  Even after the interview ended, Dr. Robinson was not free to go because the police still had custody of his driver's license, keys, and money.

These circumstances would lead a reasonable person to believe he was in police custody.  But Dr. Robinson's actions also show that *he* believed he was in custody and not free to leave.  During the course of the interview, Dr. Robinson asked whether D.I. Powell and Agent Arikpo could take him to the pharmacy to obtain his prescription medication.  May 31, 2017 Hr'g Tr. at 72:19-24.  D.I. Powell told Dr. Robinson she would not.  *Id.*  This request clearly indicates Dr. Robinson's belief that he was not free to leave, but rather needed the police to agree to escort him.  Although D.I. Powell testified that she understood the request to be because Dr. Robinson needed a ride, *see id.* at 76:7-10, there was in fact at least one pharmacy within easy walking distance that would have been accessible to Dr. Robinson without a car or transportation by D.I. Powell.  *Id.* at 75:9-19.  Accordingly, Dr. Robinson's question demonstrates that he remained in the interview with law enforcement because he believed, as a reasonable person would, that he was in police custody.

## IV.    Dr. Robinson Should Be Granted a New Trial Because Overt Prosecutorial Misconduct Prejudiced His Right to a Fair Trial

Dr. Robinson should be granted a new trial because the trial was infected with numerous instances of prosecutorial misconduct.  "[S]erious prosecutorial misconduct may so pollute a

criminal prosecution as to require dismissal of the indictment or a new trial, without regard to prejudice to the accused." *United States v. McCord*, 509 F.2d 334, 349 (D.C. Cir. 1974).

Perhaps most glaringly, the prosecution elicited false testimony from one of its earliest witnesses, Sahr Bockai Jr.  In addition, the prosecution further biased the proceedings and prevented Dr. Robinson from receiving a fair trial by failing to instruct one of the government's witnesses, Robert Long, not to testify about the highly prejudicial and plainly excluded subject of Johnny R. Jones's death.  Finally, concerns about prosecutorial misconduct remain – the government has represented that it is conducting an "additional review" of the evidence in response to the defense's recent *Brady* requests, more than two months after trial.  Together, these actions constitute serious prosecutorial misconduct that must be remedied by granting Dr. Robinson a new trial.

A.   Violations of *Brady*, *Napue*, and the Jencks Act Requires a New Trial

The government plainly violated *Brady*, *Napue*, and the Jencks Act by withholding, until well after one of its earliest witnesses' testimony, exculpatory evidence of a prior statement that disproved a material falsehood.

On July 14, 2017, the government called Mr. Bockai as its second witness in the case. Over the defense's objection that Mr. Bockai's testimony was unfairly prejudicial and prohibited by the Court's order regarding volume evidence, Mr. Bockai was permitted to testify about the volume of money orders he sold.  July 15, 2017 Trial Tr. at 1215:12-1217:23.  He testified that he sold between $8,000 and $11,000 in money orders daily.  *Id.* at 1218:7-10.  He further testified, and counsel for the government repeatedly reinforced, that Mr. Bockai sold these money orders shortly after opening his store at 9:00 a.m.  *Id.* at 1218:14-1220:15.  The government sought to imply to the jury that it was odd to sell so many money orders early in the morning.  *See id.* at 1220:12-14 ("Well, in 2001, did you have people lined up 30 people deep at

9:00 a.m. in the morning to buy $370 money orders?").  Mr. Bockai then testified that he personally called Western Union to ask about the money orders.  *Id.* at 1220:19-1221:2.

In earlier statements to the government agents investigating Dr. Robinson, Mr. Bockai made different statements that are favorable to Dr. Robinson.  But the DEA-6 containing the report of Mr. Bockai's interview was not produced by the government until July 21, 2017, a week after Mr. Bockai had testified at trial, and only then after repeated requests from the defense that the government provide interview notes and other evidence relating to Mr. Bockai. *See* Gov'ts Resp., Dkt. 195 (July 22, 2017); Ex. A at 1 (July 21, 2017 email from defense counsel to the Court regarding Bockai DEA-6).  In a 2013 interview with government agents who were investigating Dr. Robinson, Mr. Bockai said that he sold only between $6,000 and $8,000 in money orders during the period when Dr. Robinson was practicing.  *See* Ex. A at 4 (Bockai, Jr. DEA-6).  This is several thousand dollars less than what Mr. Bockai testified at trial. *Compare* July 14, 2017 Trial Tr. at 1218:7-10 (testifying he sold between $8,000 and $11,000 in money orders daily).  In addition, he told them that he had concerns about the volume of money orders he was selling, so he asked his uncle—not Western Union—whether that was permissible. His uncle told him that it was not suspicious.  *See* Ex. A at 3 (Bockai, Jr. DEA-6).  Mr. Bockai further told agents that individuals purchased money orders between 9:00 a.m. and 1:00 p.m.  *Id.* at 4.  His testimony about time and amount of sales of money orders directly contradicts the government's assertion that dozens of individuals were lined up outside Mr. Bockai's pharmacy every morning.

