## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Crim. No. 16-098 (CKK)** |
| | **:** | |
| **IVAN LAMONT ROBINSON,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## <u>GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL</u>

# TABLE OF CONTENTS

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

LEGAL STANDARD FOR NEW TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

   I.      DR. ROMANOFF'S TESTIMONY WAS PROPERLY ADMITTED . . . . .   11

        A. Review of Paper Files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

        B. Review of Patient Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

        C. The Government's Comments About Dr. Romanoff in Its Closing
           Did Not Shift the Burden to the Defendant . . . . . . . . . . . . . . . . . . . . . . .   18

   II.    THE COURT AND THE GOVERNMENT DID NOT COMMIT
        THE ALLEGED EVIDENTIARY ERRORS . . . . . . . . . . . . . . . . . . . . . . .   18

        A. Pharmacists' Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

        B. Testimony Regarding Money Orders . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

        C. The Government Did Not Make Any Racial Commentary . . . . . . . . . . . . . .   24

   III.   THE DEFENDANT'S STATEMENT TO LAW ENFORCEMENT WAS
        PROPERLY ADMITTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

   IV.   THE GOVERNMENT DID NOT COMMIT PROSECUTORIAL
        MISCONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

        A. Witness Sahr Bockai, Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

        B. Witness Robert Long . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

        C. Witness Jesse Goble . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

        D. The Defendant's Post-Trial Discovery Demands . . . . . . . . . . . . . . . . . . . . .   38

   V.    THE JURY WAS PROPERLY INSTRUCTED ON THE
        DISTRIBUTION OF A CONTROLLED SUBSTANCE OUTSIDE
        THE USUAL COURSE OF MEDICAL PRACTICE AND NOT FOR A

LEGITIMATE MEDICAL PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

A.  The Defendant was Not Entitled to a Civil Malpractice Jury Instruction . . . .   41

B.  The Good Faith Instruction Did Not Confuse the Jury and the Government
    Did Not Impermissibly Define Good Faith in its Closing Argument. . . . . . . .   43

C.  The Statute is Not Vague. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this response in opposition to the defendant's motion for a new trial.  As grounds for this opposition, the government relies on the following points and authorities, and such other points and authorities as may be cited at a hearing on this matter:

## PROCEDURAL BACKGROUND

On June 7, 2016, an indictment was returned by the Grand Jury charging the defendant with 55 counts of distribution of oxycodone outside the legitimate scope of practice of medicine, in violation of Title 21, United States Code, Section 841(a)(1).  On April 27, 2017, a superseding indictment was returned charging the defendant with 61 counts of distribution of oxycodone outside the legitimate scope of practice of medicine, in violation of Title 21, United States Code, Section 841(a)(1) and two counts of money laundering, in violation of Title 18, United States Code, Section 1957.  On July 12, 2017, the government dismissed counts 20-34, 42, 56, and 58 of the superseding indictment and the trial proceeded on the remaining 45 counts (the indictment was subsequently re-numbered so that there was no break in numbering of the counts).

On July 10, 2017, a trial commenced before the Honorable Judge Kollar-Kotelly.  On August 10, 2017, the jury returned guilty verdicts on 44 of the 45 counts, including 42 of the drug distribution counts and both of the money laundering counts.[1]  A forfeiture proceeding was held on August 10, 2017 and the jury rendered a verdict forfeiting the defendant's interest in $108,000 in cashier's checks and a 2012 Volvo automobile.[2]  At the conclusion of the trial, the Court remanded the defendant to the custody of the United States Marshal pending sentencing.  On October 20, 2017, the defendant filed a Motion for New Trial, and accompanying memorandum

---

[1] The jury returned a verdict of not guilty on Count 32.

[2] The jury did not forfeit $997 in cash seized from the defendant on June 19, 2013, nor did they order the forfeiture of $3,300 in blank money orders seized from the defendant's vehicle on the same date.

in support thereof.  See ECF Doc. 284, 284-1 (hereafter "Def. Mot.").[3]

## **FACTUAL BACKGROUND**[4]

Beginning in February 2013, the Drug Enforcement Administration ("DEA") Drug Diversion Task Force received reports from pharmacists who had noticed suspicious patterns regarding oxycodone prescriptions originating from the defendant's practice.  Based on the reports, an investigation was initiated involving DEA, the Department of Health and Human Services ("HHS") and the Department of Defense ("DOD").  The defendant was, at that time, a health care professional licensed in Washington, D.C. as a nurse practitioner and held a DEA license to prescribe controlled substances, including schedule II controlled substances, i.e., narcotics.

On March 18, 2013, law enforcement officers, acting in an undercover capacity, went to the defendant's clinic at 2021 Martin Luther King Avenue, Southeast, Washington, D.C., in an attempt to purchase oxycodone prescriptions.  Two undercover agents, separately, were able to each purchase a prescription for oxycodone from the defendant in exchange for $370 blank money orders.[5]  Each prescription was for 60 tablets of 30mg of oxycodone.  Neither of the agents had an actual back injury, but they presented false MRIs purporting to show back trouble.  The defendant did not confirm the MRIs as accurate, nor did he conduct a physical examination of either agent's back, before selling them the prescriptions.  The same two agents separately returned on April 4, 2013, and again, without receiving an adequate physical exam, they purchased oxycodone prescriptions from the defendant in exchange for $370 in blank money orders.  The patient charts for the undercover agents, later obtained during a search warrant, contained false diagnoses and

---

[3] Citations to defendant's memorandum, infra, reflect the ECF page numbers, i.e., "Page __ of 44," at the top of each page.

[4] This Factual Background is taken from paragraphs 13-19 of the Presentence Report that was issued on September 28, 2017.

[5] A third agent was turned away when she presented an MRI for a foot/ankle injury.

incorrect information (*e.g.*, a diagnosis for Schmorl's nodes on L1, which was not supported by the MRI). On both occasions, the undercover agents were equipped with audio and video recording devices. The recordings show that the defendant saw patients in groups, not individually, that he did not conduct complete physical exams, and that he instructed his patients to get money orders across the street, leave the receipt portion of the money order on, and to not fill out the money orders. [6]

On June 19, 2013, search warrants were conducted at the defendant's home, located at 4660 Martin Luther King Jr. Ave. Southwest, Washington, D.C. and his offices located at 2021 and 2041 Martin Luther King Jr. Ave. Southeast, Washington, D.C. The defendant was present in his office at the time of the execution of the search warrant at his office. During the searches, patient files, in the form of paper records and computerized records, were seized. During the office search, the defendant voluntarily agreed to be interviewed by agents and advised them that he used a cloud-based medical record database called Practice Fusion; that 97% of his practice was for spine patients; that he took money orders as payment; and that his income had increased from $3,000/month to $3,000/week. At the conclusion of the interview, the defendant surrendered his DEA license. The defendant left his office before the search warrant was completed, and he was not taken into custody.

During the trial, eight patients testified about 43 prescriptions. Each prescription was identical, that is, 60 tablets of 30mg of oxycodone. Each patient testified that they were addicted to oxycodone and had gone to the defendant's clinics, located at 2021 and 2041 Martin Luther King Jr. Ave. Southeast, Washington, D.C., often travelling a long distance, to obtain a prescription. The patients testified about prescriptions obtained in November 2011 through April

---

[6] Neighborhood Pharmacy was across the street from the defendant's clinic and sold Western Union money orders.

2013.  They also testified that they paid the defendant for the prescriptions in money orders.  They each testified that, although they began taking oxycodone for legitimate purposes, they had become addicted and they were seeking the pills for their addictions.  As with the undercover agents, the patient charts for these patients contained false diagnoses and incorrect information (*e.g.*, virtually all had a diagnosis for Schmorl's nodes on L1, which was not supported by the MRIs provided by the patients).  In addition, many of the patients' charts contained nearly identical verbiage and did not include follow-up treatment plans.

The government's expert, who testified at trial, Dr. Mark Romanoff, explained the chart review he conducted of the patients charged in the indictment.  The charts showed that the defendant did not perform proper physical exams, he did not collect an adequate medical history and the treatment plans were not accurate.  Dr. Romanoff testified that the defendant had not established a patient-provider relationship with his patients and that his relationship with the patients was not a therapeutic one.  As such, Dr. Romanoff came to the conclusion that the 43 prescriptions before the jury were prescribed by the defendant outside the legitimate course of professional practice and not for a legitimate medical purpose.

The DEA also conducted a financial investigation into the defendant's practice.  This financial investigation determined that, between 2011 and 2013, the defendant utilized several bank accounts.  The defendant initially banked at PNC, maintaining both personal and business accounts there. Beginning in November 2011, the defendant deposited large sums of cash and money orders into PNC accounts ending in -2675 and -0016.  On April 19, 2013, the defendant opened a business account at Bank of America.  The account was opened with a $70,000 deposit, which was funded, in part, by $48,000 from the PNC account ending in -0016.  The defendant then exclusively used the Bank of America account and he continued to make large deposits of money

orders into that account.  In the two months between April 19, 2013 and June 19, 2013, the defendant deposited $150,775 into the Bank of America account.  Financial investigators were able to track many of the money orders deposited into the defendant's bank accounts to the Western Union franchise across the street from the defendant's clinic.  Investigators were also able to track additional money orders that were deposited into the defendant's accounts through the analysis of hundreds of money order receipts that were located at his residence during the search warrant.  On June 11, 2013, the defendant purchased a 2012 Volvo C-70 with a cashier's check drawn on the Bank of America account in the amount of $40,769.87.  On June 13, 2013, while agents were executing the search warrants at his home and business, the defendant withdrew $108,000 from the Bank of America account in the form of four $27,000 cashier's checks.

