# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>IVAN L. ROBINSON,<br><br>Defendant | Criminal Action No. 16-98 (CKK) |

## MEMORANDUM OPINION
(September 17, 2020)

Currently pending before the Court is Defendant Ivan Robinson's [284] Motion for a New Trial and [326] Motion for Reconsideration of Motion for Institution of Conditions of Release Pending Sentencing.[1] Both Motions are grounded in the argument that Defendant Robinson is entitled to a new trial based on two violations of *Brady v. Maryland*, 373 U.S. 83 (1963) and on a claim of ineffective assistance of counsel. The United States contends that Defendant Robinson is not entitled to a new trial, and thus should not be released from custody, because the two withheld pieces of evidence do not constitute violations under *Brady* and because Defendant Robinson received effective assistance of counsel.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record for purposes of this motion, the Court DENIES Defendant Robinson's [284] Motion for a New Trial

---

[1] Defendant Robinson has also separately filed at least two additional motions for release which also raise the issue of his request for a new trial as well as other unrelated issues. The Court has already ruled on these Motions. There is one additional pending motion which the Court will resolve shortly. The focus of this Memorandum Opinion will be Defendant Robinson's request for a new trial which will inform the decision on his request for conditions of release pending sentencing.

[2] The Court's consideration has focused on the following documents:
- Def.'s Mot. for a New Trial ("Def.'s Mot."), ECF No. 284;
- Gov.'s Resp. in Opp'n to Def.'s Mot. for a New Trial ("Gov.'s Res."), ECF No. 290;

and therefore also DENIES his [326] Motion for Reconsideration of Motion for Institution of

Conditions of Release Pending Sentencing. The Court concludes that the two pieces of withheld

evidence do not constitute violations under *Brady* as they do not call into question the fairness of

the ultimate verdict. The Court further concludes that Defendant Robinson's trial counsel[3] were

not ineffective, and that the decision not to call an expert witness was a strategic decision that did

not cause prejudice to Defendant Robinson. Finally, the Court concludes that the myriad

arguments that Defendant Robinson briefly raises are not meritorious.

## I.       FACTUAL BACKGROUND

Defendant Robinson was a licensed nurse practitioner who maintained a medical practice

in Washington, D.C., with offices in various locations. ECF No. 284, 1. Defendant Robinson's

practice eventually comprised thousands of patients and he began to specialize in spinal injuries.

*Id*. Defendant Robinson represents that he treated his patients with a "patented protocol including

---

• Gov.'s Res. to Def.'s Letter Dated Feb. 13, 2018 ("Gov.'s Res. to Def.'s Letter"), ECF No. 308;
• Def.'s Mot. for Recons. of Mot. for Inst. of Conditions of Release Pending Sentencing ("Def.'s Mot. for Recons."), ECF No. 326;
• Def.'s Reply to the Opp'n to Mot. for New Trial and Suppl. to Def.'s Mot. for New Trial ("Def.'s Suppl."), ECF No. 327;
• Gov.'s Omnibus Res. in Opp'n to the Def.'s Pending Mots. ("Gov.'s Omnibus Res."), ECF No. 330;
• Def.'s Reply to the Opp'n of the Gov. to Mot. for New Trial and Mot. for Recons. of Imposition of Conditions of Release Pending Sentencing ("Def.'s Reply"), ECF No. 332;
• Gov.'s Suppl. Opp'n to Def.'s Ineffective Assistance of Counsel Claim ("Gov.'s Suppl."), ECF No. 351; and
• Def.'s Reply to Gov.'s Suppl. Opp'n to Def.'s Ineffective Assistance of Counsel Claim ("Def.'s Reply to Gov.'s Suppl."), ECF No. 364.
[3] "Trial counsel" will be used to reference the collective of attorneys who represented Defendant during trial, including Mr. Jonathan Jeffress, who is named as the "lead trial counsel."

2

spinal decompression therapy, medication, exercise, and diet," which involved "oxycodone in a dose of 30 milligrams" as part of the medication protocol. *Id*.

In February 2013, the Drug Enforcement Administration ("DEA") received reports from "pharmacists who had noticed suspicious patterns regarding oxycodone prescriptions originating from the defendant's practice" and subsequently launched an investigation into Defendant Robinson's medical practice. ECF No. 290, 5. In March 2013, undercover officers went to one of Defendant Robinson's clinics and posed as patients "in an attempt to purchase oxycodone prescriptions." *Id*. Two of the agents were able to "purchase a prescription for oxycodone from the defendant in exchange for $370 blank money orders," while the third agent "was turned away." *Id*. at 5, n.5. The two agents who received prescriptions returned in April 2013, and obtained additional prescriptions for oxycodone, again in exchange for $370 in blank money orders and without an adequate physical exam. *Id*. at 5. On June 19, 2013, search warrants were executed and conducted at Defendant Robinson's home and at two of his clinics. *Id*. at 6. Following the execution of the search warrants, Defendant Robinson withdrew $108,000 from his bank account. ECF No. 284, 2.

## II.    PROCEDURAL BACKGROUND

On June 7, 2016, Defendant Robinson was indicted with fifty-five counts of prescribing oxycodone "outside the legitimate practice of medicine," as well as forfeiture allegations with respect to the $108,000 bank account withdrawal, cash found on him during the execution of the search warrant, and a vehicle. *Id*. On April 27, 2017, a superseding indictment was returned, charging Defendant Robinson with sixty-one counts of prescribing oxycodone—eighteen of

which were eventually dropped—and two counts of money laundering pursuant to 18 U.S.C. § 1957. ECF No. 290, 4.

On August 10, 2017, following an approximately 20-day trial, Defendant Robinson was found guilty of forty-two counts of prescribing oxycodone outside the legitimate practice of medicine and two counts of money laundering. *Id.* Defendant Robinson was found not guilty of one count of prescribing oxycodone. *Id.* Lastly, the jury arrived at a split verdict on the forfeiture allegations, determining that the $108,000 and the vehicle were "proceeds constituting or derived from [Defendant's] prescription of oxycodone and money laundering," while ten money orders, totaling $3,330 and $997 in cash, did not constitute such proceeds. *Id.*

On October 20, 2017, trial counsel for Defendant Robinson moved for a new trial. ECF No. 284. On December 8, 2017, the United States filed an Opposition to that Motion. ECF No. 290.

Prior to the filing of a Reply by Defendant Robinson, the Court received a motion from Defendant Robinson to discharge his trial counsel. ECF No. 303. On February 22, 2018, the Court granted Defendant Robinson's Motion to discharge his trial counsel. ECF No. 306. Defendant Robinson was appointed new counsel. During a March 23, 2018 hearing, the Court allowed Defendant Robinson's new counsel to have extensive time to review the record of the case and to accommodate counsel's schedule. The Court ordered that, following a review of the case, Defendant Robinson would file a Reply to the United States' Opposition to Defendant Robinson's Motion for a New Trial which would address the arguments in Defendant Robinson's original motion as well as any arguments that the new defense counsel sought to raise. March 23, 2018 Minute Order.

On December 31, 2018, Defendant Robinson filed his Reply to the United States'
Opposition. ECF No. 327. He also filed a Motion for Reconsideration of Motion for Institution
of Conditions of Release Pending Sentencing, bringing new arguments relating to two alleged
*Brady* violations and ineffective assistance of counsel. ECF No. 326. On February 14, 2019, the
United States filed an omnibus response to both of Defendant Robinson's pending motions. ECF
No. 330. The United States argued that Defendant Robinson had received effective assistance of
counsel but indicated that if the claim was to be pursued additional discovery would be required.
*Id*. And, on March 8, 2019, Defendant Robinson filed a Reply to the United States' Opposition.
ECF No. 332.

On April 1, 2019, the Court held a teleconference to discuss Defendants Robinson's
pending Motions. During the teleconference, the Court indicated that there was overlap between
Defendant Robinson's ineffective assistance of counsel claim and his other claims. As such, in
order to resolve the pending Motions, Defendant Robinson's ineffective assistance of counsel
claim would need to be more detailed. Defendant Robinson agreed to waive his attorney client
privilege with his trial counsel so that the United States could conduct discovery and the Court
could address the claim. April 1, 2019 Minute Order.

Due to the high volume of material relating to Defendant Robinson's claim, discovery
into the materials took some time. Following discovery, the Court set a schedule for
supplemental briefing on Defendant Robinson's ineffective assistance of counsel claim. On
October 24, 2019, the United States filed its supplemental opposition to Defendant Robinson's
ineffective assistance of counsel claim. ECF No. 351. And, following multiple motions for

extensions of time, Defendant Robinson filed his Reply to that Opposition on March 13, 2020. ECF No. 364.

As the briefing for all of Defendant Robinson's arguments in support of a new trial are now complete, the Court shall address each argument.