The government has conceded that Mr. Bockai "could have been confronted with the figures recorded in the DEA-6 report, if the report were available to the defense."  Gov'ts Resp., Dkt. 195 (July 22, 2017).  The government thus meaningfully deprived Dr. Robinson of the

ability to conduct an effective cross examination of one of the government's leading witnesses in this case.  The government's failure to produce Sahr Bockai Jr.'s interview record before putting Mr. Bockai Jr. on the stand to testify, despite misrepresenting to this Court it had produced all *Brady* and *Giglio* material,[3] violates its obligations under *Brady*, *Napue*, and the Jencks Act and warrants a new trial.[4]

> B.     The Prosecution's Failure to Instruct Robert Long About the Scope of His Testimony Also Constituted Prosecutorial Misconduct

The prosecution also committed misconduct when it failed to instruct a government witness not to discuss the highly prejudicial fact that one of Dr. Robinson's patients, Johnny R. Jones, had passed away.  The defense moved *in limine* to exclude all evidence of uncharged patient deaths because, among other reasons, such evidence was irrelevant and likely to cause substantial, unfair prejudice to Dr. Robinson.  *See* Dkt. 68 (May 3, 2017).  The Court granted the defense's motion, reasoning that:

> [I]f the jury were to hear testimony about Defendant's patients or their acquaintances suffering oxycodone overdoses or similar events there is a significant risk that they would speculate that Defendant had caused these results and seek to punish Defendant for doing so. It would also risk inviting the jury to render a verdict

---

[3] The government represented on numerous occasions that it had complied with its discovery obligations, only to reveal later that those assertions were incorrect.  For example, the government represented that it turned over DEA-6 reports relating to the pharmacists six months before trial.  July 14, 2017 Trial Tr. at 1254:24-25 ("They had DEA-6 reports of interview since before December of all these pharmacists.").  That representation was incorrect, and only the following day (in July, during trial) did the government turn over the DEA-6 reports of the pharmacist witnesses Karen Thompson, Joseph Penzenstadler, and Vincent Ippolito.  *See* Def.'s Supp. Br. Regarding Admission of Pharmacist Testimony at 2, dkt. 181 (July 15, 2017).

[4] The government also failed to provide the complete set of audio and video tapes from its undercover investigations, as well as Agent Lee's or Agent Arikpo's notes from Agent Lee's June 19, 2013 undercover visit to Dr. Robinson's office, despite the fact that there were notes and recordings for Agent Lee's two previous visits to Dr. Robinson's office.  *See* Aug. 3, 2017 Trial Tr. at 4848:5-4849:21; July 20, 2017 Trial Tr. at 2196:24-2197:14 (Agent Adams testified the recording of her March 11, 2013 phone call was not preserved as evidence for trial); July 24, 2017 Trial Tr. at 2559:8-9, 2580:13-2582:2 (raising the issue of the failure to preserve Agent Gutierrez's MRI).

> on an improper emotional basis. Moreover, the probative worth of
> this evidence is insignificant.

*See* Dkt. 122 at 3 (June 19, 2017). The Court also cautioned: "The government shall inform its

witnesses of this ruling to ensure that no inadmissible testimony is inadvertently elicited." *Id.* at

4.

However, Mr. Long testified on direct that Mr. Jones "passed away in 2013." July 27,

2017 Trial Tr. at 3518:19-22. Outside of the presence of the jury, Mr. Long was asked whether

the prosecution "indicated to you not to say anything about Johnny R. Jones, Jr., either

overdosing or dying? Did he have that discussion with you?" Mr. Long responded: "No." *Id.* at

3520:20-25. In response to questioning by the Court to counsel as to whether counsel had

"give[n] him a specific instruction that says you cannot used the word died or he overdosed,"

counsel for the government said that "I told him that I will ask him no questions about the

circumstances of [Mr. Jones's] death. And we just focused on that, and I said 'Do you

understand that?'" *Id.* at 3526:10-16.