### LEGAL STANDARD FOR A NEW TRIAL

Federal Rule of Criminal Procedure 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  A court enjoys broad discretion in assessing the "interest of justice," but the defendant bears a substantial burden in seeking to set aside the jury's verdict: "the evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."  United States v. Howard, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (quoting United States v. Edmonds, 765 F. Supp. 1112, 1118 (D.D.C. 1991)); see also United States v. Rogers, 918 F.2d 207, 213 (D.C. Cir. 1990) (a new trial may be granted "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict."); United States v. Wilkerson, 656 F. Supp. 2d 22, 28 (D.D.C. 2009) (trial court's authority to order a new trial should be "exercised sparingly" and "limited to situations presenting a serious danger that a miscarriage of justice has occurred."); United States v. Bikundi, Case No. 14-cr-030, 2016 WL 912169, at *20 (D.D.C. Mar. 7, 2016)

(Howell, J.) ("The D.C. Circuit has instructed that 'granting a new trial motion is warranted only in those limited circumstances where a 'serious miscarriage of justice may have occurred.'") (quoting Wheeler, 753 F.3d 200, 208 (D.C. Cir. 2014) (internal quotation marks omitted); accord United States v. Mangieri, 694 F.2d 1270, 1285 (D.C. Cir. 1982) (the burden of proof that a new trial is justified rests with the defendant).

A court's Rule 33-power to grant a new trial "should be exercised with caution, and is invoked only in those exceptional cases in which the evidence weighs heavily against the verdict." Howard, 245 F. Supp. 2d at 30.   Courts across the country agree: motions for new trial are "not favored and are viewed with great caution."   United States v. Borda, 786 F. Supp. 2d 25, 31 (D.D.C. 2011); see also, e.g., United States v. Mahmood, 820 F.3d 177, 190 (5th Cir. 2016) ("We have stressed that motions for new trial are generally disfavored"); United States v. Chavez, Case No. 08-cr-746-5, 2011 WL 4852264, at *1 (N.D. Ill. Oct. 6, 2011) ("Granting a Rule 33 motion is nevertheless disfavored except in 'the most extreme cases.'") (quoting United States v. Reed, 875 F.2d 107, 113 (7th Cir. 1989)); United States v. Smith, Case No. 07-cr-146-009, 2008 WL 2002557, at *1 (E.D. Tenn. May 7, 2008) ("Motions for new trial under Rule 33 are generally disfavored and are granted only in extraordinary circumstances").

Accordingly, a Rule 33 motion should "only be granted where the government's case ha[s] been marked by uncertainties and discrepancies." Howard, 245 F. Supp. 2d at 30.  A court may conduct its own assessment of the evidence, but "because courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." United States v. Flom, 256 F. Supp. 3d 253, 264 (E.D.N.Y. 2017) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)). "An example of

exceptional circumstances is where testimony is 'patently incredible or defies physical realities[.]'" Flom, 256 F. Supp. 3d, at 264 (internal citation omitted).

Further, a new trial motion under Rule 33 does not substitute for a direct appeal or motion for reconsideration—it is not a proper vehicle to revisit issues that were raised, litigated, and resolved before the verdict.  Courts routinely deny Rule 33 motions that attempt to relitigate already-decided issues.  See, e.g., Flom, 256 F. Supp. 3d at 272 (collecting cases in which Rule 33 motions were denied because defendants attempted to relitigate evidentiary decisions and pretrial rulings); see also United States v. O'Brien, Case No. 13-cr-586, 2017 WL 2371159, at *12 (E.D.N.Y. May 31, 2017) ("Just like the defendants' arguments in Delva and Christian, these issues were briefed and decided during pre-trial evidentiary proceedings, and thus offer no basis to warrant a new trial.").[7]

## ARGUMENT

A substantial number of issues raised in the defendant's new trial motion were raised pretrial or during trial, argued, and denied by this Court.  The defendant cannot meet his high burden for a new trial under Rule 33, as there is no danger that a miscarriage of justice as occurred, and the evidence against the defendant was overwhelming.

---

[7] Similarly, Rule 33 does not permit a defendant to bootstrap previously unasserted objections into a new trial motion, and pursue them as if they had been timely raised.  See, e.g., United States v. Kenner, Case No. 13-cr-607, 2017 WL 4570709, at *58–59 (2017) (defendant, prior to closing argument, withdrew request for special verdict form, but later asserted in Rule 33 motion that Court should have used one; the court held that defendant "forfeited his challenge" on the issue, and determined that plain error review would be unavailing regardless).  "In reviewing the District Court's decision on a new trial motion, the D.C. Circuit applies a deferential standard, and will only reverse if the court abused its discretion or misapplied the law." United States v. Sheffield, 76 F. Supp. 3d 148, 152 (D.D.C. 2014) (internal quotation marks and brackets omitted).  These limitations further underscore that Rule 33 is reserved for "exceptional cases," in which "it would be a miscarriage of justice to let the verdict stand." United States v. Ring, 768 F. Supp. 302, 301 (D.D.C. 2011).  In short, a Rule 33 motion is not—and was never intended to be—a perfunctory step between conviction and appeal.

## I.     DR. ROMANOFF'S TESTIMONY WAS PROPERLY ADMITTED

On July 28, 2017, the government offered Dr. Mark Romanoff as an expert physician, anesthesiology specialist, and specialist in pain management.  July 28, 2017 Trial Tr. at 3783:16-20.  The Court inquired of the defendant "Any objection? Any voir dire?"  Defense Counsel replied, "No objection, Your Honor."  Id. at 3783:21-23.  Thus, Dr. Romanoff testified as an expert without objection from the defense.[8]  Now, in his Motion for a New Trial, the defendant argues that Dr. Romanoff's unobjected-to testimony was inadmissible and unreliable under Rule 702.  His argument is without merit.

### A.     Review of Paper Files

The defendant begins his argument by claiming that Dr. Romanoff "testified either without reviewing or reviewing only cursorily large portions of [the] paper files."  Def. Mot., page 9.  This is not accurate.  Dr. Romanoff testified that he reviewed three types of records that were found at the defendant's clinics, including paper files:

> So, there were three locations that files were encountered in this practice. One was there was an electronic medical record in a computer. There were some paper files. And then there was also a laptop in the office that had files as well. So they were located in three different places.

July 28, 2017 Trial Tr. 3824:18-23.  To thus claim that Dr. Romanoff did not review paper files is clearly erroneous.

The defendant places much of his argument on the fact that Dr. Romanoff did not review the defense exhibits prior to reaching his opinion in this matter.  In his Motion, the defendant states "Dr. Romanoff revealed on cross-examination that he had not reviewed medical records from Defense Exhibits L, M, N, O, P, Q, R, S, or T before beginning his testimony. Those exhibits

---

[8] Likewise, at the pretrial Daubert hearing, the defendant did not object to Dr. Romanoff's expertise.  See July 6, 2017 Hearing Tr. 12:8-9; see also July 28, 2017 Trial Tr. 3769:17-18.

totaled 233 pages, whereas the paper records that he had reviewed and based his opinion upon totaled only 120 pages. *See* Gov't Exs. 312-326, 329-334, 337-340, 343-344, 347-350, 371-376, 379-383, 386, 391-392." Def. Mot., page 11.

The above statement from the defendant's Motion is replete with misstatements and inaccuracies. A careful review of both the government and the defense exhibits reveals that Dr. Romanoff did, indeed, have all the necessary documentation to arrive at his opinions. The defendant under-represents the volume and nature of the government exhibits reviewed by Dr. Romanoff, and also over-represents the volume and nature of the material contained in his own exhibits.

First, there is no Defense Exhibit P. See ECF Doc. 221 (Defense Exhibit List); see also August 1, 2017 Trial Tr. 4387:21-22 (Defense Counsel: "P never came in."). To include "Defense Exhibit P" in this argument is misleading and improper.

Next, the defendant omits from his recitation of the records provided to Dr. Romanoff by the government numerous exhibits, containing dozens of pages of documents, that Dr. Romanoff reviewed and considered in his evaluation. The defendant lists exhibits 312-326, 329-334, 337-340, 343-344, 347-350, 371-376, 379-383, 386, 391-392. Def. Mot., page 11. Yet he omits government exhibits number 327 (28 pages), number 328 (29 pages), number 336 (11 pages), number 342 (16 pages), number 346 (31 pages), number 370 (28 pages), number 378 (24 pages), number 385 (23 pages), number 390 (1 page).

To be clear, the exhibits that the defendant omitted (with the exception of the one-page exhibit number 390) are print-outs from Practice Fusion. The defendant seeks to minimize the Practice Fusion records, but they are records that the defendant admitted to using and which were obtained from the defendant's own electronic medical records system. The exhibits omitted by

the defendant from his calculations total 191 pages.  Thus, in his argument, when the defendant claims that the Dr. Romanoff based his opinion on a review of 120 pages of documents, the defendant under-represents by 191 the number of pages of documents that Dr. Romanoff actually reviewed. Dr. Romanoff reviewed more than twice the number of documents than the defendant alleges. Notably, all 311 (120 + 191) pages of the government's exhibits pertain to the indicted conduct.

The defendant's exhibits are not what he claims them to be.  The defendant states that Defense Exhibits L, M, N, O, Q, R, S, and T "totaled 233 pages."[9]  Def. Mot., page 11.  Of the 233 pages of alleged new material in defense exhibits L, M, N, O, Q, R, S, and T, only 37 pages pertain to indicted charges.  See Attachment A.[10]  The remaining 196 pages all relate to patient visits that are not charged in the indictment.  When considering the 37 pages that do relate to indicted conduct, three pages are lists of exercise classes, 13 pages are forms acknowledging receipt of privacy rights, 14 pages are "fitness consent" forms filled-out by the patient, three pages are symptom forms filled-out by the patient, one page is a blank symptom form, one page is a diagram, one page is a prescription for an X-ray, and one page is a handwritten treatment note (page Q-3).

Thus, in his argument, the defendant has over-represented by 196 the number of pages of additional documents relating to counts in the indictment that the defendant provided to Dr. Romanoff mid-trial.  The 196 pages of "additional" or "missing" paper records are for conduct

---

[9] The government's calculation is that exhibits L, M, N, O, Q, R, S, and T equal 228 pages. It is unclear why there is a 5-page discrepancy, but it is perhaps accounted for by the erroneous inclusion of Defense Exhibit P that was never admitted into evidence.

[10] Attachment A is a log of every page of defense exhibits L, M, N, O, Q, R, S, and T.  Attachment A was created by the government while reviewing the defense exhibits in preparation for the filing of this Response.

that was not in the indictment, so the defendant cannot argue that the government was remiss in not showing Dr. Romanoff the files in the defense exhibits.