## III.   LEGAL STANDARD

Defendant Robinson has filed two Motions—a motion for a new trial and a motion to reconsider his conditions of confinement. Both Motions are interrelated as Defendant Robinson requests that he be released from custody in large part because he is entitled to a new trial. As such, the Court's analysis shall be conducted pursuant to Federal Rule of Criminal Procedure 33 which governs requests for new trials.

Under Rule 33, upon motion by the defendant, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In order to grant a new trial, "the evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Howard*, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (quoting *United States v. Edmond*, 765 F. Supp. 1112, 1118 (D.D.C. 1991)). In making its determination, the district court "weighs the evidence and evaluates the witnesses' credibility and decides whether 'a serious miscarriage of justice may have occurred.'" *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990) (quoting *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982)). Notably, this "power should be exercised with caution, and is invoked only in those exceptional cases in which the evidence weighs heavily against the verdict." *Edmond*, 765 F. Supp. at 1118. The moving party has "the burden of proof that a new trial is justified." *Id*.

## IV.   DISCUSSION

The Court shall proceed in evaluating Defendant Robinson's arguments in favor of a new trial. The Court shall first address the myriad arguments raised in Defendant Robinson's initial Motion filed by his trial counsel. The Court shall next address Defendant Robinson's primary arguments in support of a new trial—claims of *Brady* violations and ineffective assistance of trial.

### A.  Previously Addressed Arguments

As was previously discussed, Defendant Robinson's trial counsel filed his initial Motion requesting a new trial. However, before briefing had completed on that Motion, Defendant Robinson requested and received new counsel. As such, many of the arguments introduced in Defendant Robinson's initial Motion are not pursued in later briefs. Additionally, the majority of these arguments were raised before and during trial and already decided by the Court. However, for the purposes of completeness, the Court shall briefly address those primary, initial arguments. The Court adopts and incorporates and makes a part of this Memorandum Opinion all of the previous rulings on these issues. *See, e.g.*, ECF Nos. July 6, 2017 Minute Order, 178, 191, 130, 204, 137, 125, 126, 81, 119, 122, 129, 214.

First, Defendant Robinson argues that the testimony of Dr. Mark Romanoff, the United States' expert witness, was unreliable and inadmissible. In so far as Defendant Robinson's argument concerning Dr. Romanoff is based on trial counsels' inability to cross-examine Dr. Romanoff due to *Brady* violations, such analysis will be addressed below. *See Infra* Sec. IV.B. However, Defendant Robinson also argues that Dr. Romanoff's testimony was improper as he conducted only a limited chart review and failed to take into account contradictory paper medical

files or the testimony from the patients themselves. As such, Defendant Robinson contends that

Dr. Romanoff's expert testimony was unreliable and inadmissible under Federal Rule of

Evidence 702.

The Court finds, as it previously ruled, that Dr. Romanoff was an appropriate expert

witness. *See* July 6, 2017 Minute Order (denying motion to exclude Dr. Romanoff following

*Daubert* hearing). The Court notes that Defendant Robinson had the opportunity to confront Dr.

Romanoff about the existence of any un-reviewed patient records during the July 6, 2017

*Daubert* hearing and when Dr. Romanoff was presented as a witness. Additionally, trial counsel

was able to—and did in fact—cross-examine Dr. Romanoff as to any un-reviewed medical

records at trial. *See e.g.* July 31, 2017 Trial Tr. 4140: 1-4144: 25 (portion of cross-examination

of Dr. Romanoff). Moreover, Dr. Romanoff explained that, while he had skimmed some of the

patient testimony, he did not credit it as patients are often not reliable witnesses as to the quality

of the care received. July 28, 2017 Trial Tr. 3827: 20-3838: 20. And, the Court instructed the

jury that they did not have to accept Dr. Romanoff's opinion. *See* Aug. 7, 2017 Trial Tr. 5192: 4-

19.

Second, Defendant Robinson argues that the Court erred in admitting evidence of bad

acts without a connection to the charged activities, such as testimony from other pharmacists

who would not fill Defendant Robinson's prescriptions and testimony about patient volume and

money orders. Defendant Robinson contends that such evidence was irrelevant and prejudicial.

Again, the Court previously ruled as to most of these issues. The Court issued two pre-

trial rulings as to the testimony of the other pharmacists. *See* ECF Docs. 178, 191. Ultimately,

the Court concluded that the pharmacists could testify "that they refused to fill prescriptions for

oxycodone issued by the Defendant, and to state their reasons for doing so." ECF No. 178, 2. As to the testimony on the use of money orders, the Court previously limited the use of money order evidence, such as prohibiting evidence on Defendant Robinson's overall wealth and eliminating testimony on money orders in denominations other than $370 which had an evidentiary basis. ECF No. 130, 2; ECF No. 204, 3. The Court allowed evidence as to money orders for $370 because there was a sufficient link between those money orders of that denomination and illegal prescriptions. ECF No. 204. Defendant Robinson's post-trial arguments do not alter the Court's decisions.

Third, Defendant Robinson contends that the United States improperly relied on the racial composition of Defendant Robinson's patient population. Prior to trial, and on Defendant Robinson's Motion, the Court ruled that "[t]he jury should not be invited to base its decision in any way on the race of Defendant's patients." ECF No. 137, 2. Defendant Robinson argues that the United States violated this prohibition by asking multiple witnesses to testify about Dr. Robinson's office being on Martin Luth King, Jr. Avenue or near the "Big Chair," even though the location of the office was not in dispute. Defendant Robinson contends that this testimony was designed to draw attention to the fact that the office was in Anacostia, a primarily African-American Southeast D.C. neighborhood, while the majority of Dr. Robinson's patients were not from that neighborhood.

Again, prior to trial, Defendant Robinson moved to exclude testimony about the racial composition of his patients. The United States conceded that such evidence would not be probative of any relevant factor, and the court ordered that the United States not introduce any such evidence. ECF No. 137, 2. During the trial, no witness testified about the racial composition

of Defendant Robinson's patients before the jury. And, testimony as to the location of Defendant Robinson's office was not in violation of the Court's Order. Anacostia was never identified as a primarily African-American neighborhood. In fact, it was Defendant Robinson's trial counsel who first mentioned the neighborhood and landmark in opening statements, saying that Defendant Robinson "opened a medical practice, eventually locating his clinic right over in Anacostia by the Big Chair." July 13, 2017 Trial Tr. 733: 17-18. And, when this issue was raised during the trial, the Court explained, "I think you're making an assumption that everybody in Martin Luther King Avenue, in terms of people that are on the street, are all African-Americans. That's not true." July 14, 2017 Trial Tr. 1223: 18-21. Accordingly, the Court finds that the United States did not improperly introduce racial evidence.

Fourth, Defendant Robinson contends that the Court erred in admitting statements made by Defendant Robinson while in the custody of the DEA Task Force. Defendant Robinson argues that these statements were taken in violation of his *Miranda* rights and should not have been permitted.

This issue was previously raised pre-trial in Defendant Robinson's motion to suppress. Following a 3-day hearing on the motion, the Court issued a lengthy ruling explaining that law enforcement "was not required to provide *Miranda* warnings prior to the interview on June 19, 2013 because Defendant was not in custody." ECF No. 126, 26. The Court further concluded that Defendant Robinson's statements were voluntary. *Id.* The Court has already considered and denied this argument, and Defendant Robinson provides no grounds for its reconsideration.

Fifth, Dr. Robinson complains that a new trial should be granted due to various instances of prosecutorial misconduct. The Court shall address the majority of Defendant Robinson's

*Brady* arguments later in the opinion. *See Infra* Sec. IV.B. However, the Court will currently address Defendant Robinson's argument that the United States violated *Brady* by failing to produce a report of an interview with witness Sahr Bockai Jr. prior to his testimony. Defendant Robinson also argues that the United States failed to properly instruct witness Robert Long about the scope of his testimony, resulting in prejudicial testimony about the death of one of Defendant Robinson's patients, Johnny Jones, Jr.