As the defense noted at trial, the government's actions in failing to instruct Mr. Long

about the parameters of his testimony constituted misconduct. After a full round of briefing on

this precise issue and a specific written order, the Court's order was never explained to the

government's witness. *Id.* at 3523:25-3525:6. The government thus did not prevent the

introduction of evidence which the Court had held "risk[ed] inviting the jury to render a verdict

on an improper emotional basis." Dkt. 122 at 3. This failure constitutes prosecutorial

misconduct warranting a new trial.

C.      *Brady* Concerns Remain Due to the Government's Continuing Review of Evidence

The issues detailed above require a new trial for Dr. Robinson.  Moreover, concerns regarding whether the government has fully discharged its *Brady* obligations continue.  On October 3, 2017, Dr. Robinson requested additional *Brady* material from the government.  The defense has several reasons, in addition to the pattern of violations at trial, to believe the government still has not complied with its *Brady* obligations.  First, discovery produced from the government identifies sources of additional Brady material that the defense has previously requested but has not been produced (including about law enforcement officials with whom the defendant communicated).  Second, criminal charges against Jesse Goble, a government witness, were recently dismissed without explanation.  Third, there are numerous individuals identified on the government's witness list for whom no reports of interviews or discovery were ever produced.  On October 6, 2017, the government responded that it was undergoing an additional review of evidence.  On October 12, 2017, Dr. Robinson followed up with another *Brady* request related to the dismissal of charges against Jesse Goble on October 5, 2017.  Since the government has not yet provided the results of its additional search for *Brady* material, concerns remain that there is outstanding discovery to which Dr. Robinson is entitled but has not been provided with even months after trial concluded.  The defense preserves its right to file a supplement to this brief at the appropriate time.

**V.      Prejudicial Legal Error in the Definition of Criminal Liability Under 21 U.S.C. § 841 Requires A New Trial**

Dr. Robinson is entitled to a new trial due to reversible error in the definition of criminal liability under 21 U.S.C. § 841 given to the jury.  The failure to provide the jury with an instruction explaining the critical difference between civil medical malpractice and the criminal violation of 21 U.S.C. § 841, together with the good faith definition in the government's closing

31

argument and in the Court's jury instructions, constitute prejudicial legal error and grounds for a new trial.

A.    Legal Standard

The Court must consider the jury instructions as a whole, in the context of the language of the other instructions, the arguments of counsel, and the evidence presented.  *See, e.g.*, *United States v. Norris*, 873 F.2d 1519, 1524-25 (D.C. Cir. 1989); *United States v. Martin*, 475 F.2d 943, 947 (D.C. Cir. 1973).  "When reviewing a challenge to jury instructions, '[t]he pertinent question is whether, taken as a whole, the instructions accurately state the governing law and provide the jury with sufficient understanding of those issues and applicable standards.'"  *United States v. Vega*, 826 F.3d 514, 524 (D.C. Cir. 2016) (quoting *United States v. Wilson*, 605 F.3d 985, 1018) (D.C. Cir. 2010)).  If the Court "conclude[s] that the error itself had substantial influence—or even if [the Court has] grave doubts on this question—the conviction cannot stand."  *Norris*, 873 F.2d at 1525.

B.    The Standard Presented to the Jury for Liability Under 21 U.S.C. § 841 Was Legally Erroneous

1.    Background

Dr. Robinson was charged with distributing oxycodone in violation of 21 U.S.C. § 841 (a)(1) and § 841(b)(1)(C).  Section 841 and the accompanying regulations prohibit a physician from prescribing controlled substances, knowingly and intentionally, outside the usual course of professional practice and without a legitimate medical purpose.  In pre-trial briefing, Dr. Robinson moved to dismiss the charges against him for unconstitutional vagueness.  *See* Dkt. 58 (Mar. 22, 2017).