Out of these "missing" pages, only one page is arguably relevant, that is, the one page of treatment notes (page Q-3), which are undated and unsigned.  The defendant questioned Dr. Romanoff about Q-3, and Dr. Romanoff testified that it was a "SOAP note" but advised, "we still don't know what patient that is for though."  July 31, 2017 Trial Tr. 4168:23-24; see also July 28, 2-17 Trial Tr. 3902:10-12 ("SOAP note … the subjective, objective, assessment, and then plan"); July 28, 2017 Trial Tr. 38:8-25, 3820:1-21 (explanation of each element of the SOAP note).  Thus, the single page of all the defense exhibits that would prove useful regarding indicted counts was not even beneficial to Dr. Romanoff's evaluation because there was no patient name on the SOAP note.  The defendant cannot claim that Dr. Romanoff's review was unreliable and that his opinion was inadmissible because of the omission of one page of material that wasn't useful to his evaluation.

Elsewhere in his Motion, the defendant misrepresents what the defense exhibits contain.  For example, the defendant states that Defense Exhibit L is "additional medical records of Stephanie Dudzik."  Def. Mot., page 10.  While Defense Exhibit L is a 25-page document of Ms. Dudzik's visits to the defendant's clinic, 20 of those pages are for non-indicted visits.  See Attachment A.  Of the remaining five pages, one of the pages (page L-7) is contained in Government Exhibit 314.  Of the four "new" pages involving indicted visits, pages L- 2 and L-5 are "Fitness Consent" forms filled out by the patient, and pages L-4 and L-6 are privacy right forms filled out by the patient.  To allege that Defense Exhibit L contains 25 pages of "missing documents" -- when in reality it contained four pages of pre-printed forms filled out by the patient -- is disingenuous.

The defendant had ample opportunity to confront Dr. Romanoff regarding the additional patient records, but elected to wait until cross examination at trial.  For example, the defendant did not mention the other patient files when cross-examining Dr. Romanoff at the July 6, 2017 <u>Daubert</u> hearing.  Nor did the defendant vior dire Dr. Romanoff on the additional files on July 28, 2017 when the government tendered Dr. Romanoff as an expert.  The defendant had the opportunity, on at least these two occasions prior to accepting him as an expert, to confront Dr. Romanoff on the thoroughness of his chart review utilizing the defense exhibits, but chose not to do so.  The defendant did cross-examine Dr. Romanoff on the records he reviewed, and the Court instructed that the jury did not have to accept the expert's opinion.  <u>See e.g.</u> July 31, 2017 Trial Tr. 4140:1 through 4144:25 (portion of cross-examination of Dr. Romanoff); <u>see also</u> August 7, 2017 Trial Tr. 5192:4-19 (Expert Testimony Jury Instruction); ECF Doc. 231, page 22 (Expert Testimony Jury Instruction).

## B.   <u>Review of Patient Testimony</u>

The defendant also argues that Dr. Romanoff failed to consider the testimony of the patients in reaching his opinion.  <u>See</u> Def. Mot., page 9.  The defendant claims that "Dr. Romanoff disregarded crucial patient testimony about [the defendant's] treatment but based his opinion in large part on Practice Fusion records that were not relied on by the practice."  Def. Mot., page 14. This argument fails for multiple reasons.

First, Dr. Romanoff did not "disregard crucial patient testimony" but rather, he stated his reasons for not considering the patients as reliable sources of information.  Dr. Romanoff explained on direct examination:

>     Q.    You don't ask the patient?
>     A.    You don't.
>     Q.    Why don't you ask the patient?

A.    The problem with asking patients is that they're not -- normally, they're not medical professionals. So they wouldn't have the body of knowledge to understand if the exam was appropriate for you. They wouldn't have the body of knowledge to know whether they should've asked different questions than the ones they did, or if they asked any questions . . . . So when you ask patients, they don't really know what the right thing is.

July 28, 2017 Trial Tr. 3827:20-25; 3838:1-4, 19-20.

At the <u>Daubert</u> hearing, the Court recognized the logic behind not asking a patient whether

their health care practitioner provided adequate care, and explained it in detail:

I have nothing on this record to indicate that [speaking to patients or reviewing grand jury testimony is] an appropriate consideration in deciding this and adding to it besides the chart review. And the reason I think I would be surprised, frankly, is that I don't see how the patient decides what kind of an exam you have or whether they actually understand that walking around the room is an exam . . . I would be shocked, frankly, but I've been shocked before -- I would be really surprised if, frankly, whatever they said in the grand jury . . . about whether they got exams or not and their opinion about whether it was good enough or not -- would make a difference in the particular chart. [Dr. Romanoff has] made it very clear what his position is. He looks at the chart. It's not there. It's not correctly set out, whatever, to put it in summary form. [The defense is] suggesting that the information from the patient in the grand jury would somehow add to this review. There's not -- I don't hear any standard. I don't hear there's any other reviews that he participated in where they rely solely on charts, anything about talking to patients. So you're injecting something that has no basis as to being correct that you would talk to patients because that is something that would be needed in order to reach your conclusion. So you're putting something in without any standard, as far as I can hear, that would suggest that talking to patients is the appropriate thing to do if something is missing in the chart ... [Dr. Romanoff has] indicated you don't – you know, in essence, that you don't talk to the patients.

July 6, 2016 Hearing Tr. 71:15-21; 74:13-25; 75:1-8; 76:3-4.  Nevertheless, Dr. Romanoff did

"skim" the patients' grand jury testimony, but the testimony did not change his opinion.  July 6,

2017 Hearing Tr. 61:1-16.

Secondly, while Dr. Romanoff relied on the Practice Fusion Records, he also looked at the paper records and the computer records, as stated above.  See also July 28, 2017 Trial Tr. 3824:18-23 ("There were some paper files. And then there was also a laptop in the office that had files as well").  Dr. Romanoff testified that he reviewed the Practice Fusion records "along with the paper records that they could find and along with the laptop information."  August 1, 2017 Trial Tr. 4240:24-25.

Third, contrary to what the defendant claims, Practice Fusion was used, and relied upon, by the defendant's practice.  In fact, the defendant himself is the person who alerted law enforcement to the existence of his Practice Fusion database.  DEA Diversion Investigator Shirley Powell testified regarding the defendant's interview with law enforcement:

> Q.    Did he explain anything to you about his workload, or the hours in the day he worked, how he keeps medical records?
> A.    Yes. He said that he use an electronic system called Patient [*sic*] Fusion where he maintains the electronic records of his patients.

July 14, 2017 Trial Tr. 962:8-13.  Additionally, the defense witness and defendant's colleague, Dr. Ericka Brock, testified that the defendant relied on both paper and electronic recordkeeping.  August 1, 2017 Trial Tr. 4413: 11-17.  Dr. Brock described Practice Fusion as "an electronic health record system, which basically you were able to go in and write documentation and information about for the -- each visit for the patients."  August 1, 2017 Trial Tr. 4414: 2-5.  Further, Dr. Brock testified that the defendant had his own log-in ID and entered his own notes into Practice Fusion.  August 1, 2017 Trial Tr. 4414:11-17.  Additionally, the defendant's name appeared as the user on numerous patients records.  See, e.g., Government Exhibits 300 (Practice Fusion Records of Johnny Jones), 306 (Practice Fusion Records of Trina King), 311 (Practice Fusion Records of Christi Townsend), 336 (Practice Fusion Records of Jesse Goble), 342 (Practice Fusion Records

of Chris Lusby), 346 (Practice Fusion Records of Stephanie Dudzik), 370 (Practice Fusion Records of Tammy Raum), and 385 (Practice Fusion Records of Johnny R. Jones, Jr.).  It is clear, by the defendant's admissions to the DEA agents, and the testimony of his colleague, that the defendant utilized Practice Fusion.  Thus, it was not unreasonable for Dr. Romanoff to consider the Practice Fusion notes during his assessment.

Finally, the defendant made use of the so-called missing files in his closing argument as he tried to discredit Dr. Romanoff.  Defense Counsel argued -- incorrectly -- that the government is "who sent just the Practice Fusion records even though they should have known better. . . . They didn't give any of those paper records to Dr. Romanoff until the Thursday night before he testified." 5120:24-25; 5221:4-5 (emphasis added).  Although accepting him as an expert without objection, the defendant argued forcefully in his closing that Dr. Romanoff's opinion was not reliable.

Dr. Romanoff's opinion was based on a thorough review of the indicted counts and three different record keeping systems -- including the paper files -- and is, therefore, reliable and admissible under Rule 702.

> **C.** **The Government's Comments About Dr. Romanoff in Its Closing Did Not Shift the Burden to the Defendant**

The defendant claims that "the government's comment that the jury 'heard from one expert in this case' also constituted impermissible burden shifting."  Def. Mot., page 10.  This claim has no merit.  As an initial matter, it should be noted that the defendant failed to object to this, or any portion of the government's closing, including its rebuttal closing.[11]  This was a mere observation, and accurate one, that only one witness was qualified as an expert, and the statement does not

---

[11] The government also provided to Defense Counsel, prior to closing arguments, a copy of its demonstrative exhibits, in the form of a PowerPoint, that the government intended to use during closings.  When asked by the Court, the defendant did not indicate any objection to the government's closing PowerPoint.  August 7, 2017 Trial Tr. 5019:16-25; 5020:1-2.

imply that the defense had an obligation to call witnesses.

The jury was properly instructed that the government bore the burden of proof:

> Every defendant in a criminal case is presumed to be innocent. This presumption of innocence remains with the defendant throughout the trial unless and until the government has proven the defendant is guilty beyond a reasonable doubt. This burden never shifts through the trial. The law doesn't require defendant, Ivan Lamont Robinson, to prove his innocence or even to produce any evidence at all . . . As I have said many times, the government has the burden of proving the defendant guilty beyond a  reasonable doubt as to each count or charge against him.

August 7, 2017 Trial Tr. 5186: 4-12; 20-22.  In fact, the defendant also advised the jurors that the defendant "has no burden. The Court has no burden. Only the prosecution bears the burden of proving its case beyond a reasonable doubt."  August 7, 2017 Trial Tr. 5108:24-25; 5109:1. Jurors are presumed to follow the instructions as given to them by the Court.  Price v. North Carolina, 512 U.S. 1249 (1994) (citing Yates v. Evatt, 500 U.S. 391, 403 (1991) and Richardson v. Marsh, 481 U.S. 200, 211 (1987)); Pena-Rodrigues v. Colorado, 137 U.S. 855, 868 (2017) ("Jurors are presumed to follow their oath.").  See also United States v. Eiland, 2006 WL 288403, *4 (2006) ("Jurors are presumed to follow the Court's instructions.").