The Court finds no instances of prosecutorial misconduct which would warrant a new trial. As to witness Bockai, Defendant Robinson is correct that the United States failed to provide a report of his interview prior to the completion of his testimony. However, the failure to disclose was discovered during the trial and considered by the Court. The Court concluded that the lack of disclosure was a mistake and provided a choice of remedies, including the United States recalling the witness, defense counsel calling the witness, or defense counsel impeaching the witness through another witness. July 24, 2017 Trial Tr. 2501: 4-10; 2503: 1-5. Defendant Robinson's trial counsel stated, "[a]ll we're asking of the Government is that if we do want to call him in our [case], that they not oppose that." July 24, 2017 Trial Tr. 2502: 20-22. Trial counsel did not call Mr. Bockai but did attempt to impeach him through another witness, DEA Investigator Verna Lofton, who was questioned about any discrepancies between Mr. Bockai's testimony and the report of his interview regarding the dates, times, and amounts for money orders. *See* July 27, 2017 Trial Tr. 3707: 13-3709: 5; July 28, 2017 Trial Tr. 3749 :16-3755: 25. Defendant Robinson's trial counsel also highlighted the discrepancies in their closing arguments. August 7, 2017 Trial Tr. 5144: 13-23. Accordingly, while the failure to produce the report prior to trial was a mistake, Defendant Robinson was able to cure the mistake during the trial and did

not suffer prejudice sufficient to warrant a new trial. *See United States v. Andrews*, 532 F.3d 900, 907 (D.C. Cir. 2008) ("in such circumstances, where disclosure was made but made late, 'the defendant must show a reasonable probability that an earlier disclosure would have changed the trial's result' and not just that the evidence was material").

Similarly, the Court finds that the United States did not commit prosecutorial misconduct with its examination of witness Mr. Long. Prior to trial, the Court ruled that the United States could not introduce testimony "of the death or injury of any of Defendant's patients, or their acquaintances." ECF No. 122, 1. During the trial, the United States asked Mr. Long, "[a]bout how many times did you accompany Johnny R. Jones, Jr., to the Ivan Robinson clinic after the first time, roughly?" Mr. Long replied, "[w]ell, we went every two weeks in 2012. So he passed away in 2013." July 27, 2017 Trial Tr. 3518: 16-20. Notably, Mr. Long did not testify as to the cause of Mr. Jones' death. Additionally, the United States could not have anticipated such a response to their question and had previously instructed Mr. Long that the focus should not be on Mr. Jones' death. July 27, 2017 Trial Tr. 3522: 5-7; 3523: 4-5. Even though the Court's Order was not violated and the cause of Mr. Jones' death was not revealed, the Court instructed the jury, "[a]s part of the testimony, you heard testimony that Johnny R. Jones, Jr., has passed away. Mr. Jones' death is unrelated to his experience as a patient of Dr. Robinson. So I would ask that you not speculate as to the cause of Mr. Jones' death." July 27, 2017 Trial Tr. 3567: 13-17. As such, the Court finds that Defendant Robinson has failed to state a claim of prosecutorial misconduct where the mention of Mr. Jones' death was brief, the cause was not discussed, and the Court issued an instruction remedying any prejudice.

Sixth, Defendant Robinson contends that the Court committed legal error in the definition for criminal liability under 21 U.S.C. § 841. Defendant Robinson faults the Court for not giving a jury instruction on the difference between civil medical malpractice and a violation of 21 U.S.C. § 841. Defendant argues that this mistake was furthered by the "good faith" instruction given by the Court and used by the United States.

As with the majority of Defendant Robinson's other arguments, this claim was argued and decided before and during trial. The Court considered Defendant Robinson's request to include a civil malpractice instruction and decided that the instruction for 21 U.S.C. § 841 "does not create any confusion regarding whether the jury should apply a criminal or civil standard" and that including the civil standard "would itself risk such confusion." ECF No. 214, 6-7. Additionally, the Court noted that the jury would already be instructed that the burden for criminal liability is higher than that for civil liability. *Id*. at 5 (citing reasonable doubt instruction). In this same briefing and opinion, the Court also addressed both parties' arguments about the inclusion of "good faith" in the instruction. The Court continues to find that such instruction was permissible. Finally, the Court previously found that the statute under which Defendant Robinson was convicted is not unconstitutionally vague as applied to Defendant Robinson. ECF No. 81, 2. Again, Defendant Robinson has provided no new arguments which would cause the Court to change its determinations on these matters.

### B. *Brady* Arguments

Moving to Defendant Robinson's primary arguments in favor of a new trial, Defendant Robinson contends that the United States withheld documents that were material and subject to *Brady*. Defendant Robinson asserts the following: (1) the Government "intentionally withheld

material and favorable evidence in the form of written notes drafted by case agents," (2) the agents involved "materially and falsely maintained that they did not create notes that were clearly exculpatory as to defendant," (3) the suppressed evidence "would have supported defendant's defense that he was properly and legally operating his medical practice," (4) Defendant Robinson was "significantly prejudiced by the suppression of the favorable evidence and was thereby denied his constitutional right to due process of law," and (5) this Court's "rulings would have been affected had it been aware of the existence of the material and exculpatory suppressed evidence." ECF No. 326, 7-9. Defendant Robinson's *Brady* allegations center on two law enforcement reports: (1) the DEA-6 reports authored by DEA Special Agent Lisa Pryor ("Pryor reports"), and (2) an incident report from the Metropolitan Police Department ("the CCN report").

Generally speaking, the United States Supreme Court's decision in *Brady* established that the government has an "affirmative duty to disclose material evidence favorable to a criminal defendant." *United States v. Cook*, 526 F. Supp. 2d 10, 14 (D.D.C. 2007) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Following the decision in *Brady*, courts have interpreted a "*Brady* violation" to mean a "multitude of prosecutorial sins involving breach of the broad obligation to disclose exculpatory evidence," otherwise known as "*Brady* material." *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 892 (D.C. Cir. 1999) (internal quotation marks omitted) (quoting *Strickler v. Green*, 527 U.S. 262, 281 (1999)). This interpretation includes "both the failure to search for *Brady* material and the failure to produce it." *Id*. However, a "true *Brady* violation" is comprised of three components: (1) the evidence at issue must be "favorable to the accused, either because it is exculpatory, or because it is impeaching";

14

(2) that evidence must have been "suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler*, 527 U.S. at 281-82; *see id.* at 281 ("[S]trictly speaking, there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."). In determining whether or not prejudice ensued, a court has a "responsibility to evaluate the impact of the undisclosed evidence not in isolation, but in light of the rest of the record." *United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999) (citing *United States v. Agurs*, 427 U.S. 97, 112 (1976)).

### 1. Pryor Reports

Multiple times during the course of this case, and prior to trial, Defendant Robinson requested that the United States produce the reports of conversations Defendant Robinson had with Agent Pryor. ECF No. 308, 2.   The documents at issue here are two DEA-6 reports, authored by Agent Pryor in early 2011, that reflect conversations Defendant Robinson had with Agent Pryor in January 2011. *See* ECF No. 308-1; ECF No. 308-2. The first report discusses a telephone conversation between Defendant Robinson and Agent Pryor, during which Defendant Robinson claimed that "someone was using his name on fraudulent prescriptions." ECF No. 308-1. The second report reflects a meeting that Defendant Robinson had with Agent Pryor and Agent Mark Embry on January 25, 2011, during which Defendant Robinson reiterated his belief that some individuals were engaging in prescription fraud and stated that he had lost approximately 80 patients whom he believed were "pill seekers." ECF No. 308-2.

Considering the first factor under *Brady*, the Court finds that the Pryor Reports were favorable to Defendant Robinson. Under *Brady*, evidence is "favorable" to the defendant if "it

has either exculpatory or impeachment value." *United States v. Sitzmann*, 74 F. Supp. 3d 128, 134 (D.D.C. 2014), *aff'd*, 893 F.3d 811 (D.C. Cir. 2018) (citing *Strickler*, 527 U.S. at 282). This includes evidence "could be used to impeach a prosecution witness." *Id.* at 135. In addition, "[e]xculpatory evidence is 'that which would tend to show freedom from fault, guilt, or blame.'" *United States v. Nelson*, 979 F. Supp. 2d 123, 131 (D.D.C. 2013) (quoting *United States v. Blackley*, 986 F. Supp. 600, 603 (D.D.C. 1997)).

Here, Defendant Robinson argues that the Pryor reports could have been used to impeach the Government's expert witness, Dr. Romanoff, and to impeach Task Force Officer ("TFO") Karen Taylor's[4] grand jury testimony. ECF No. 326, 19. Defendant also suggests that the Pryor reports were "exculpatory" because they "corroborated defendant's defense at trial that he reported patients to law enforcement whom he believed to be engaged in criminal activity[.]" *Id.* at 7-8. The United States contends that the Pryor reports were not favorable because the reports merely contain allegations of prescription fraud and claims from Defendant Robinson that pill seekers were leaving his practice. However, the reports do not show that Defendant Robinson named these pill seekers or reported them to law enforcement. ECF No. 330, 15.