In addition, in their pre-trial submission to the Court, the parties agreed that it would appropriate to include a jury instruction that addressed the possible confusion between the

criminal standard to be applied in this case and the civil malpractice standard.  *See* Proposed Jury

Instructions, Dkt. 110 at p. 65 (June 5, 2017) (including "Special Jury Instruction No. 3");

Proposed Jury Instructions, Dkt. 127 (June 23, 2017); Government's Supplement to Proposed

Jury Instructions, Dkt. 128 (June 24, 2017); Dkt. 157 Ex. 2 (email dated July 8, 2017).  That

agreed-upon instruction was given in a recent federal prosecution in *United States v. Volkman*,

1:07-CR-060-03, 2011 WL 13128698, at *3 (S.D. Ohio Aug. 23, 2011), *aff'd United States v.*

*Volkman*, 797 F.3d 377, 387-88 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 348, 193 L. Ed. 2d 250

(2015)).  The instruction reads:

> You've heard the phrase standard of care used during the trial by
> several witnesses. When you go to see a doctor as a patient, the
> doctor must treat you in a manner that meets the applicable
> standard of care that physicians of similar training would have
> given to you under the same circumstances. If a doctor fails to
> provide you with that care, the doctor may be found neglect [sic] in
> a civil lawsuit. This case is not about whether the defendant acted
> negligently or whether he committed malpractice. Rather, in order
> for you to find the defendant guilty, you must find that the
> government has proved to you beyond a reasonable doubt that the
> defendant's action was not for a legitimate medical purpose in the
> usual course of professional practice.[5]

The government then switched course and opposed the inclusion of an instruction

distinguishing civil malpractice.  The government argued the previously-agreed-upon instruction

should not be read to the jury because the civil standard of care was irrelevant and an instruction

referencing this standard would confuse and distract the jury.  *See* Dkt. 157 at 3-4 (July 8, 2017).

On August 1, the Court held it would not give this instruction, because "in the larger context of

. . . all of the instructions the jury will be read" there was not a risk of confusion for the jury

between a criminal or civil standard to be applied.  Moreover, "the Court agree[d] with the

---

[5] A similar instruction was also given in *United States v. Zolot*, 968 F. Supp. 2d 411 (D. Mass. 2013).

government that the Defendant's proposed addition itself would itself risk such confusion." *See*

Order, Dkt. 214 at 5-6 (Aug. 1, 2017).

> 2.     Argument

The Court's failure to include a jury instruction that addresses the confusion between the

criminal standard to be applied in this case and the civil malpractice standard constitutes

prejudicial legal error requiring reversal for at least three reasons.

*First*, a district court "may impermissibly lower the standard for criminal liability by

instructing the jury to determine whether a practitioner-defendant has complied, or attempted to

comply, with the standard of care." *United States v. Feingold*, 454 F.3d 1001, 1009-12 (9th Cir.

2006).  That is precisely what happened here.  The failure to include a jury instruction that

distinguished between the criminal standard of liability in this case and the lesser civil

malpractice standard impermissibly allowed the jury to determine whether Dr. Robinson was

guilty based solely on a finding that he failed to comply with the standard of care.  *See Feingold*,

454 F.3d at 1010 (holding that "an instruction is improper if it allows a jury to convicted a

licensed practitioner under § 841(a) solely on a finding that he has committed malpractice,

intentional or otherwise.  Rather, the district court must ensure that the benchmark for criminal

liability is the higher showing that the practitioner intentionally has distributed controlled

substances for no legitimate medical purpose and outside the usual course of professional

practice.").

Federal courts routinely hold that "the standard for criminal liability under § 841(a)

requires more than proof of a doctor's intentional failure to adhere to the standard of care."

*Feingold*, 454 F.3d at 1011; *see also, e.g.*, *Zolot*, 968 F. Supp. 2d at 428; *United States v. Cuong*,

18 F.3d 1132, 1137 (4th Cir. 1994) (noting that a criminal conviction "requires more" than a

showing of malpractice); *United States v. Stump*, 735 F.2d 273, 276 (7th Cir. 1984) (holding that

34

evidence was sufficient to support a conviction where the doctor's pattern of prescribing drugs "could not possibly be consistent with legitimate medical treatment").  But the instructional error here meant the jury had no direction for determining that critical difference.

*Second*, the prejudice arising from the failure to instruct the jury on the difference between civil malpractice and criminal liability was compounded by the government's closing argument and the jury instructions defining good faith.  The Court must consider the jury instructions as a whole, in context of the arguments in the case and the other instructions.  *See, e.g.*, *Norris*, 873 F.2d at 1525.  The government's closing argument provided no guidance to the jury as to how to distinguish between criminal liability under the statute and civil malpractice.  Instead, the government provided a circular definition of the criminal liability standard, which was based on a different, undefined medical term:

> The judge is also going to explain to you that if the defendant, in the usual course of his medical professional practice, distributed the substance in good faith in medically treating a patient, that that's not unlawful.  But we know that the defendant didn't medically treat his patients, so there was no good faith in medically treating the patients because the patients were not medically treated.