## II.    THE COURT AND THE GOVERNMENT DID NOT COMMIT THE ALLEGED EVIDENTIARY ERRORS

During the multi-week course of the trial, and pretrial motions, the Court considered over twenty pretrial motions by the parties.  The Court put significant resources into its careful consideration of each issue and gave precise guidelines for what evidence could, and could not, be admitted.   By these allegations, defendant seeks to relitigate already-decided issues and attempts to revisit the tactical decisions of his defense team.  Defendant's claims are not properly rooted in Rule 33, and they are meritless in any event.

### D.    Pharmacists' Testimony

The defendant objects to what he characterizes as "improper testimony by pharmacists" who testified.  Def. Mot., page 17.  This claim is unfounded.  After the defendant moved to preclude the pharmacists' testimony, the Court issued two Orders regarding the pharmacist testimony.  See ECF DOC. 178 and 191.  The Court issued the second Order because the defendant moved for reconsideration of the first Order.  Now, in his motion for new trial, the defendant seeks yet another review.  The defendant raises no new issues and cannot claim that because the Court did not rule in his favor that he is entitled to a new trial.  It is not the purpose of Rule 33 to simply relitigate evidentiary issues that have been settled prior to the verdict.

The testimony of the pharmacists was admissible.  When the defendant raised the same argument prior to the testimony, the Court considered the arguments and found as follows in its July 13, 2017 Order:

> The Court will allow pharmacists to testify as to the fact that they refused to fill prescriptions for oxycodone issued by the defendant, and to state their reasons for doing so. That is, based on the government's proffer, the Court will allow pharmacists to explain that they have a duty to not "fill a prescription just because a health care professional wrote it," and that they did not fill prescriptions issued by Defendant because they were concerned about those prescriptions given that a number of people (who apparently came in groups) presented the exact same prescriptions and travelled a far distance to get those prescriptions, and because they were dissatisfied with the responses they received from the Defendant (with whom they spoke directly) when they called him to verify the prescriptions. Contrary to Defendant's argument, this testimony is not "plainly irrelevant," even to the extent the pharmacists do not identify specific patients named in the Superseding Indictment.

ECF Doc. 178, page 2.  Four days later, on July 17, 2017, the Court issued a second order in response to the defendant's motion to reconsider.  The Court noted that it heard "extensive oral argument on this issue, and [] received a number of emails from defense counsel as well."  ECF Doc. 191, page 3 (July 17, 2017 Court Order).   Nonetheless, the Court's ruling remained

unchanged.  Additionally, in its July 17, 2017 Order, the Court detailed the many ways in which the pharmacists' testimony was "clearly relevant in this case for a number of different reasons." Id., page 4 - 7. The Court found many of the defendant's arguments "incorrect" and "meritless." Id., page 6.  The defendant has produced no new argument in his motion for new trial, thus the Court's previous rulings should stand.

The defendant further argues that "the pharmacists' testimony essentially [w]as expert testimony."  Def. Mot., page 19.  The pharmacists were not expert witnesses, and the Court has already considered and rejected this argument.  In its July 13, 2017 Order, the Court stated, "testimony that a pharmacist took certain actions because they were concerned about Defendant's prescriptions, even if their concerns were based in part on their experience, is not an expert opinion."  ECF Doc. 178, page 3 (July 13, 2017 Court Order); see also ECF Doc. 191, page 7-8 (July 17, 2017 Court Order).

The defendant also takes issue with the way the government used the pharmacists' testimony in its closing argument.  As noted in Footnote 11, *supra*, the defendant was provided, in advance of closing arguments, with a copy of the PowerPoint presentation that the government intended to use during closing argument, and which included the references to the pharmacists' testimony, the defendant raised no objection to the PowerPoint when asked by the Court.  August 7, 2017 Trial Tr. 5019:16-25; 5020:1-2.  Then, when the prosecutor mentioned the pharmacists' testimony in closing, the defendant again did not object.  In any event, the government's closing was not improper.  The prosecutor argued that the pharmacists found the defendant's prescriptions to be "strange," "odd," "not right," and that the pharmacists were "concerned."  August 7, 2017 Trial Tr. 5065:12-13,18; 5066:1-2,5-6.  This is exactly what the Court's Order permitted: "it is clear to the Court that testimony about the pharmacists' concerns and refusal to fill prescriptions

is quite relevant." ECF Doc. 178, page 3 (July 13, 2017 Court Order); <u>see also</u> ECF Doc. 191, page 7 (July 17, 2017 Court Order).

This issue should be put in the context of the overwhelming evidence against the defendant. The defendant's own words regarding the pharmacies were more powerful than anything the pharmacists themselves could have said: the defendant wrote a letter to the pharmacies, asking them to "carry more oxycodone to accommodate his patients." July 20, 2017 Trial Tr. 2321: 11-12. This letter was admitted into evidence without objection. July 20, 2017 Trial Tr. 2320:8-25; 2321:1-21; <u>see also</u> ECF Doc. 191, page 2 (July 17, 2017 Court Order noting, "Defendant does not object to this letter."); ECF Doc. 220, page 19 (Government Exhibit List).

### E.  <u>Testimony Regarding Money Orders</u>

The defendant argues that the government elicited "improper testimony" regarding the defendant's income in money orders and "used these money orders as a back door to introduce [inadmissible] evidence." Def. Mot., pages 19, 23. This argument is disingenuous. The Court prohibited the government from introducing evidence of the defendant's "gross income, total salary, financial success, or overall wealth." ECF Doc. 130, page 2 (June 26, 2017 Order). The Court also limited the government from discussing "the overall amounts in Defendant's bank accounts" and ordered that the government "eliminate money orders in denominations other than $370 from the 'total amount of money orders attributable to the defendant'" from the testimony of DEA Financial Investigator Verna Lofton. ECF Doc. 204, page 4 (July 27, 2017 Order). The government complied with these orders. <u>See e.g.</u>, Trial Tr. 3612:8-14 (Court: "Is [Investigator Lofton] all set to be in conformance with my order, I hope?" Prosecutor: "Yes, Your Honor. Over the lunch hour, we did revise the summary chart that she will be using to reflect just $370 money orders.")

The issues of what money orders could be discussed, and for what purpose, was litigated thoroughly during the trial.  The defendant seeks to relitigate already-decided issues and attempts to revisit the tactical decisions of his defense team.  However, the Court issued a comprehensive ruling laying out what part of the financial investigation could be discussed and what could not. See ECF Doc. 204 (July 27, 2017 Order).  The Court found there was a sufficient link between the $370 money orders and the illegal prescriptions.  Id., page 1-2.  The Court's sound reasoning that "there is enough link between $370 money orders and patients receiving prescriptions for oxycodone from the Defendant for Investigator Lofton's testimony about $370 money orders to at least be relevant" was based on the testimony prior to the July 27, 2017 Order.  Id.  Notably, the Court recognized that "the illegal activity that could support the money laundering counts is not limited to the prescriptions specifically set out in the drug distribution counts."  Id., pages 3-4.

The defendant argues that the Court was mistaken when it found that there was "testimony that a pharmacy across the street from Defendant's clinic - to which Defendant directed his patients to go -was selling $370 money orders to many of Defendant's patients on a daily basis." Def. Mot., page 22 (citing ECF Doc. 204 (July 27, 2017 Order)).  The defendant claims that the government "could not link" the money orders sold by Neighborhood Pharmacy to the defendant. Def. Mot., page 22. That is simply not true.  The $370 money orders that were sold by Neighborhood Pharmacy were signed by the defendant and made payable to the defendant's clinic.  July 27, 2017 Trial Tr. 3633:23-25; 3634:1-19; 3639:23-25; 3640:1-2 see also Government Exhibit 607 (Western Union Records).  In addition, money order stubs[12] were located in the defendant's home, clearly linking the money orders to him.  July 27, 2017 Trial Tr. 3643:8-9. 3644:12-13; see also Government

---

[12] Throughout the trial, the terms "stub" and "receipt" were used interchangeably. Investigator Lofton explained that "there is also a stub, that's the portion you keep, the receipt portion."  July 28, 2017 Trial Tr. 3635:16-17.

Exhibits 13 and 14 (money order receipts).

In his motion for a new trial, the defendant levels numerous objections regarding the mention of money orders in the government's closing argument.  These objections were not made at trial, either during the closing or upon receiving the government's PowerPoint demonstratives prior to closing argument.  The defendant made a strategical decision not to object during closing argument, and as a result the government's closing can be reviewed only for plain error.  United States v. Venable, 269 F.3d 1086, 1089 (D.C. Cir. 2001).  That standard requires: (1) error, (2) that is plain, and (3) that affects substantial rights, and, if all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.  See Id. (internal citations and quotations omitted).  Further, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." United States v. Olano, 507 U.S. 725, 734 (1993).  The government's closing was appropriate argument and, therefore, the defendant cannot meet this burden.

Investigator Lofton's testimony regarding the money orders analyzed during the financial investigation was limited by the Court, at the defendant's request, and the government honored those limitations.  The testimony that was permitted was admissible and relevant, and thus not improper.

### F.  The Government Did Not Make Any Racial Commentary

The defendant alleges that the government alluded to race and used "coded racial references in order prejudice the jury."  ECF Doc. 248-1, pages 24-25.  This accusation is unfounded.  The race of any party -- the defendant, his patients, the clinic employees, the bank

employees, the pharmacists -- was never mentioned at any point in the trial.[13]   Making

inflammatory and baseless allegations such as accusing the government of racial motivation is

reminiscent of many of the defendant's motions filed during trial.   The Court admonished the

defense that "many motions *in limine* and other objections thus far in this case have not been

meritorious . . . Litigating and attempting to resolve a vast number of unmeritorious pretrial

[motions] is wasteful of the Court's and the parties' time and resources."   ECF Doc. 172, page 3.

It is likewise for this argument.