Despite the United States' arguments, the Court finds that the Pryor reports were favorable to Defendant Robinson. While the reports do not have the import that Defendant Robinson attempts to ascribe to them, as will be discussed below, the reports do show that Defendant Robinson reported the use of fraudulent prescriptions. ECF Nos. 308-1, 308-2. While the reports focus on the somewhat tangential allegations of fraudulent prescriptions, they also

---

[4] In the trial transcript, TFO Karen Taylor goes by "Karen Arikpo." Taylor was her maiden name. However, as the parties discuss "TFO Taylor," the Court shall also refer to her by that name.

show that Defendant Robinson told law enforcement that he had lost approximately 80 patients whom he believed to be "pill seekers." ECF No. 308-2, 1. In a case in which Defendant Robinson is accused of illegally providing individuals with medication, such reports can be considered favorable to him.

The Court also finds that the Pryor reports were suppressed. It is undisputed that during the course of the case, Defendant Robinson requested the reports from his conversations with Agent Pryor. The United States contends that it attempted to locate such reports but was informed by the DEA that no such reports existed. ECF No. 308, 2-3. The United States also directly contacted Agent Pryor who twice stated that she did not take any notes during her conversations with Defendant Robinson. *Id*. During a conversation with Agent Pryor on February 15, 2018, after the conclusion of Defendant Robinson's trial, Agent Pryor mentioned for the first time that Agent Embry was present and may have taken notes. *Id*. at 6. After contacting Agent Embry, the United States was eventually able to locate the reports in a general file, not under Defendant Robinson's name or case number. It is undisputed that these reports were not located or provided to Defendant Robinson until after the trial. While the United States appears to have acted diligently in attempting to locate the reports, the reports were still suppressed. As such, the Court finds that Defendant Robinson has met the second *Brady* prong.

However, the Court ultimately concludes that Defendant Robinson has not established a *Brady* violation as he has not shown that he was prejudiced by the suppression of the reports. Even if the disputed evidence is favorable to the defendant and was suppressed or not disclosed by the government, there is no *Brady* violation unless the withheld evidence is "material." *Strickler*, 527 U.S. at 281–82. If the undisclosed evidence is material, a new trial is required.

*Kyles v. Whitley*, 514 U.S. 419, 421-22 (1995). Relying on the Supreme Court's previous

decisions, the United States Court of Appeals for the District of Columbia Circuit ("D.C.

Circuit") has articulated the materiality standard of a *Brady* violation as follows:

> Our inquiry is confined to a determination of whether "there is a reasonable probability
> that, had the evidence been disclosed to the defense, the result of the proceeding would
> have been different." The Supreme Court has emphasized that "[t]he question is not
> whether the defendant would more likely than not have received a different verdict with
> the evidence, but whether in its absence he received a fair trial, understood as a trial
> resulting in a verdict worthy of confidence." Therefore, our focus is on the "potential
> impact that the undisclosed evidence might have had on the fairness of the proceedings"
> rather than on the overall strength of the government's case. Evidence is material if "the
> undisclosed information could have substantially affected the efforts of defense counsel
> to impeach the witness, thereby calling into question the fairness of the ultimate verdict."

*United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996) (alteration in original) (citations

omitted). The defendant has the burden to show that "the favorable evidence could reasonably be

taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Kyles*, 514 U.S. at 435.

　　　First, the Court will address Defendant Robinson's argument that the United States

violated his "constitutional right to present a complete defense." ECF No. 332, 6. Defendant

Robinson claims that the suppression of the Pryor reports prevented him from "putting on a

complete theory of defense," as he was unable to "challeng[e] the government's singular expert"

or "present a defense expert with a complete record of all relevant evidence." *Id*. at 4-6.

However, Defendant Robinson does not provide legal support for the proposition that a *Brady*

violation can occur simply when a defendant is not presented with all of the discovery. In fact,

the existence of the materiality prong suggests to the contrary, which the Supreme Court has

previously indicated. *See Agurs*, 427 U.S. at 108 ("But to reiterate a critical point, the prosecutor

will not have violated his constitutional duty of disclosure unless his omission is of sufficient

18

significance to result in the denial of the defendant's right to a fair trial."); *id*. at 109-10 ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

Next, Defendant Robinson argues that if he had access to the Pryor reports, he would have subpoenaed Ms. Traci Cooksey—who is listed in the Pryor reports as the pharmacist informing Defendant Robinson of suspected fraudulent activities—to "support and corroborate [his] defense" that he was reporting suspicious individuals to the authorities. ECF No. 326, 18. Defendant Robinson contends that this testimony "could have been used to rebut the powerfully incriminating and heavily relied upon testimony of the pharmacists who were called by the government." ECF No. 327, 6. However, Defendant Robinson was made aware of Ms. Cooksey's identity prior to trial, on September 30, 2016, when Defendant was provided with police reports from the St. Mary's County Sheriff's Office regarding the investigation of Claude Carpenter. ECF No. 330-2, Attch. B. In one report prepared by the Sheriff's Office, an investigator wrote that "contact was made with Pharmacist Traci Cooksey at the Target Pharmacy in California, Maryland," and the report then details that fraudulent prescriptions were being presented at the pharmacy. *Id*. Defendant Robinson argues that he was provided with Ms. Cooksey's name, and not with "documentation concerning the exculpatory nature of her contact with [him]." ECF No. 332, 21. However, Defendant Robinson's own quotes from that report strongly indicate that fraudulent prescriptions were being filled at the Target pharmacy which would put Defendant Robinson on notice of the potentially exculpatory nature of Ms. Cooksey's testimony. *Id*. Moreover, Defendant Robinson does not assert how this particular information

19

was material; specifically, how the suppression of the document detailing an interaction between Ms. Cooksey and Defendant Robinson impacted the fairness of the proceedings. Defendant Robinson simply "reiterates the government cannot pick and choose the evidence it wants to provide." *Id*. at 22. However, as will be discussed further below, even without Ms. Cooksey, Defendant Robinson was able to introduce multiple pieces of evidence supporting his argument that he had previously called law enforcement on pill-seeking patients.

Defendant Robinson further argues that the Pryor reports were material because he would have used them to impeach the testimony of United States' witness TFO Taylor. However, in order for impeachment evidence to satisfy the materiality prong, the witness's testimony itself must be material to the case. *Cuffie*, 80 F.3d at 518 ("[Witness's] testimony was an important part of the government' case against [the defendant] because, as [his] counsel argued to the jury, it established the only direct connection between [the defendant] and the drugs found during the search of [the witness's] apartment."); *United States v. Smith*, 77 F.3d 511, 517 (D.C. Cir. 1996) ("Because the Government's nondisclosures in this case significantly impaired defense counsel's ability to impeach the credibility of a principal prosecution witness, we reverse and remand for a new trial."); *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009) (supporting "the principle that evidence insignificantly impacting the degree of impeachment may not be sufficient to meet the *Kyles* materiality standard"). And here, TFO Taylor was not a material witness.

The Court notes that Defendant Robinson attempts to establish materiality by arguing that the Pryor reports "contradicted the grand jury testimony of material witness M.P.D. [sic] officer Karen Taylor." ECF No. 326, 14-15. However, the majority of TFO Taylor's grand jury

testimony was never presented to the jury and, thus, cannot weigh against the fairness of

Defendant Robinson's trial. TFO Taylor's testimony during trial constitutes only seven pages in

a trial transcript that is thousands of pages long. *See* July 25, 2017 Trial Tr. 2896-2903. TFO

Taylor's testimony did not mention Agent Pryor or the Pryor reports; rather, the testimony was

focused strictly on a statement made by a previous witness, Christi Townsend. *Id*. As such, the

Pryor reports could not have been used to impeach TFO Taylor as the subject of those reports

was not relevant to her trial testimony.

This case is not like that cited by Defendant Robinson, *United States v. Quinn*, 537 F.

Supp. 2d 99 (D.D.C. 2008). In *Quinn*, the defendant's direct supervisor was labeled as a

"'critical' government witness" who was "the only witness who would testify that he warned [the

defendant] of the illegality of indirect shipments." *Quinn*, 537 F. Supp. 2d at 109. Therefore, the

court found that the fact that the supervisor had "lied to investigators" concerning the

defendant's culpability "would surely be material to [the defendant's] guilt and hence *Brady*

information." *Id*. Here, TFO Taylor was not a material witness to the United States' case against

Defendant Robinson, as such the reports that could have been used to impeach her testimony was

also not material.

Next, Defendant Robinson argues that the Pryor reports were material as they would have

"supported a theory of defense." ECF No. 326, 31. Though Defendant Robinson does not

explicitly state what his "theory of defense" was during trial, he does represent that his "primary

defense" was that he was "practic[ing] [medicine] in legitimate good faith." *Id*. at 11. The Court

disagrees and finds that the suppression of the Pryor reports did not prevent Defendant Robinson

from putting forth his theory of defense.