Aug. 7, 2017 Trial Tr. at 5023:1-8.  Moreover, in closing the government identified the government's expert as the sole witness who defined the standard for criminal liability.  *See id.* at 5023:20-24 ("The only element that is in dispute is whether the defendant distributed those outside the usual course of medical practice and not for legitimate medical purpose.  So let's talk about that. What does that mean?  You heard from one expert in this case."); *see also id.* at 5024:20-25 ("He held the defendant to minimal standards, and he told you that these minimum standards are taught in nursing school. . . .  So let's discuss the three minimum standards *that Dr. Romanoff described to us*.") (emphasis added).  Because of the lack of a malpractice instruction, the jury was left to assess the government's closing argument without any legal basis for

35

distinguishing the civil standard of care from the standard provided by the government's expert or from the showing necessary to find criminal liability under the statute.

In addition, the manner in which the jury instructions defined good faith further compounded the prejudice to Dr. Robinson.  Dr. Robinson requested that the Court give the "model of clarity" good faith instruction from *Volkman*, which states in part that good faith "means that the defendant acted in accordance with what he reasonably believed to be proper medical practice."  *See* Dkt. 127 at 7 (June 23, 2017); *see also Volkman*, 797 F.3d at 388. However, the Court instead instructed the jury that good faith was tied to "a standard of medical practice generally recognized and accepted in the United States."  *See* Aug. 7, 2017 Trial Tr. at 5203:14-17.  The Court's good faith instruction thus explicitly tied good faith to the "standard of medical practice generally recognized and accepted in the United States," but provided no distinction between this standard and a civil standard for medical malpractice.  The coupling of this instruction with the government's closing argument exacerbated the prejudicial effect of each and amounted to reversible error.

*Third*, the failure to properly instruct the jury was particularly prejudicial because the statutory standard under 21 U.S.C. § 841(a)(1) is itself impermissibly vague.  *See* Def's. Mot. to Dismiss All Charges in the Indictment Because 21 U.S.C. § 841 is Unconstitutionally Vague, Dkt. 58 (Mar. 22, 2017).  The terms "legitimate medical purpose" and within the "usual course of professional practice" failed to provide constitutionally required notice to Dr. Robinson in direct violation of his rights, and the government's closing argument and the jury instructions failed to address this issue.  *See, e.g., United States v. Kim*, 808 F. Supp. 2d 44, 50 (D.D.C. 2011) ("[T]he touchstone is whether the statute, either standing alone or as construed, made it

reasonably clear at the relevant time that the defendant's conduct was criminal[.]") (quoting *United States v. Lanier*, 520 U.S. 259, 267 (1997)).

In sum, Dr. Robinson's motion for a new trial should be granted because, considering the jury instructions as a whole and in the context of the government's closing argument, the jury was presented with a prejudicial and legally erroneous definition of criminal liability under 21 U.S.C. § 841.

## CONCLUSION

For the reasons stated above, the Court should grant Dr. Robinson a new trial pursuant to Rule 33.

DATED this 20th day of October, 2017          Respectfully submitted,


    */s/*  Emily S. Ullman

Jonathan S. Jeffress (D.C. Bar #479074)
KAISER DILLON PLLC
1401 K St NW #600
Washington, DC 20005
Telephone: (202) 640-2850
Facsimile: (202) 280-1034
jjeffress@kaiserdillon.com
azurbriggen@kaiserdillon.com

Phyllis A. Jones (D.C. Bar #983154)
Emily S. Ullman (D.C. Bar #1001677)
J. Chase Johnson (*pro hac vice*)
Elizabeth A. Spavins (D.C. Bar #1008729)
Andrew E. Siegel (D.C. Bar #1029365)
Kimberly Stietz (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter,
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5868
Facsimile: (202) 778-5868
pajones@cov.com
eullman@cov.com

37

*Attorneys for Defendant*
*Ivan Lamont Robinson*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of October, 2017, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing (NEF) to the following:

John P. Dominguez
Assistant U.S. Attorney
For the District of Columbia
555 4th Street, NW
Washington, DC 20530
(202) 252-7684
john.dominguez@usdoj.gov

Dineen A. Baker
Assistant U.S. Attorney
For the District of Columbia
555 4th Street, NW
Washington, DC 20530
(202) 252-6954
dineen.baker@usdoj.gov


_____/s/ Emily S. Ullman____
Emily S. Ullman


*Counsel for Ivan Lamont Robinson*