The defendant cites United States v. Doe (903 F.2d 16 (D.C. Cir. 1990)), arguing that

"prosecutorial remarks kindling racial or ethnic predilections can violently affect a juror's

impartiality."  Def. Mot., page 25.  Yet the defendant does not, and cannot, cite to a single instance

where any government witness or counsel of the government ever did such a thing – because no

such reference was ever made by a government witness, nor by a prosecutor.   In the Doe case, a

government witness, as well as the prosecutor, repeatedly referred to "the Jamaicans" and that "the

Jamaicans had taken over local drug trade. "   Doe, at 18-19.  To compare the Doe case to the trial

in the instant case is absurd.

The defendant similarly misapplies Farag v. United States (587 F. Supp,2d 436 (E.D.N.Y.

2008).  In Farag – a civil lawsuit – FBI agents detained travelers of Middle Eastern descent at an

airport, but as the Farag Court notes, Farag is *not* a case of racial incongruity, as the defendant here

claims. Id., at 463. Nonetheless, the Farag Court does discuss the "racial incongruity" argument -

*i.e.,* that race is indicative of criminality when members of a particular race seem 'out of place' in

a particular location.   Id., at 462.   This is inapplicable because at no point in the trial did the

---

[13] One witness testified *outside the presence of the jury* that the bank she worked at was located in a "predominantly African-American area" and that the customers from the defendant's practice were "a lot of Caucasian[s]."  July 17, 2017 Trial Tr. 1388: 18-20.  Since this testimony was never put before the jury, it is not at issue here.

government claim that the defendant was guilty because he was "out of place" at a certain location. While there was testimony that some patients were from out of town, that does not equal "racial incongruity" as the defendant suggests.   The testimony regarding patients traveling from their homes in Maryland was elicited to show how far they were willing to go to buy a prescription. The distance the patients travelled had absolutely nothing to do with race, but had everything to do with the nature of drug addiction.

The defendant claims that "the government drew attention over multiple days at trial to the 'Big Chair' as a 'distinctive landmark' of Anacostia, a primarily African-American Southeast D.C. neighborhood."  Def. Mot., page 26.  This claim is without merit.  At no point in the trial was the neighborhood of Anacostia ever described as a "primarily African-American Southeast D.C. neighborhood."  In fact, the words "African-American" were never uttered in front of the jury at any time during the trial.   To read misanthropy into the mention of a statue is unfounded.

It was, in fact, the defendant who first mentioned the Big Chair and who first mentioned the Anacostia neighborhood, and he did so in his opening statement.  Defense Counsel announced that the defendant "opened a medical practice eventually locating his clinic *right over in Anacostia by the Big Chair*."  July 13, 2017 Trial Tr. 733: 17-18 (emphasis added).  The defendant told the jury, before a single witness testified, that the conduct in this case occurred in Anacostia near the Big Chair.  The Court acknowledged that it was the defendant who "raised the issue in your opening that  . . . . if you put it all together, we have [the defendant], who is in Anacostia, in an area doing the very best that he can in a very poor neighborhood."  July 14, 2017 Trial Tr. 942:10-13.  And Defense Counsel replied, "That's right."  Id., at 942:14

Indeed, the defendant did not object at trial when a photograph of "the Big Chair" was admitted into evidence:

| | |
|---|---|
| Prosecutor: | Let's switch to Exhibit 106. Depicted on your screen now should be Government's Exhibit 106 that has been marked for identification. Do you recognize that? |
| Witness: | Yes. |
| Prosecutor: | What is that? |
| Witness: | They call it the Big Chair. It's like a landmark in the D.C. area where Ivan Robinson's practices were located. |
| Prosecutor: | Okay. |
| Prosecutor: | And so the government moves the Court to receive into evidence what's been marked for identification purposes as Government's Exhibit 105 and 106. |
| Defense Counsel: | No objection, Your Honor. |

July 13, 2017 Trial Tr. 853:18-25; 854:1-5. <u>See also</u> ECF Doc. 220, page 5 (Government's

Exhibit List).

In a criminal trial, the location of the criminal activity is a relevant and logical question to

ask witnesses. Yet the defendant claims that asking witnesses where they met with the defendant

was a "veiled reference to race." Def. Mot., page 28. The defendant argues that asking the patients

where the defendant's clinic was located, and the answer being a street name ("Martin Luther King

Jr. Avenue") or reference to a sculpture ("The Big Chair") was a "coded racial reference in order

to prejudice the jury." Def. Mot., page 26. The record is devoid of evidence supporting this claim.

In fact, the Court stated to Defense Counsel:

> I think you're making an assumption that everybody in Martin Luther King Avenue, in terms of people that are on the street, are all African-Americans. That's not true. I worked at St. Elizabeth's; a lot of the staff, other people, Anacostia has a whole neighborhood farther up in Anacostia that are mostly white. So I don't see how it automatically gets to race.

July 14, 2017 Trial Tr. 1223: 18-25. The Court was correct in its assessment that

mentioning a neighborhood does not equate to mentioning race. The government witnesses, nor

government counsel, never mentioned race, and the trial record bears out the fact that race played

27

no part in this trial.  The defendant's argument is meritless.


### III.    THE DEFENDANT'S STATEMENT
### TO LAW ENFORCEMENT WAS PROPERLY ADMITTED

The defendant argues that he should be granted a new trial because he did not prevail on his Motion to Suppress the statement that he gave to law enforcement.  Def. Mot., pages 28-31. This issue was litigated extensively pretrial, including a suppression hearing with testimony of several witnesses.  The defendant raises no new issues and cannot claim that because the Court did not rule in his favor that he is entitled to a new trial.  That is simply not the purpose of Rule 33. As stated, *supra*, a new trial motion does not substitute for a direct appeal or a motion for reconsideration, and it is not a proper vehicle to revisit issues that were raised, litigated, and resolved before the verdict.  Courts routinely deny Rule 33 motions that attempt to relitigate already-decided issues.  See, e.g., Flom, 256 F. Supp. 3d at 272; O'Brien, 2017 WL 2371159.

The defendant raises the identical issue that formed the basis for his Motion to Suppress, that is, that his statement was taken in violation of Miranda.  See ECF. Doc. 57 (Defendant's Motion to Suppress Statements).  After a three-day motion hearing, the Court issued a 26-page ruling.  See ECF Docs. 125, 126.  The Court noted in its Memorandum Opinion:

> The Court has considered the evidence presented at all three days of the hearing. In doing so, the Court considered the demeanor and behavior of the witnesses on the stand, the witnesses' manner of testifying, whether the witnesses impressed the Court as truthful, whether the witnesses impressed the Court as having an accurate memory and recollection, whether the witnesses had any motive for not telling the truth, whether the witnesses had a full opportunity to observe the matters about which they testified, and whether the witnesses had any interest in the outcome of the case, or friendship or hostility to the other persons concerned with the case. The Court also considered the reasonableness or unreasonableness and the

> probability or improbability of the testimony of the witnesses in
> determining whether to accept it as true and accurate, as well as
> whether the testimony was contradicted or supported by other
> credible evidence. The Court has also considered the pleadings and
> the entire record in this case. The Court credits the testimony of the
> witnesses Shirley Powell, Karen Arikpo, Latonya Coates and
> Jerome Lee.

ECF Doc. 126, page 2.   The Court then considered the evidence -- both the uncontroverted evidence and the evidence in dispute -- and then analyzed the defendant's arguments.   The Court weighed the <u>Miranda</u> argument and the voluntariness argument and denied each one in turn.  The Court found that law enforcement "was not required to provide <u>Miranda</u> warnings prior to the interview on June 19, 2013 because Defendant was not in custody. The Court also concludes that the statements Defendant made at that interview were voluntary." <u>Id.</u>, page 26.  As the Court has already weighed the testimony and evaluated the arguments, it is unnecessary to restate the Court's extensive rationale here, as this Rule 33 Motion is the inappropriate venue for the defendant to re-address the issue.

## IV.     <u>THE GOVERNMENT DID NOT COMMIT PROSECUTORIAL MISCONDUCT</u>

Defendant asserts that the United States committed "numerous instances of prosecutorial misconduct," which so "infected" and "pollute[d]" his prosecution that a new trial is required.  Def. Mot. at 31-32.  We disagree.  The defendant alleges that the government committed prosecutorial misconduct on three matters.   First, the defendant claims that the government withheld "exculpatory evidence of a prior statement that disproved a material falsehood" regarding the testimony of Sahr Bockai, Jr.  Def. Mot., page 32-34.   Second, the defendant asserts that the government committed misconduct by eliciting a statement from Robert Long regarding the death of Johnny R. Jones.  Def. Mot., page 34-35.   Third, the defendant alleges that the government has outstanding Brady obligations.  Def. Mot., page 36.   By these allegations, defendant seeks to

relitigate already-decided issues and attempts to revisit the tactical decisions of his defense team. Defendant's claims are not properly rooted in Rule 33, and they are meritless in any event.

### A.  Witness Sahr Bockai, Jr.

The defendant claims that the government withheld "exculpatory evidence of a prior statement that disproved a material falsehood" regarding the testimony of Sahr Bockai, Jr.[14]  Def. Mot., page 32-34.  This allegation is mischaracterization of the events at trial. While it is accurate that the September 5, 2013 DEA-6 report of Mr. Bockai, Jr.'s interview was disclosed after his trial testimony was complete, it is inaccurate to say that the defendant was "meaningfully deprived . . . of the ability to conduct an effective cross examination" of Mr. Bockai, Jr.  The Court permitted the defendant the opportunity to recall Mr. Bockai, Jr. and question him about what was detailed in the DEA-6, however, the defense elected not to for tactical reasons.

As both the government acknowledged and the Court recognized, the DEA-6 was inadvertently not disclosed prior to Mr. Bockai, Jr.'s testimony.  The statement in dispute is contained in a four-page DEA-6 document dated September 5, 2013; the statement itself is only two of the four pages.  See ECF Doc. 284-2, pages 3-6.  As the government explained in its July 22, 2017 filing, Sahr Bockai, Jr., the witness, works with this father, Sahr Bockai, Sr. at the Neighborhood Pharmacy, and both men were interviewed by DEA agents.[15]  ECF Doc. 195, pages 1-2.  Since the agents omitted the generational suffix from the witness' name in the report, the government mistakenly provided the DEA-6 of the father, and not of the son.  The government

---

[14] Mr. Bockai, Jr. is the manager of the Neighborhood Pharmacy that sold Western Union money orders across the street from the defendant's clinic.   July 14, 2017 Trial Tr. 1210:13-25, 1211:1-18.