21

According to Defendant Robinson, the Pryor reports could have been used to show that he was practicing medicine in good faith because they provided some evidence that he reported pill seekers to law enforcement. However, the evidence in the Pryor reports is not as supportive as Defendant Robinson contends. Each report is only two pages long. The first report recounts that Defendant Robinson contacted law enforcement to state that at least two people were using his name on fraudulent prescriptions. Defendant Robinson also made allegations that a police officer was involved in the illegal distribution of pharmaceuticals. ECF No. 308-1. The second report recounted an interview with Defendant Robinson again concerning suspected fraudulent prescriptions. Defendant Robinson alleged that some of his patients, as well as certain police officers, were involved in a scheme with the fraudulent prescriptions. ECF No. 308-2. He further stated his belief that some patients who had left his practice were pill seekers. *Id.*

These reports primarily show Dr. Robinson's concern with the suspected use of fraudulent prescriptions made out in his name. The reports do not provide direct evidence of Dr. Robinson reporting any specific individuals for pill-seeking behavior. Additionally, the reports are from early 2011, significantly prior to the events at issue in the lawsuit dated mid to late 2013.

Moreover, even absent the Pryor reports, Defendant Robinson was able to introduce evidence at trial that he reported substance abusers to the authorities. In Defendant Robinson's opening and closing statements, trial counsel argued that Defendant Robinson practiced medicine in good faith. July 13, 2017 Trial Tr. 730: 9-13; Aug. 7, 2017 Trial Tr. 5117: 18-5118: 6. Defendant Robinson also introduced specific evidence that he reported pill-seekers. DEA Investigator Shirley Powell testified that Defendant Robinson stated that he "would keep a

security file folder on patients that are bad, and if – at times, if they are bad, he will sometime

have them arrested . . . bad people meant that these are people that are not coming in for the right

reasons, and he felt that they were bad, and he would have them arrested . . . if they were doctor

shopping or going to multiple doctors, if he found out, then he would have them arrested." July

14, 2017, Trial Tr. 968: 20-22; 1062: 10-13; 1062: 16-18. Investigator Powell also testified that

the defendant told her that he had called law enforcement on "bad" patients. July 14, 2017, Trial

Tr. 1062: 5-7. And, Dr. Ericka Brock, testified that when she worked at Defendant Robinson's

clinic, he would "call the police" when a patient "tried to obtain treatments using a fraudulent

MRI." August 1, 2017, Trial Tr. 4422: 11-15. Additionally, on undercover video evidence

submitted to the jury, Defendant Robinson can be heard telling patients at his clinic that he

would report pill seekers to law enforcement. Defendant Robinson stated, "I've caught two

people trying to come here and take medications and sell medications. I've had them arrested. If

I catch anybody else trying to use my practice to do anything at all illegal, I will personally have

you prosecuted." ECF No. 330, 12 (quoting Gov't Ex. 54A.7 at timestamp 30- 44). As such, the

Court finds that the lack of the Pryor reports did not prevent Defendant Robinson from

presenting his defense. Therefore, the lack of production of the Pryor reports did not render his

trial unfair.

       Finally, Defendant Robinson claims that he could have used the Pryor reports to impeach

the United States' expert witness, Dr. Romanoff. Defendant Robinson maintains that the

suppression of the Pryor reports prevented him from "impeach[ing] [Dr.] Romanoff and the

reliability and accuracy of his opinions," and that there were "numerous and material ways in

which [Dr.] Romanoff could have been effectively challenged had [he] been provided with the

Pryor reports in a timely manner." ECF No. 332, 17, 7. Defendant Robinson claims that his trial

Counsel would have "confronted Dr. Romanoff with the Pryor reports and inquired of [Dr.]

Romanoff whether that information refuted part of [his] opinions." *Id*. at 8. Defendant Robinson

further emphasizes that the Pryor reports "would have allowed for a *complete* cross-examination

of [Dr.] Romanoff." *Id*. at 24 (emphasis in original).

In presenting this argument, Defendant Robinson speaks largely in generalities, failing to

explain how the inability to cross-examine Dr. Romanoff with the information in the Pryor

reports undermines the confidence of the verdict. Defendant Robinson represents that his trial

Counsel would have used the Pryor reports to "confront[] Dr. Romanoff" and "inquire[] of [Dr.]

Romanoff whether that information refuted part of [his] opinions." *Id*. at 8. However, Defendant

Robinson could have impeached Dr. Romanoff with similar evidence, introduced at trial, that

Defendant Robinson had previously reported patients exhibiting drug-seeking behavior.

Additionally, Defendant Robinson does not show how impeachment via the Pryor reports would

have been material to his defense, particularly since Dr. Romanoff was already thoroughly cross-

examined and questioned on his review of patient files in an attempt to discredit his opinion. *See*

*e.g.* July 31, 2017 Trial Tr. 4140: 1-4144: 25 (portion of cross-examination of Dr. Romanoff).

Accordingly, the Pryor reports would not have materially aided in Defendant Robinson's

attempts to impeach Dr. Romanoff.

For the reasons explained above, the Court finds that even though the Pryor reports were

favorable to Defendant Robinson and were suppressed, they do not constitute a violation of

*Brady* which would warrant a new trial. The Pryor reports were not material evidence and do not

implicate the fairness of Defendant Robinson's trial.

### 2. CCN Report

The Court will next consider Defendant Robinson's *Brady* argument as it relates to the

CCN report which was allegedly suppressed until after the trial. The CCN report concerns an

incident which occurred on March 28, 2013, at Defendant Robinson's clinic involving an

individual named Tonica Reid. *See* ECF No. 301-1, 10–12. The report details that Defendant

Robinson received a supposed referral from Ms. Reid. Defendant Robinson had begun treating

her and wrote her "a prescription for oxycodone" when Defendant Robinson was informed that

there was no record of such a referral from the prescribing medical clinic. *Id*. at 12. Defendant

Robinson then reported Ms. Reid to the authorities, took back his prescription "in the presence of

the reporting officer," and Ms. Reid was subsequently "detained and transported to the Seventh

District to be interviewed by [TFO] Taylor of check and fraud." *Id*.

Both the DEA and the Metropolitan Police Department ("MPD") wrote reports on this

incident. *See* ECF No. 301-1, 4-9 (DEA); *id*. at 10-18 (MPD). Defendant Robinson received the

report of the incident from the DEA prior to trial on October 12, 2016. However, Defendant

Robinson did not receive the CCN report of the incident from the MPD until after trial.

Defendant Robinson contends that the failure to provide him with the CCN report of the incident

from the MPD constitutes a *Brady* violation. The Court disagrees.

The Court begins by considering the first *Brady* factor—whether or not the evidence in

the CCN report was favorable to Defendant Robinson. Defendant claims that the CCN report

was "highly exculpatory" because it revealed the existence of "other exculpatory witnesses

whose testimony the jury was deprived of hearing," and would have demonstrated "his good

faith efforts to run his practice in a legal manner." ECF No. 326, 20-21. The exculpatory

25

witnesses to which Defendant Robinson refers are Detective Arthur Reed and Officer Taziyah Mujaahid, the MPD personnel who were associated with the matter involving Ms. Reid. The Court agrees that the CCN report was likely favorable to Defendant Robinson as it provides some evidence that he reported at least one patient with a fraudulent referral, supporting his argument that he was practicing medicine in good faith.

Pursuant to *Brady*, the Court next considers whether or not the CCN report was suppressed. It is undisputed that Defendant Robinson did not receive the CCN report made by the MPD until after the trial. However, the United States contends that this failure did not constitute a *Brady* violation because "*all* of the information contained in the CCN report was provided to the defendant on October 16, 2016," when Defendant was given the DEA report that addressed the March 28, 2013, incident involving Ms. Reid, ECF No. 330, 12. Courts have found that there is no *Brady* violation "if the information was available to [the defendant] from another source." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)); *see, e.g., United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986) ("This court has subsequently held that the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources."); *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001) ("The government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels."); *cf. Agurs*, 427 U.S. at 103 (noting that *Brady* violations involve discovery of information "which had been known to the prosecution but unknown to the defense").

Accordingly, for purposes of the second *Brady* factor, the question becomes whether or not Defendant Robinson had access to the information contained in the CCN report. And,

26

Defendant Robinson fails to identify any information in the withheld CCN report which was not also in the provided report by the DEA. Defendant Robinson focuses on the argument that, if he had access to the MPD report, he would have called as witnesses MPD personnel Reed and Mujaahid who were assigned to the matter. However, the names of these two individuals were known to Defendant Robinson as they were also included in the DEA report. The DEA report stated that "subject was interviewed by TFO Taylor and Detective Arthur Reed of the Seventh District's Detective's Office." ECF No. 301-1, 4. The report went on to state that "Office Mujaahid of the Seventh District was given paperwork from [Defendant Robinson]. The paperwork was turned over to TFO Taylor as evidence." ECF No. 1, 6. As such, prior to trial, Defendant Robinson was aware of the names of these two allegedly exculpatory witnesses.