[15] Sahr Bockai, Sr. was not called as a witness at trial by either party and his statements are not at issue here.

realized its error and provided the correct DEA-6 on July 21, 2017 -- this was after Mr. Bockai, Jr. testified, but before the government rested its case.

When the Court considered the late disclosure of the DEA-6, it stated "it would appear it was a mistake. . . it looks like a mistake.  It's something that can remedied."  July 14, 2017 Trial Tr. 2500: 5-6, 25; 2501:1.  The Court then suggested several remedies: the government could recall Mr. Bockai, Jr., the defendant could call Mr. Bockai, Jr., or the defendant could impeach Mr. Boacki, Jr. through another witness, *e.g.,* a DEA agent.  <u>See</u> July 14, 2017 Trial Tr. 2501:4-10; 2503:1-5.  The government suggested that "we can call -- ask Mr. Bockai to come back during the government's case in chief, or the defense could call him in their case in chief."  July 14, 2017 Trial Tr. 2502: 12-14; <u>see also</u> ECF Doc. 195, page 2 (government offered a similar remedy in its written response).  Defense counsel was in agreement, stating, "All we're asking of the government is that if we do want to call him in our [case], that they not oppose that.  That was our proposal we said."  July 14, 2017 Trial Tr.2502: 20-22.  For the remainder the trial, the defendant never raised the issue again.

The defendant asserts that Mr. Bockai, Jr.'s statement "about time and amount of sales of money orders directly contradicts the government's assertion that dozens of individuals were lined up outside Mr. Bockai's pharmacy every morning."  Def. Mot., page 33.  In fact, both the DEA-6 and Mr. Bockai, Jr.'s trial testimony say exactly that.  Mr. Bockai, Jr.'s statement in the September 5, 2013 DEA-6 is: "Neighborhood Pharmacy opens its doors at 9:00 a.m. and prior to opening there would be a line of people waiting to purchase money orders."  ECF Doc. 284-2, page 5.  On July 14, 2017, Mr. Bockai, Jr. testified at trial:

> Q.     So when you would get to the store, would you open the store at 9?
> A.     Sometimes I'm late, but 9, yes.
> Q.     Okay. So what was it like?
> A.     A lot of people outside.

> Q.      Okay.
> A.      Waiting to get money orders.

July 14, 2017 Trial Tr. 1218:14-20. The defendant cannot legitimately argue that these two statements are contradictory, when, in fact, they are identical.

Although the defendant elected not to call Mr. Bockai, Jr. and confront him with the DEA-6, he took advantage of the opportunity to impeach Mr. Bockai, Jr. through DEA Investigator Lofton. Impeaching Mr. Bockai, Jr. through another witness, such as a DEA investigator, was one of the Court's suggested remedies. See July 14, 2017 Trial Tr. 2501:4-10; 2503:1-5. The defendant admitted into evidence, through Investigator Lofton, a spreadsheet of the money orders sold at Neighborhood Pharmacy. See Defense Exhibit HT; ECF Doc. 221, page 3; and July 28, 2017 Trial Tr. 3750:22-23   Investigator Lofton was then questioned extensively about the spreadsheet, highlighting purported discrepancies with Mr. Bockai, Jr.'s testimony regarding the date, times, and amounts of money orders sold. See July 27, 2017 Trial Tr. 3707:13 through 3709:4 and July 28, 2017 Trial Tr. 3749:16 through 3755:25.

In addition, the defendant argued Mr. Bockai, Jr.'s credibility in his closing argument. Defense counsel highlighted what he characterized as inconsistencies and discrepancies in Mr. Bockai, Jr.'s testimony, and provided very detailed examples:

> But the problem with his testimony, if you look at Defense Exhibit HT -- right? -- which is his spreadsheet, it is totally inconsistent with the image that he is painting for you. Let's just take a couple of examples. These are the $370 money orders that were filled at Mr. Bockai's pharmacy, okay? On March 4th, he filled -- 1, 2, 3, 4, 5, 6 – 7 between the hours of 10:30 and 12:00. Hardly a line out the door. Hardly a line out the door before business opens. What about March 5th? One for 370. March 7th? Four for 370, starting at noon.

August 7, 2017 Trial Tr. 5144:13-23. The defendant and his counsel made abundant use of Mr. Bockai, Jr.'s purported inconsistencies without ever using their opportunity to recall him.

The D.C. Circuit Court of Appeals considered a similar case involving a mid-trial disclosure, and held that "in such circumstances, where disclosure was made but made late, 'the defendant must show a reasonable probability that an earlier disclosure would have changed the trial's result' and not just that the evidence was material." United States v. Andrews, 532 F.3d 900, 907 (D.C. Cir. 2008) citing United States v. Dean, 55 F.3d 640, 663 (D.C. Cir. 1995). In this case, the defendant passed on the opportunity to recall Mr. Bockai, Jr., but nonetheless impeached Mr. Bockai, Jr. through another witness, and then fully utilized the impeachment in his closing. The defendant cannot meet the burden of showing that the late disclosure would have changed the trial result when he fulsomely argued that Mr. Bockai, Jr.'s testimony was not to be credited.

In sum, it is uncontroverted that the DEA-6 was inadvertently disclosed late. But it was disclosed in time for there to be a remedy. Again, this issue should be put in the context of the overwhelming evidence against the defendant: for example, the jury saw a video of the defendant telling his patients to purchase money orders at Mr. Bockai, Jr.'s pharmacy, which is more powerful evidence than anything Mr. Bockai, Jr. himself could have ever said.

## B. Witness Robert Long

The defendant alleges that the government committed misconduct by introducing, during Robert Long's testimony, a "highly prejudicial fact" about the death of Johnny R. Jones, in spite of the Court's Order that no evidence of overdose deaths was admissible. ECF Doc. 264-1, page 34. The defendant accurately recites the Court's June 19, 2017 Order, which stated, in part:

> if the jury were to hear testimony about Defendant's patients or their acquaintances suffering oxycodone overdoses or similar events there is a significant risk that they would speculate that Defendant had caused these results and seek to punish Defendant for doing so.

DCF Doc. 68, page 3. The defendant's argument fails because the jury, in fact, never heard evidence of overdose deaths of the defendant's patients. The jury never heard evidence of the

"defendant's patients or their acquaintances suffering oxycodone overdoses" and the jury never heard evidence that the "defendant caused these results." Therefore, the defendant's argument that the government violated the Court's order by eliciting testimony in violation of the Order is plainly wrong.

What the jury did hear, however, was that one patient, Johnny R. Jones, "passed away" several years prior to the trial. July 27, 2017 Trial Tr. 3518:20. There was no testimony about the cause of Mr. Jones' death. Further, this testimony was unexpected and not responsive to the government's question. The following exchange is the statement at issue:

> Q. About how many times did you accompany Johnny R. Jones, Jr., to the Ivan Robinson clinic after the first time, roughly?
> A. Well, we went every two weeks in 2012. So he passed away in 2013.

The prosecutor could not have anticipated that by asking Mr. Long "how many times" he went to the clinic with Mr. Jones, that Mr. Long would reply that Mr. Jones was deceased.

Importantly, Mr. Long did not mention the cause of Mr. Jones' death. The Court acknowledged this, stating "They don't know how he passed away . . . People pass away different ways . . . could be lots of reasons. He may have had a heart attack, or he could've been in an accident . . . at this point, the record is all right. They don't know why he passed away. People can die for lots of reasons . . . he can pass away for lots of different reasons. There's nothing to link it to these drugs." July 27, 2017 Trial Tr. 3518:25, 3519:6, 3519:14-16; 3520:8-10; 3527:7-9. Thus, this testimony was not in violation of the Court Order, which prohibited mention of overdose deaths. The Court correctly found that "the record is all right" on this issue. July 27, 2017 Trial Tr. 3520:8-9.

Further, the record shows that the prosecutor had instructed Mr. Long that Mr. Jones' death was not going to be an issue at trial. When questioned as to whether he had been cautioned by the

prosecutor not to mention Mr. Jones's overdose death, Mr. Long stated, "I remember [the prosecutor] saying that we're focusing on things to do with Mr. Robinson and not so much about Johnny as far as overdosing . . . [the prosecutor] had told me we're focusing on the clinic itself, not [Mr. Jones'] actual death."  July 27, 2017 Trial Tr. 3522:5-7; 3523:4-5.   The Court, having witnessed Mr. Long's demeanor and testimony, observed:

> he's very concrete . . . very concrete listening to him in terms of his thinking and how he expresses himself, which is hard to, I think, prepare in terms of doing it . . . I don't want to be insulting to [Mr. Long], but let me just say it seems to me listening to him that this is somebody who is very concaved in his thinking, and perhaps is not, as some have said, he's not that well educated at the level he is.

The above record illustrates that the prosecutor instructed Mr. Long as to the parameters of his testimony, and that the Court recognized the limitations of the witness.

Finally, the Court gave a cautionary instruction to the jury, remedying any potential prejudice.  The instruction the Court read was as follows:

> As part of the testimony, you heard testimony that Johnny R. Jones, Jr., has passed away. Mr. Jones' death is unrelated to his experience as a patient of Dr. Robinson. So I would ask that you not speculate as to the cause of Mr. Jones' death.

July 27, 2017 Trial Tr. 3567:12-16.  The Court correctly stated that this instruction cured any potential issue, noting that the instruction "just takes the thing off the table."  July 27, 2017 Trial Tr. 3528:22-23.  Jurors are presumed to follow the instructions as given to them by the Court. Price v. North Carolina, 512 U.S. 1249 (1994).