Having reviewed both the CCN report from the MPD and the DEA report, the Court concludes that all relevant information from the CCN report was included in the DEA report which Defendant Robinson had access to before the trial. And, in fact, the DEA report is considerably more detailed than the CCN report. Moreover, as previously stated, Defendant Robinson cites to no information contained in the CCN report which was not previously disclosed in the DEA report. In fact, in his Motion for Reconsideration, Defendant Robinson appears to confuse the two reports. ECF No. 326. Defendant Robinson writes that "Pryor's written Report of the Investigation of April 4, 2013, not disclosed prior to trial, contained the following information related to Tonica Reid…" ECF No. 236, 25. Defendant Robinson proceeds to quote from the report and state that "the withheld written report is clearly *Brady*." *Id*. However, Defendant Robinson's quote is taken directly from the DEA report, which was provided to him prior to trial, rather than from the CCN report which was withheld. As such, the

27

information which Defendant Robinson refers to as "clearly *Brady*" was available to him prior to trial.

Because the information in the CCN report was not suppressed and was available to Defendant Robinson prior to trial through the DEA report, such information cannot have been material. As Defendant Robinson already possessed the substance of the CCN report prior to trial, the fairness of Defendant Robinson's trial is not impugned. However, the Court shall briefly address one of Defendant Robinson's arguments in favor of materiality.

In support of his *Brady* argument, Defendant Robinson submitted an affidavit from Jonathan Jeffress, a member of Defendant Robinson's trial counsel. In the affidavit, Mr. Jeffress states that the CCN report was "a significant piece of evidence that could have been used as a part of Dr. Robinson's trial defense." ECF No. 326-6. Mr. Jeffress explains that the CCN report "would have been powerful evidence for use with the law enforcement witnesses the government called to testify. It also would have been extremely significant for the cross examination of the government's expert witness, Dr. Romanoff." *Id*.

The Court finds Mr. Jeffress' affidavit to be vague and unconvincing. Mr. Jeffress fails to explain how he would have used the CCN report to cross-examine law enforcement witnesses or Dr. Romanoff. Without such specifics, the Court is left to speculate as to how the trial would have been different with the disclosure of the CCN report. Moreover, Mr. Jeffress does not address that the information in the CCN report was also contained in the DEA report, to which trial counsel had access significantly prior to the trial.

For the reasons explained above, the Court finds that even though the CCN report was favorable to Defendant Robinson, it was not suppressed as the information was available to

Defendant Robinson's trial counsel through the DEA report. Moreover, as the information was available to counsel, the lack of the CCN report does not implicate the fairness of Defendant Robinson's trial. As such, Defendant Robinson has failed to state a claim under *Brady*.

### C. Ineffective Assistance of Counsel Argument

Finally, the Court considers Defendant Robinson's ineffective assistance of counsel argument. Defendant Robinson contends that he was "prejudiced by the unexplained and unsound decision not to present expert testimony to rebut the expert testimony of Dr. Romanoff." ECF No. 327, 16-17. Defendant Robinson's ineffective assistance of counsel claim chiefly hinges on two arguments: first, that trial counsel performed deficiently by failing to call Dr. Thomas Simopoulos as an expert witness; and second, that "attempt[ing] to introduce another unqualified physician [Dr. Yolanda Ragland] in substitution for [Dr.] Simopoulos is not justifiable on the grounds of it being a strategic decision." ECF No. 332, 32.

A defendant claiming ineffective assistance of counsel, including in the context of a motion for a new trial, must satisfy the two-prong standard introduced in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that the "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Second, the defendant must prove that "the deficient performance prejudiced the defense." *Id*. at 687. The defendant "faces a heavy burden in his effort to establish that any of his lawyers were ineffective." *United States v. Brisbane*, 729 F. Supp. 2d 99, 109 (D.D.C. 2010). Moreover, a defendant's failure to make the required showing for either *Strickland* prong defeats an ineffective assistance of counsel claim, and a court has the discretion to choose which inquiry to address first. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an

29

ineffective assistance of counsel claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

As a preliminary matter, the Court shall address the United States' argument that Defendant Robinson's ineffective assistance of counsel claim is "premature." ECF No. 330, 17. In support of its argument, the United States cites to the Supreme Court's decision in *Massaro v. United States*, 538 U.S. 500 (2003), in which the Court held that "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003).

The Court finds that *Massaro* does not stand for the proposition that a collateral proceeding is the only appropriate venue for an ineffective assistance of counsel claim. Additionally, courts within this Circuit have allowed ineffective assistance of counsel claims to be raised in the context of motions for a new trial. *See, e.g., United States v. Fennell*, 53 F.3d 1296, 1304 (D.C. Cir. 1995) ("When an appellant has not raised a claim of ineffective assistance of counsel before the district court, either in a motion for a new trial, pursuant to Federal Rule of Criminal Procedure 33, or in a collateral attack, under 28 U.S.C. § 2255 . . . ."); *United States v. Cyrus*, 890 F.2d 1245, 1247 (D.C. Cir. 1989) (same); *United States v. Pinkney*, 543 F.2d 908, 915 (D.C. Cir. 1976) ("When a claim of ineffective assistance of counsel is contemplated, it should first be presented to the District Court in a motion for a new trial."); *cf. United States v. Weaver*, 281 F.3d 228, 234 (D.C. Cir. 2002) (noting that D.C. Circuit is "in a minority," as other "courts of appeals requires defendants to raise their ineffectiveness claims only in a collateral proceedings"); *United States v. Geraldo*, 271 F.3d 1112, 1115-16 (D.C. Cir. 2001) (citing other

30

circuit court cases to demonstrate majority approach). As such, the Court concludes that it can consider Defendant Robinson's claim of ineffective assistance of counsel in the context of his motion for a new trial.

### 1. Deficient Performance

Under the first *Strickland* factor, the defendant must "show that counsel's actions were not supported by a reasonable strategy . . . ." *Massaro*, 538 U.S. at 505. When engaging in this analysis, the Supreme Court cautioned that:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689 (internal citations omitted); *see id*. at 690 (noting that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

Defendant Robinson argues that the failure to call an expert witness was deficient performance, especially after trial counsel had retained and prepared Dr. Simopoulos. He contends that "there is no good reason or explanation for not calling [Dr.] Simopoulos as a defense expert" as a qualified expert could have "offered numerous opinions that would have bolstered defendant's defense." ECF No. 332, 28. Specifically, Defendant Robinson claims that a defense expert could have (1) opined about the "proper medications and dosages" prescribed by

Defendant Robinson, (2) opined about the "differences between a clinic that services a large volume of uninsured patients as opposed to a well-funded private hospital," and (3) offered "opinions about the existence of an appropriate physician/patient relationship based upon the testimony of defendant's patients." *Id.* at 28-29.

The Court disagrees and finds that trial counsel's failure to call an expert witness was not deficient performance and was instead a strategic decision. Rather than simple negligence or haphazard decision-making, a review of the contemporaneous emails produced by trial counsel suggests that the defense team came to doubt the benefits of calling Dr. Simopoulos as an expert witness after thoroughly vetting and preparing him. *See* ECF No. 351-1, 223 ("Dr. S[imopoulos] is going to wuss out on us too! I think he just doesn't like getting crossed."); *id.* at 222 (attorney acknowledging that Dr. Simopoulos "didn't pan out" as an expert witness); *id.* at 231 (stating there was a "Simopoulos issue," and noting that every medical provider, except for Dr. Ragland,[5] "refus[ed] to bless [Defendant Robinson's] prescribing methods"); *id.* at 232 (noting that Dr. Simopoulos can "testify exclusively about general opioid use," but that he is "vulnerable if asked about particular records"); *id.* at 249 ("[A]fter some other discussions about the strength of Dr. Simopoulos's testimony at trial, we thought it might make sense to look into the possibility of putting on another expert."); *id.* at 255 (stating "[i]n defense of our judgment in retaining Dr. S[imopoulos] in the first place, the rant about oxy he went on is very different than how he presented himself 6 months ago. It has been extremely frustrating to watch him undermine his original positions"); *id.* (stating, in reference to Dr. Simopoulos, "I am confident that your

---

[5] Dr. Yolanda Ragland was called as a medical practitioner fact witness and testified in support of Defendant Robinson's practice.

judgment was unimpeachable. He's allowed himself to be overtaken by the media coverage"). Based on the content of the emails, Defendant Robinson's trial counsel began to have concerns that Dr. Simopoulos would not testify favorably as to Defendant Robinson's prescription strategy and that he would be vulnerable to cross-examination.