The D.C. Circuit Court of Appeals has considered a similar situation previously and found that the jury instruction was an adequate remedy.  In United States v. Wheeler, a witness answered the prosecutor's question with testimony that was unexpected by the prosecutor.  Wheeler, 735 F.3d 200, 206 (D.C. Cir. 2014).  In Wheeler, a witness unexpectedly stated that the defendant

forged documents.  Wheeler, at 206.  As in this case, the District Court instructed the jury regarding the unexpected comment.  The D.C. Circuit found that "the comment was brief, and, viewed in context, less harmful to Wheeler than she maintains."  Id. at 207, citing United States v. Venable, 269 F.3d 1086, 1090 (D.C. Cir. 2001) (explaining that the prejudicial impact of comments should be assessed in context).  As in Wheeler, "the comment was brief, and, viewed in context, less harmful to [defendant Robinson] than [he] maintains."  Id.  Also, again as in Wheeler, "it is highly unlikely that [the testimony] was a significant factor in the jury's deliberations."  Id.

While not binding on this Court, the Third Circuit has developed a three-part test for analyzing a witness' allegedly prejudicial comments.  The three factors are (1) whether [Mr. Long's] remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury; (2) the strength of the other evidence; and (3) curative action taken by the District Court.  United States v. Golson, 559 Fed.Appx. 157 (3rd Cir. 2014), citing United States v. Lore, 430 F.3d 190, 207 (3d Cir. 2005).  Mr. Long's comment -- "he passed away in 2013" -- was five words in a multi-week trial where the jury heard from nearly 40 witnesses.   In this scenario, the comments do not rise to the level of "pronounced and persistent, creating a likelihood they would mislead and prejudice the jury."  Id.  Likewise, when considering the strength of the evidence against the defendant, the comment pales.  Mr. Long's comment was inconsequential in light of the overwhelming evidence against the defendant.   Finally, the third prong of the Third Circuit's analysis is the curative action taken by the District Court.   In this case, the Court gave an instruction that Mr. Jones passed away "unrelated to his experience as a patient" of the defendant's and that the jury was not to "speculate as to the cause of Mr. Jones' death."  July 27, 2017 Trial Tr. 3567:14-16.  Thus, under the Lore analysis, the defendant's argument fails.

There is no misconduct where the prosecutor advised the witness that Mr. Jones's death

was not going to be discussed at the trial, and that the mention of Mr. Jones's death -- without any mention of the <u>cause</u> of his death -- was brief, inconsequential, and immediately remedied.

### C.  <u>Witness Jesse Goble</u>

The defendant also alleges that dismissal by the St. Mary's County, Maryland, State's Attorney's Office of Jesse Goble's pending criminal matter in St. Mary's County is somehow an outstanding <u>Brady</u> issue.  See Def. Mot., page 36.  The defendant asserts that the charges "were recently dismissed without explanation."  <u>Id.</u>  The defendant also sent the government a letter on October 12, 2017, stating that the "charges were dismissed without any public explanation, including to the court there."  <u>See</u> Attachment B (October 12, 2017 letter from Defense Counsel to government counsel).  U.S. Attorney's Office for the District of Columbia made no promises to Mr. Goble that his case would be dismissed, nor did it play any part in the dismissal of the case by St. Mary's County.  And, indeed, Mr. Goble's testimony at trial, as recited below, confirms these points.

At trial, the defendant recognized that Mr. Goble's understanding of any possible consideration was the key factor in this analysis.  Defense Counsel accurately stated, "it's not the Government's reason for doing these things, it's Mr. Goble's understanding of what he's being offered that matter."  July 26, 2017 Trial Tr. 3169:14-16.  To that end, Mr. Goble stated that he understood that no one at the United States Attorney's Office for the District of Columbia was going to intervene in his St. Mary's County case, and that, in fact, he was unaware that such an arrangement could even exist.  On direct examination, Mr. Goble was asked the following:

> Q.    Okay. Do you understand that this immunity letter doesn't mean that you won't get prosecuted?
> A.    Yes, I do.
> Q.    All right. And do you understand this immunity letter doesn't -- it means that we're not asking that St. Mary's dismiss the charges against you?

> A.     Yes, I do.

July 26, 2017 Trial Tr. 3173:2-8.  Then, on cross-examination, Mr. Goble was asked about the

effect his trial testimony would have on his case in St. Mary's County, and the following exchange

took place between Mr. Goble and Defense Counsel:

> Q.     . . . you know that if you're convicted, in sentencing, you
>        could ask the Government to write a letter on your behalf
>        based on your cooperation here today, right?
> A.     No. I never heard such a thing.
> Q.     You've never heard, based on your time being involved in
>        this case, that the Government can weigh into your
>        sentencing considerations?
> A.     I never heard of such a thing.
> Q.     You never heard of it at all?
> A.     No.
> Q.     Not just you don't expect it, but you're not even aware that
>        the Government can weigh into sentencing considerations?
> A.     Not at all.

July 26, 2017 Trial Tr. 3203:20-25; 3204:1-9.  It is plain that, regardless of what happened with

Mr. Goble's case in another jurisdiction, that he had no reason to curry favor with the government.

The defendant had the opportunity to, and did, question Mr. Goble regarding his possible motives.

Thus, the defendant cannot now base his Motion for a New Trial on the dismissal of Mr. Goble's

case in St. Mary's County, Maryland.

### D.  The Defendant's Post-Trial Discovery Demands

Defendant baldly asserts that "Brady concerns remain due to the government's continuing

review of evidence," but nowhere in his motion does defendant set forth the governing law for a

Brady violation, or even attempt to meet its rigorous standard.   See Def. Mot., page 36

(capitalization adjusted in quote).  Regardless, the defendant's accusations are baseless.

There are three components of a Brady violation: (i) the evidence at issue must be favorable

to the accused, either because it is exculpatory, or because it is impeaching; (ii) that evidence must

have been suppressed by the prosecution, either willfully or inadvertently; and (iii) prejudice must have ensued. Strickler v. Greene, 527 U.S. 263, 281–282 (1999). Prejudice (or materiality) requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome." Id.; see also United States v. Pettiford, 627 F.3d 1223, 1227 (D.C. Cir. 2010).

A defendant cannot establish a Brady violation with speculation or conjecture, and a blanket statement that "concerns remain" (see Def. Mot., page 36) is plainly insufficient to obtain a new trial. An accusation of a Brady violation "does not entitle [a defendant] to conduct a fishing expedition for possible exculpatory evidence." United States v. Nagle, Case No. 09-cr-384, 2013 WL 3894841, at *56 n. 77 (M.D. Pa. July 26, 2013); see also United States v. Meros, 866 F.2d 1304, 1309 (11th Cir. 1989) ("A prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially impeaching evidence every time a criminal defendant makes a Brady request for information regarding a government witness."). Moreover, Brady does not require production of documents based on "mere speculation about materials in the government's files." United States v. Stinson, 647 F.3d 1196, 1208 (9th Cir. 2011). Nor can such assertions support a Rule 33 new trial motion. See, e.g., United States v. Reyes-Garcia, Case No. 10-cr-0348, 2011 WL 6260357, at *3 (E.D. Cal. Dec. 15, 2011) (denying Rule 33 motion, as defendant's Brady assertions offered only "[s]peculative evidence [that] is insufficient to warrant a new trial," and collecting cases holding the same); United States v. Walker, Case No. 94-cr-328, 1998 WL 760260, at *3 (N.D.N.Y. Oct. 30, 1998) (same).

With respect to defendant's Brady claims, he offers nothing more than conjecture, and "[m]ere conjecture will not carry [d]efendant's burden." Nagle, 2013 WL 3894841, at *56 n.77.

As the defendant notes, he was given access to the government's materials well in advance of trial, and he even recounts in his Motion a visit the defense team took to the DEA evidence room to review boxes of documents.  <u>See</u> Def. Mot., page 4.

In response to defendant's post-trial request for additional materials, the government stated that it would further review its files.  The government advised Defense Counsel that it had "previously disclosed all <u>Brady</u> and <u>Jencks</u> material for this case [however] we are conducting an additional review" at the defense request.  <u>See</u> Attachment C (October 3, 2017 letter from Defense Counsel[16]) and Attachment D (October 6, 2017 response from the government).  To the extent that defendant suggests that this file-review implies the existence of undisclosed *Brady* material, he is mistaken.  Nowhere in the United States' response did it concede—or even suggest—that any additional *Brady* disclosures would be forthcoming.  The mere fact that the United States is responding to the defendant's post-trial letter does not mean that his <u>Brady</u> "concerns" are legitimate, let alone any violation has occurred.  The government is complying with, and will continue to comply with, its <u>Brady</u> obligations and to date, has found no <u>Brady</u> material.

## V.    THE JURY WAS PROPERLY INSTRUCTED ON THE DISTRIBUTION OF A CONTROLLED SUBSTANCE OUTSIDE THE USUAL COURSE OF MEDICAL PRACTICE AND NOT FOR A LEGITIMATE MEDICAL PURPOSE

The defendant again attempts to relitigate an issue that was extensively briefed and argued before and during trial.  As stated previously, a Rule 33 motion for a new trial is not a proper vehicle to revisit issues that were raised, litigated, and resolved before the verdict.  The defendant raises three arguments regarding the jury instruction: that the Court should have provided a civil jury instruction, that the good faith jury instruction was confusing to the jury, and that the

---

[16] Defense Counsel's letter October 3, 2017 letter states that a "witness list" was attached, yet no such list was attached to the letter sent to the government.  <u>See</u> Attachment C, page 2.

instructions were prejudicial because the defendant believes the statute itself is vague. Each of these arguments fail.

As an initial matter, the defendant misstates the procedural history, claiming that:

> the parties agreed that it would appropriate to include a jury instruction that addressed the possible confusion between the criminal standard to be applied in this case and the civil malpractice standard. *See* Proposed Jury Instructions, Dkt. 110 at p. 65 (June 5, 2017) (including "Special Jury Instruction No. 3"); Proposed Jury Instructions, Dkt. 127 (June 23, 2017); Government's Supplement to Proposed Jury Instructions, Dkt. 128 (June 24, 2017); Dkt. 157 Ex. 2 (email dated July 8, 2017).

Def. Mot., page 38. The defendant further goes on to say that the "agreed-upon instruction" was from the Volkman case.[17] This is inaccurate. In fact, the defendant explicitly stated in his June 23, 2017 filing, "the proposed revised version of the special jury instruction on the Controlled Substances Act, Special Jury Instruction #1, is a *defense-only proposal*." ECF Doc. 127, page 1 (emphasis added). The government, in its response, stated that "reliance upon Volkman is not helpful" and that the Volkman instruction was "erroneous." ECF Doc. 128, page 7.