These concerns were likely furthered by comments Dr. Simopoulos made to trial counsel during their preparation sessions. In November 2016, Dr. Simopoulos told trial counsel that "it's the uniform nature of the prescription that's the problem" and that a "higher dose" "requires medical justification." ECF No. 351-1, 214, 218-219. He also instructed trial counsel that some of Defendant Robinson's patient charts lacked information indicating "medical necessity to justify starting with a higher dose." *Id*. Given these statements, trial counsels' concerns about calling Dr. Simopoulos to testify seem justified.

Defendant Robinson goes on to argue that even if Dr. Simopoulos would not have testified favorably, "there is no defensible reason for not calling another qualified medical expert the trial team had more confidence in." ECF No. 364, 7. Defendant Robinson explains that "Trial counsel was acutely aware, through its discussions with Dr. Simopoulos, that expert was [sic] testimony was available to opine that defendant's prescriptions of oxycodone were not outside acceptable norms of pain medicine practice." *Id*. Defendant Robinson supports his arguments by citing to a post-trial affidavit by Dr. Richard Stieg explaining that, if he had been qualified as an expert by the Court, he would have testified that Defendant Robinson's prescribing methods were medically acceptable. *See* ECF No. 327-4.

However, Defendant Robinson fails to acknowledge that his trial counsel did consider, and reject, potential expert witnesses other than Dr. Simopoulos. *See, e.g.*, ECF No. 351-1, 205

(noting Baker Botts has an expert in Tennessee); *id.* at 207 (noting "Dr. Carol Warfield in Boston is the gold standard" but that she "will say she is too busy"); *id.* at 208 ("We got a couple of leads on possible experts. Emily will do some outreach."); *id.* at 222 (discussing the possibility of getting Dr. Warfield or Dr. Karch after Dr. Simopoulos "didn't pan out"); *id.* at 231 ("[E]very medical provider I've talked to except for Dr. Ragland refuses to bless [Defendant Robinson's] prescribing methods."); *id.* at 232 ("I don't think [Dr.] Emanuel is going to come testify in support of [Defendant Robinson's] questionable prescription practices."); *id.* at 233 (discussing the possible benefits of "noticing" Dr. Starr as an expert); *id.* at 237-247 (listing a spreadsheet of at least 12 possible experts); *id.* at 248 (considering as an expert Dr. Frisch, the brother of an attorney at the firm). Ultimately, despite the use of effort and resources in a thorough search, Defendant Robinson's trial counsel were unable to locate an expert that they believed would benefit Defendant Robinson's defense. The fact that Defendant Robinson was able to find a more favorable expert in Dr. Stieg after trial does not mean that trial counsel were ineffective for failing to locate an expert following a reasonable and thorough investigation before trial.

The D.C. Circuit has recently addressed a case analogous to the present one. In *United States v. Gray-Burriss*, 920 F.3d 61 (D.C. Cir. 2019), the defendant asserted a number of grounds for his ineffective assistance of counsel claim, including that his counsel was "ineffective by fail[ing] to secure the testimony of an expert witness . . . to support the defense that [the defendant] acted in good faith . . . ." *United States v. Gray-Burriss*, 920 F.3d 61, 67 (D.C. Cir. 2019). The D.C. Circuit observed that "given the damaging cross-examination that [the expert witness] would have endured," the district court was correct in finding that the counsel's performance did not satisfy the first *Strickland* prong. *Id.* at 68. Similarly, other circuit courts

have stated their reticence to conclude that the failure to call an expert witness is indicative of

deficient performance. *See, e.g., United States v. Staples*, 410 F.3d 484, 488-89 (8th Cir. 2005)

(noting that the Eighth Circuit consistently finds that a "decision not to call a witness is a

'virtually unchallengeable' decision of trial strategy," in part, because "there is considerable risk

inherent in calling any witness because if the witness does not hold up well on cross-

examination, the jurors may draw unfavorable inferences against the party who called him or

her") (internal citations omitted); *Lema v. United States*, 987 F.2d 48, 54 (1st Cir. 1993) (stating

similar reasoning); *Greiner v. Wells*, 417 F.3d 305, 323 (2nd Cir. 2005) ("The decision not to

call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-

suited to second-guess.") (citation omitted); *cf. Dorsey v. Chapman*, 262 F.3d 1181, 1186 (11th

Cir. 2001) (concluding that "trial counsel's decision not to call the expert witness was not so

patently unreasonable a strategic decision that no competent attorney would have chosen this

strategy").

        Rather than calling an expert witness who could be subject to damaging cross-

examination, Defendant Robinson's trial counsel elected to follow a different litigation strategy.

Before and during trial, trial counsel filed over 20 motions attempting to limit or exclude the

United States' evidence. *See* ECF Nos. 33, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 115, 140,

141, 142, 144, 145, 146, 147, 173, 185, 193. Additionally, trial counsel engaged in rigorous

cross-examination of the United States' fact witnesses and expert witness. The Court previously

noted that trial counsel "did a thorough job of impeaching the Government's witnesses." ECF

No. 316, 5. Additionally, trial counsel called six witnesses who testified in support of Defendant

Robinson. Included in the defense witnesses and the cross-examination of two of the United

States' witnesses were four medical professionals who testified favorably about at least some of Defendant Robinson's practices. *See* August 2, 2017 Trial Tr. 4654: 17-18; 4655: 14-15 (Dr. Ragland testifying that Defendant Robinson's "patients [] seemed to be doing well" and that she sometimes oversaw his research); August 1, 2017, Trial Tr. 4408-4422 (Dr. Ericka Brock testifying as to Defendant Robinson's treatment protocol and record-keeping); July 17, 2017 Trial Tr. 1302: 9-1308: 9 (Dr. Peter Huynh's testimony about Defendant Robinson's spinal decompression apparatus which was based on scientific ideas); July 17, 2017, Trial Tr. 1343: 17-24 (Dr. Nesle Clerge testifying that there was nothing suspicious about patients paying by money order). Accordingly, the Court concludes that trial counsel's decision not to call an expert to testify was a reasonable trial strategy.

In addition to complaining about his trial counsels' failure to call Dr. Simopoulos or another expert, Defendant Robinson also complains that attempting to "qualify [Dr.] Ragland was a preposterous and ill-conceived error that was the product on ineffectiveness," as the evidence suggested that Dr. Ragland was "defendant's friend" and there is "no explanation or justification for attempting to offer an utterly biased witness as your sole defense expert." ECF No. 332, 32.

However, the Court notes that Defendant Robinson does not cite to any legal authority that suggests a "biased witness," particularly one that is biased towards the defendant, is sufficient to satisfy the *Strickland* factors. Moreover, while Dr. Ragland was considered as an expert, she ultimately testified as a fact witness pursuant to Federal Rule of Evidence 701 as to her experiences as a medical professional witnessing Defendant Robinson's practices. *See* August 2, 2017 Trial Tr. 4626: 6-8 (withdrawing request to qualify Dr. Ragland as an expert).

36

Dr. Ragland's testimony about Defendant Robinson's practices was valuable as trial counsel

recounted that "every medical provider I've talked to except for Dr. Ragland refuses to bless

[Defendant Robinson's] prescribing methods." ECF No. 351-1, 231. Accordingly, the Court

finds no support for Defendant Robinson's argument that trial counsel's decision to call Dr.

Ragland as a supporting fact witness was deficient. *See Garnett v. Neven*, 408 F. App'x 47, 48

(9th Cir. 2011) (finding that counsel's performance was not deficient for failing to call a specific

expert witness when counsel presented other witnesses and favorable testimony).

For these reasons, the Court finds that Defendant Robinson has not satisfied the first

*Strickland* factor of deficient performance. Trial counsels' decision to not call Dr. Simopoulos,

or another expert witness, constituted a reasonable trial strategy.

## 2. Prejudice

Because the Court has found that Defendant Robinson's trial counsel was not deficient,

the Court need not assess the second *Strickland* factor of prejudice. Nevertheless, for purposes of

thoroughness, the Court shall explain why Defendant Robinson was not prejudiced by this trial

counsels' performance.

To establish prejudice under *Strickland*, the defendant must show that there is "a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability is a

probability that is sufficient to undermine confidence in the outcome." *Id*. While this does not

require a "showing that counsel's actions 'more likely than not altered the outcome,'" the

"likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*,

562 U.S. 86, 111-12 (2011) (quoting *Strickland*, 466 U.S. at 693, 697); *see also United States v.*

*Newman*, 805 F.3d 1143, 1147 (D.C. Cir. 2015) ("[T]he burden of establishing prejudice falls squarely on [the defendant's] shoulders."). In addition, if the alleged *Strickland* violation is based on a failure to call an expert witness, the defendant must demonstrate what the "scientific expert would have stated," and must show "that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citation omitted).