## D.  The Defendant was Not Entitled to a Civil Malpractice Jury Instruction

This Court carefully considered the defendant's suggestion that that a civil malpractice jury instruction be provided, and declined to do so. On August 1, 2017, the Court found that, in the context of the rest of the jury instructions, Special Instruction #1 (Distribution of Controlled Substances) "does not create any confusion regarding whether the jury should apply a criminal or civil standard" and that adding the civil malpractice instruction "would itself risk such confusion." ECF Doc. 214, pages 6-7. The Court further noted that the jury would be told that the burden is greater in a criminal trial than a civil trial. Id.; see also ECF Doc. 231, page 15 (Reasonable Doubt Jury Instruction). The Reasonable Doubt Jury Instruction states:

---

[17] United States v. Volkman, 797 F.3d 377 (6th Cir. 2015).

> Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely true than not true. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.

Id. Thus, the jury was told that the burden was higher in a criminal matter and that they must not use the standard that is used in a civil matter.

The defendant, citing United States v. Feingold, 454 F.3d 1001 (9th Cir. 2006), argues that "the failure to include a jury instruction that distinguished between the criminal standard of liability in this case and the lesser civil malpractice standard" was error. Def. Mot., page 39. This is a misapplication of Feingold. Feingold does not stand for the proposition that that a civil jury instruction is appropriate. In fact, Feingold notes that "significantly, both the Supreme Court and this [Ninth] Circuit have previously approved jury instructions that refer to a national standard of care." Feingold, at 1009. The Feingold Court found that "after viewing the jury instructions in their entirety, 'we failed to see how the jury could have interpreted the instructions as permitting a finding of guilt based on mere negligence.'" Feingold, at 1010 (citing United States v. Hayes, 794 F.2d 1348 (9th Cir. 1986)). Likewise, in this case, the jury instructions were clear and properly instructed the jurors to hold the government to the highest burden of criminal liability. Finally, Feingold "reaffirm[ed] that it is appropriate in cases such as this for the jury to consider the practitioner's behavior against the benchmark of acceptable and accepted medical practice." Feingold, at 1011.

Additionally, the jury instructions did not allow the jury to convict the defendant "based *solely* on a finding that he failed to comply with the standard of care" as the defendant alleges. Def. Mot., page 39 (emphasis added). Rather, the jury was instructed that, to convict, they must find beyond a reasonable doubt, that the defendant "*knowingly and intentionally* distributed the drug outside of the usual course of medical practice generally recognized and accepted in the

United States *and* not for a legitimate medical purpose."  ECF Doc. 231 (Jury Instructions), page 35 (emphasis added).  Thus, there was no danger that the jury would convict "based *solely* on a finding that he failed to comply with the standard of care" as the defendant suggests.  As in <u>Feingold</u>, "the district court's instructions required a finding of intent, not merely a finding of malpractice." <u>Feingold</u>, at 1009.

Quite simply, jury instructions need not provide the jury with other standards by which the defendant should not be judged as reference for what the standard of criminal liability should be. The Court appropriately instructed the jury on the burden of proof and instructed the jury as to the elements of the criminal charges.

### E.  <u>The Good Faith Instruction Did Not Confuse the Jury and the Government Did Not Impermissibly Define Good Faith in its Closing Argument</u>

The defendant suggests that the "government's closing argument provided no guidance to the jury as to how to distinguish between criminal liability under the statute and civil malpractice" and is therefore error.   Def. Mot., page 40.  However, had the government discussed in its closing a non-applicable standard, it would have only served to confuse the jury.  The defendant gave a comprehensive and impassioned closing argument, and also never mentioned the civil standard of proof.  The Court did, however, instruct the jury to not use the civil burden of proof in weighing the evidence.  August 7, 2017 Trial Tr. 5186:22-25.

The defendant further claims that the government's "circular definition" of good faith in its closing argument was somehow defining the standard for liability.  Def. Mot., page 40.   The defendant did not object during the government's closing when the prosecutor made the statement to which he now objects.  It was, in fact, the Court who defined the standard for criminal liability when it that the burden of proof was beyond a reasonable doubt, and higher than the burden in a civil matter.  August 7, 2017 Trial Tr. 5186:20-25; 5187:1-12.  The Court also explained that the jury,

in order to convict, must find that the defendant "*knowingly and intentionally* distributed the drug outside of the usual course of medical practice generally recognized and accepted in the United States *and* not for a legitimate medical purpose" beyond a reasonable doubt.  August 7, 2017 Trial Tr. 5202:10-21; ECF Doc. 231 (Jury Instructions), page 35 (emphasis added).  The defendant also addressed this issue in his closing argument:

> The government has to prove beyond a reasonable doubt that [the defendant] knowingly and intentionally -- knowingly and intentionally – distributed painkillers -- in this case, oxycodone -- outside the course of medical practice recognized in the United States and not for a legitimate medical purpose. That "and" is important, too.

August 7, 2017 Trial Tr. 5117:6-12.

Although the defendant believes the government's definition of good faith was "circular," in reality, the government merely told the jury that one cannot practice in good faith if one is not practicing at all.  The defendant also defined good faith, criminal liability, and the burden of proof in his closing argument:

> I draw your attention specifically to the use of the word "good faith." It tells you that Dr. Robinson is allowed to prescribe oxycodone in good faith in the course of his practice, in the course of medically treating a patient. Then, it tells you what "good faith" means. It means, right in the middle of that paragraph, his honest exercise of good professional judgment as to a patient's medical needs that he reasonably believed in accordance with the standard of medical practice generally recognized and accepted in the United States. That is the definition of good faith. That language is important: Knowingly and intentionally; good faith; reasonable medical practice; the needs of the patient. All of that falling on the government's burden beyond a reasonable doubt.

August 7, 2017 Trial Tr. 5117:17-25; 5118:1-6.

The defendant continues, after much litigation, to object to the good faith instruction that the Court gave.  It is well-established that good faith must be objective, not subjective.  Indeed, if a lawful defense would be anytime a practitioner claimed "I did what I thought was right," the

statute would be essentially void.  The inquiry into a practitioner's good faith is an objective one, and thus not required to delve into the realm of subjectively determining what the motive of the individual practitioner may have been.  United States v. Hurwitz, 459 F.3d 463, 478-80 (4th Cir. 2006) (proposed instruction that doctor acted in good faith if he "acted according to what he believed to be proper medical practice" was an inaccurate statement of law because "proposed instruction clearly sets forth a subjective standard" whereas "the inquiry is an objective one" and imports an "objective standard for determining whether the defendant acted in good faith"); accord United States v. Joseph, 709 F.3d 1082, 1097 (11th Cir. 2013) (good faith turns on objective, rather than subjective, standard); United States v. Tobin, 676 F.3d 1264, 1283 (11th Cir. 2012) ("whether a prescription is made in the usual course of professional practice is to be determined from an objective, and not subjective, viewpoint").  United States v. Smith, 573 F.3d 639, 647-48 (8th Cir. 2009) (subjective standard would "effectively shield the practitioner from criminal liability" even when acting as nothing more than a "large scale pusher" (quoting Moore, 423 U.S. at 143)); United States v. Vamos, 797 F.2d 1146, 1152-53 (2d Cir. 1986) (belief of practitioner claiming to have distributed controlled drugs for legitimate medical uses is governed by objective standard).

Moreover, the jury was not confused by the jury instructions or arguments, as evidenced by the fact that they deliberated for a lengthy period of time, carefully considered the evidence (as evidenced by the jury notes), and ultimately found the defendant not guilty of Count 32.  The jury deliberated for three days, sent out several notes and delivered a split verdict -- these are the actions of a thoughtful and deliberate jury, not a confused jury.  See United States v. Cornell, 780 F.3d 616, 627 (4th Cir. 2015) (a long deliberation and a split verdict "reflects a thoughtful and deliberate jury").  The jury instructions were proper and stated accurately the defendant's criminal liability. The defendant's continued objection to the Court's instructions is not a basis for a new trial under

Rule 33.

## F.  The Statute is Not Vague

The defendant renews his pretrial argument that the Controlled Substance, for which he was convicted, is vague.  This, like many of the defendant's previous arguments, has already been decided, and a Rule 33 motion is not the appropriate venue to relitigate it.  The defendant argues that "the terms 'legitimate medical purpose' and within the 'usual course of professional practice' failed to provide constitutionally required notice."  Def. Mot., page 41.  This argument is frivolous.

The Court considered the defendant's March 22, 2017 Motion to Dismiss Case for Unconstitutional Vagueness (ECF Doc. 58), and rejected it.   The Court found that "Section 841 is not unconstitutionally vague as applied to [the] defendant."  ECF Doc. 81, page 2 (Court Order dated May 15, 2017).  The Court methodically evaluated the issue and concluded as follows:

> It has long been settled that this prohibition [21 U.S.C. § 841(a)(1)] applies to registered health care professionals like [the] defendant. . . With respect to such individuals, who are legally allowed to distribute controlled substances under certain circumstances, the prohibition means that "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04. Prescriptions outside these bounds—such as those alleged in the Superseding Indictment—are illegal.  The Court finds that this framework, including the "legitimate medical purpose" and "usual course of his professional practice" standards, is not unconstitutionally vague . . . The above-described framework clearly provides adequate notice to a person of ordinary intelligence in Defendant's position that such conduct is illegal.

No further analysis is required and this previously litigated issue is certainly not grounds for a new trial.

## CONCLUSION

The defendant had a fair trial, the Court very carefully weighed the numerous motions the

defendant filed, and the evidence against the defendant was overwhelming. The evidence does not "preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." United States v. Walker, 899 F.Supp. 14, 15 (D.D.C. 1995), affirmed 99 F.3d

439 (D.C. Cir. 1996).  Therefore, the defendant's Motion for a New Trial is due to be denied.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar No. 472845

By:

/s/
_____
John P. Dominguez
Assistant United States Attorney
D.C. Bar No. 959809
555 4th Street, N.W.
Washington, D.C.  20001
202-252-7684
john.dominguez@usdoj.gov

Dineen A. Baker
Assistant United States Attorney
D.C. Bar No. 487820
555 4th Street, N.W.
Washington, D.C.  20001
202-252-6954
dineen.baker@usdoj.gov