Here, Defendant Robinson maintains that he was prejudiced by "the unexplained and unsound decision not to present expert testimony to rebut the expert testimony of Dr. Romanoff," and that such expert testimony "would certainly have aided the jury in reaching a fair and fully informed decision[.]" ECF No. 327, 16-17. Defendant Robinson contends that the case against him was only considered "a strong case because just one side of the story was heard." ECF No. 364, 8. Specifically, Defendant Robinson argues that there were two "essential areas that needed to be addressed by an expert witness": (1) whether Defendant Robinson had a "proper physician/patient relationship," and (2) whether the "dosages and amounts of oxycodone prescribed by [Defendant Robinson] were proper and entirely consistent with a legitimate medical practice." *Id*. at 9-14.

However, a review of the record shows that trial counsel did address Defendant Robinson's relationship with his patients. Dr. Ragland testified that she discussed Defendant Robinson's patients with him and that his "patients [] seemed to be doing well." *See* August 2, 2017 Trial Tr. 4654: 17-18; 4655: 14-15. And, Dr. Brock testified about her experience working with Defendant at his clinic, giving evidence of his treatment protocol, including a physical examination and testing. *See* August 1, 2017, Trial Tr. 4408-4422. As for whether or not the dosages and amounts of oxycodone prescribed by Defendant Robinson were appropriate, the

Court has already explained that despite a thorough investigation trial counsel were unable to find an expert that would testify favorably.

Moreover, even if Defendant Robinson had presented an expert witness at trial, he has failed to show that there is a reasonable probability that the result would have been different. The United States' case was not primarily centered around the testimony of Dr. Romanoff. Instead, the United States presented over 30 witnesses in its case, including law enforcement, medical professionals who had worked with Defendant Robinson, bank employees, pharmacists, undercover agents who were prescribed medicine by Defendant Robinson, and eight patients of Dr. Robinson who explained their interactions with him. Additionally, the United States presented video footage showing Defendant Robinson's interactions with his patients as well as evidence of Defendant Robinson's admissions given during an interview with the DEA.

Given the weight of the evidence against Defendant Robinson, as well as the breadth of that evidence, the Court finds that Defendant Robinson has failed to establish prejudice. *See, e.g.* *United States v. Udo*, 795 F.3d 24, 31 (D.C. Cir. 2015) ("This case was not a close call. The strength of the government's case against [the defendant] leaves us with no concern that the outcome would have been different had counsel never promised that [the defendant] would testify. We therefore hold that counsel's unfulfilled promise did not amount to ineffective assistance of counsel because [the defendant] suffered no prejudice."); *United States v. Moore*, 104 F.3d 377, 391 (D.C. Cir. 1997) (explaining that, given the strength of evidence against defendant, counsel's failure to call a witness was not prejudicial).

Finally, the Court will address Defendant Robinson's attempt to show prejudice through reliance on an allegedly analogous case, *United States v. Laureys*, 866 F.3d 432 (D.C. Cir. 2017).

In *Laureys*, the court found that the defendant had been denied effective assistance of counsel where his attorney failed to present expert psychiatric testimony. The court first emphasized the importance of psychiatry in criminal proceedings that turn on the defendant's mental state, particularly when it is "necessary to an adequate defense." *Laureys*, 866 F.3d at 437-38. The court then concluded that the "record shows that in pursuing his own idea of a diminished capacity defense, trial counsel lost sight of how [an expert witness] could have placed his client's conduct in a clinical context and mitigated the effects of evidence offered by the government and by [the defendant] himself." *Id*. at 440; *see id.* ("Counsel admitted that he had never handled an insanity defense, and yet he appears to have considered himself qualified, as a layperson, to effectively diagnose his client as an 'Internet sexual compulsive' . . . ."). Defendant Robinson contends that *Laureys* is "instructive and exactly on point with this case," noting that "[b]oth cases involve trial counsel who knew they needed an expert witness to support a specific and known defense and in both instances trial counsel employed misguided efforts that resulted in the failure to call an essential expert to 'mitigate the effects of evidence offered by the government.'" ECF No. 364, 14, 16.

The Court finds that Defendant Robinson's reliance on *Laureys* is misplaced. In the present case, psychiatry did not play a pivotal role, or any role, in Defendant Robinson's criminal proceedings. In addition, the record does not indicate that trial counsel "lost sight" of how Dr. Simopoulos could have benefited Defendant Robinson during trial. Rather, as discussed at length above, the evidence suggests that Dr. Simopoulos changed his position into one that would harm Defendant. *See* ECF No. 351-1, 255 ("[T]he rant about oxy [Dr. Simopoulos] went on is very different than how he presented himself 6 months ago. It has been extremely frustrating to watch

40

him undermine his original positions."). And, despite a thorough search prior to trial, trial

counsel were unable to find an expert witness who would benefit Defendant Robinson and not be

subject to damaging cross-examination. Finally, in *Laureys*, absent an expert witness, the

defendant was unable to put on any evidence that he lacked the intent to engage in the charged

conduct. Here, even without an expert, Defendant Robinson was able to produce evidence that he

had a true doctor-patient relationship and that he practiced medicine in good faith through the

testimony of non-expert medical practitioners. As a result, the Court concludes that the D.C.

Circuit's decision in *Laureys* is not instructive for the present case.

For these reasons, the Court finds that Defendant Robinson has not satisfied the second

*Strickland* factor of prejudice. Even with the addition of an expert witness, there is not a

reasonable probability that the result of the proceeding would have been different.

### 3. Evidentiary Hearing

As a final matter, the Court must decide whether or not an evidentiary hearing is

warranted for Defendant Robinson's claims. The D.C. Circuit has recognized that "the district

court need not hold an evidentiary hearing unless the movant has offered substantial evidence

suggesting his or her right to the underlying relief." *United States v. Gray-Burriss*, 801 F. App'x

785, 785-86 (D.C. Cir. 2020); *see United States v. Davis*, 612 F. Supp. 2d 48, 51 (D.D.C. 2009)

(noting that the decision to hold an evidentiary hearing on a Rule 33 motion "rests within the

sound discretion of the district court"). On the other hand, the D.C. Circuit has stated that it

"do[es] not 'hesitate to remand [for an evidentiary hearing] when a trial record is insufficient to

assess the full circumstances and rationales informing the strategic decisions of trial counsel.'"

*United States v. McGill*, 815 F.3d 846, 942 (D.C. Cir. 2016) (quoting *United States v. Williams*,

41

784 F.3d 798, 804 (D.C. Cir. 2015)); *see generally, Cyrus*, 890 F.2d at 1247 ("An evidentiary hearing is critical to our evaluation of most ineffective assistance of counsel claims, since these frequently concern matters outside the trial record, such as whether counsel properly investigated the case, considered relevant legal theories, or adequately prepared a defense."). However, a motion for a new trial "can ordinarily be decided on the basis of affidavits without an evidentiary hearing, and a district court's decision not to hold such a hearing may be reversed only for abuse of discretion." *United States v. Lam Kwong-Wah*, 924 F.2d 298, 308 (D.C. Cir. 1991) (internal quotation marks and citation omitted). In addition, the D.C. Circuit has rejected ineffective assistance of counsel claims, without remanding for an evidentiary hearing, where the record "clearly shows" that the challenged actions by counsel were not deficient or did not result in the defendant being prejudiced. *Sitzmann*, 893 F.3d at 831-32 (compiling cases).

Here, Defendant Robinson has not requested an evidentiary hearing. Instead, Defendant Robinson has submitted affidavits to support his claims. *See* ECF No. 326-4 (Dr. Stieg's affidavit); ECF No. 326-6 (trial counsel's affidavit). Additionally, both parties have relied on contemporaneous emails from Defendant Robinson's trial counsel as evidence of their trial strategy. *See* ECF No. 351-1. Moreover, this Court is the same court that presided over Defendant's trial, providing the Court with added insight into the happenings at and before trial. And, Defendant Robinson has not offered substantial evidence that he is entitled to relief on any of his claims. Consequently, the Court concludes that it can confidently rely on the parties' filings and the record as a whole to resolve Defendant Robinson's claims without an evidentiary hearing.

## V.      CONCLUSION

In conclusion, the Court DENIES Defendant Robinson's [284] Motion for a New Trial and thus also DENIES his [326] Motion for Reconsideration of Motion for Institution of Conditions of Release Pending Sentencing. The Court finds that the two pieces of withheld evidence, the Pryor reports and the CCN report, do not constitute violations under *Brady* as they do not call into question the fairness of the ultimate verdict and as the information in the CCN report was not withheld. The Court further concludes that Defendant Robinson's trial counsel were not ineffective as they did not perform deficiently and their actions did not prejudice Defendant Robinson. Finally, the Court determines that the myriad arguments that Defendant Robinson briefly raises are not meritorious.

An appropriate Order accompanies this Memorandum Opinion.


_____/s_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge