**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>IVAN L. ROBINSON,<br><br>Defendant | Criminal Action No. 16-98 (CKK) |

**MEMORANDUM OPINION**
(May 31, 2021)

Defendant Ivan Robinson was convicted of forty-two counts of prescribing oxycodone outside the legitimate practice of medicine and two counts of money laundering. Shortly before Defendant Robinson's scheduled sentencing hearing on April 26, 2021, the Clerk of Court received by mail two motions filed by Defendant Robinson, *pro se*:[1] [418] Defendant's Motion to Dismiss Indictment for Violation of Rights Guaranteed to Defendant Pursuant to the Fifth and Sixth Amendments to the United States Constitution or in the Alternative Motion for Mistrial and [417] Defendant's Motion for *Franks* Evidentiary Hearing. The Court continued the sentencing hearing to allow time to consider the arguments raised in each of his motions. After reviewing both motions, the Court noted that most of the arguments offered by Defendant Robinson have been addressed by the Court in earlier pleadings, but ordered the Government to respond to a discrete issue that had been discussed only orally during the jury's deliberations.

Upon consideration of the pleadings, the relevant legal authorities, and the record as a whole, for the reasons discussed below, the Court **DENIES** Defendant Robinson's motions.

---

[1] Defendant Robinson is represented by counsel in this matter, but filed the two pending motions and his reply in support thereof without the assistance of his attorney.

# I.    BACKGROUND

Defendant Robinson was a licensed nurse practitioner who maintained a medical practice in Washington, D.C., with offices in various locations.  ECF No. 284, 1.  Defendant Robinson's practice eventually comprised thousands of patients and he began to specialize in spinal injuries. *Id*.  Defendant Robinson represents that he treated his patients with a "patented protocol including spinal decompression therapy, medication, exercise, and diet," which involved "oxycodone in a dose of 30 milligrams" as part of the medication protocol.  *Id*.

In February 2013, the Drug Enforcement Administration ("DEA") received reports from "pharmacists who had noticed suspicious patterns regarding oxycodone prescriptions originating from the defendant's practice" and subsequently launched an investigation into Defendant Robinson's medical practice.  ECF No. 290, 5.  In March 2013, undercover officers went to one of Defendant Robinson's clinics and posed as patients "in an attempt to purchase oxycodone prescriptions."  *Id*.  Two of the agents were able to "purchase a prescription for oxycodone from the defendant in exchange for $370 blank money orders," while the third agent "was turned away." *Id*. at 5 n.5.  The two agents who received prescriptions returned in April 2013, and obtained additional prescriptions for oxycodone, again in exchange for $370 in blank money orders and without an adequate physical exam.  *Id*.  On June 19, 2013, search warrants were executed and conducted at Defendant Robinson's home and at two of his clinics.  *Id*. at 6.  Following the execution of the search warrants, Defendant Robinson withdrew $108,000 from his bank account. ECF No. 284, 2.

On June 7, 2016, Defendant Robinson was indicted with fifty-five counts of prescribing oxycodone "outside the legitimate practice of medicine," as well as forfeiture allegations with respect to the $108,000 bank account withdrawal, cash found on him during the execution of the

search warrant, and a vehicle. *Id.* On April 27, 2017, a superseding indictment was returned, charging Defendant Robinson with sixty-one counts of prescribing oxycodone—eighteen of which were eventually dropped[2]—and two counts of money laundering pursuant to 18 U.S.C. § 1957. ECF No. 290, 4.

On August 10, 2017, following an approximately 20-day trial, Defendant Robinson was found guilty of forty-two counts of prescribing oxycodone outside the legitimate practice of medicine and two counts of money laundering. *Id.* Defendant Robinson was found not guilty of one count of prescribing oxycodone. *Id.* Lastly, the jury arrived at a split verdict on the forfeiture allegations, determining that the $108,000 and the vehicle were "proceeds constituting or derived from [Defendant's] prescription of oxycodone and money laundering," while ten money orders, totaling $3,330 and $997 in cash, did not constitute such proceeds. *Id.*

This criminal matter has been the subject of extensive post-trial litigation. On October 20, 2017, trial counsel for Defendant Robinson moved for a new trial. ECF No. 284. On December 8, 2017, the United States filed an Opposition to that Motion. ECF No. 290. Prior to the filing of a Reply by Defendant Robinson, the Court received a motion from Defendant Robinson to discharge his trial counsel. ECF No. 303. On February 22, 2018, the Court granted Defendant Robinson's Motion to discharge his trial counsel. ECF No. 306. Defendant Robinson was appointed new counsel. During a March 23, 2018 hearing, the Court allowed Defendant Robinson's new counsel to have extensive time to review the record of the case and to accommodate counsel's schedule. The Court ordered that, following a review of the case, Defendant Robinson would file a Reply to the United States' Opposition to Defendant Robinson's

---

[2] The government dismissed counts 20–34, 42, 56, and 58 of the [63] Superseding Indictment on July 12, 2017. *See* ECF No. 290, 4. The Government later filed a [200] Retyped Indictment so that the remaining counts would be consecutively numbered.

Motion for a New Trial which would address the arguments in Defendant Robinson's original motion as well as any arguments that the new defense counsel sought to raise. Minute Order (Mar. 23, 2018).

On December 31, 2018, Defendant Robinson filed his Reply to the United States' Opposition. ECF No. 327. He also filed a Motion for Reconsideration of Motion for Institution of Conditions of Release Pending Sentencing, bringing new arguments relating to two alleged Brady violations and ineffective assistance of counsel. ECF No. 326. On February 14, 2019, the United States filed an omnibus response to both of Defendant Robinson's pending motions. ECF No. 330. The Government argued that Defendant Robinson had received effective assistance of counsel but indicated that if the claim was to be pursued additional discovery would be required. *Id*. And, on March 8, 2019, Defendant Robinson filed a Reply to the United States' Opposition. ECF No. 332. On April 1, 2019, the Court held a teleconference to discuss Defendants Robinson's pending Motions. During the teleconference, the Court indicated that there was overlap between Defendant Robinson's ineffective assistance of counsel claim and his other claims. As such, in order to resolve the pending Motions, Defendant Robinson's ineffective assistance of counsel claim would need to be more detailed. Defendant Robinson agreed to waive his attorney client privilege with his trial counsel so that the United States could conduct discovery and the Court could address the claim. April 1, 2019 Minute Order. Due to the high volume of material relating to Defendant Robinson's claim, discovery into the materials took some time. Following discovery, the Court set a schedule for supplemental briefing on Defendant Robinson's ineffective assistance of counsel claim. On October 24, 2019, the United States filed its supplemental opposition to Defendant Robinson's ineffective assistance of counsel claim. ECF No. 351. And, following

multiple motions for extensions of time, Defendant Robinson filed his Reply to that Opposition on March 13, 2020.  ECF No. 364.

In an order dated September 17, 2020, the Court denied Defendant Robinson's Motion for a New Trial and Motion for Reconsideration.  ECF No. 394.  The parties subsequently filed a Joint Motion for a Sentencing Date, requesting that the Court set a date for a sentencing hearing.  ECF No. 404.  The Court scheduled a sentencing hearing for April 26, 2021 at 3:00pm.  *See* Minute Order (Jan. 13, 2021).

On April 19, 2021, the Clerk of Court received by mail two motions filed by Defendant Robinson, *pro se*, each of which total more than 80 pages: [418] Motion to Dismiss Indictment for Violation of Rights Guaranteed to Defendant Pursuant to the Fifth and Sixth Amendments to the United States Constitution or in the Alternative Motion for  Mistrial ("Def.'s Mot. to Dismiss") and [417] Motion for *Franks* Evidentiary Hearing ("Def.'s *Franks* Mot.").  To allow time to consider the arguments raised in both motions, the Court ordered that the sentencing hearing scheduled for April 26, 2021 be continued.  *See* Minute Orders (Apr. 23 & 27, 2021).

After reviewing Defendant Robinson's latest motions, the Court concluded that "it appears that most of the arguments raised by Defendant have been addressed by the parties and the Court in earlier written pleadings and orders."  Minute Order (Apr. 28, 2021).  However, the Court noted that in his Motion to Dismiss, Defendant Robinson "raises the issue of an entrapment instruction, which was discussed by the parties and the Court only orally in response to a juror note and not by written pleadings."  *Id.*  Accordingly, the Court ordered the United States to respond to the discrete entrapment arguments raised by Defendant Robinson. *Id.* The Government filed its response on May 5, 2021.  *See* Government's Reply in Opposition to Defendant's Claim that Denial of an Entrapment Jury Instruction was Error ("Gov.'s Resp. to Def.'s Mot. to Dismiss"), ECF No. 420.

The Court was notified by defense counsel that Defendant Robinson intended to file *pro se* a response to the Government's Opposition.  *See* Minute Order (May 10, 2021).   Defendant Robinson filed a reply, comprising a 53-page pleading and more than 200 pages of exhibits, on May 26, 2021.  *See* Defendant's Response to Government's Reply ("Def.'s Reply"), ECF No. 422.

## II.     DISCUSSION

In both of his *pro se* Motions, Defendant Robinson relies on arguments about the Government's suppression of "material" and "favorable" evidence, which the Court already considered in denying his earlier Motion for a New Trial.  Now, he resuscitates many of the same arguments, and re-casts them as allegations of misconduct by both the prosecutors for failing to "correct" allegedly "false" or "misleading" testimony during trial and the law enforcement investigators for falsifying or omitting "material" information from the affidavit filed in support of a search warrant.  Specifically, Defendant Robinson contends that he was prejudiced by the Government's failure to produce certain records in advance of trial, an issue the Court has already addressed in earlier rulings.  The Court shall first address arguments previously raised by Defendant Robinson before discussing his now-pending claims for relief and myriad arguments in support thereof.

### A.  Previously Addressed Arguments Regarding "Suppressed" Evidence

Defendant Robinson's current motions both rely primarily on his contention that the Government suppressed "favorable" and "material" evidence—specifically the "Pryor Reports" and the "CCN Report."  Because Defendant Robinson repeatedly asserts throughout both motions that he was prejudiced by the Government's failure to disclose these "material" records in advance of trial, some discussion of those records and the Court's previous analysis related to those records is useful. *See* ECF No. 395, 15-29.

### 1. **Pryor Reports**

Both of Defendant Robinson's motions rely on two reports written by DEA Agent Lisa Pryor in early 2011. *See, e.g.*, Def.'s Mot. to Dismiss at 6, 8, 10, 11, 13, 15–16, 18, 21, 23, 33, 45, 53, 80; Def.'s *Franks* Mot. at 2–5, 20–21, 31, 35, 47, 56.  Defendant Robinson contends that these reports show that the Government knew he reported "pill seekers" to the DEA and that it "sanctioned" his treatment methods, including his identical oxycodone prescriptions.

Both Pryor reports focus on complaints made by Defendant Robinson in January 2011—months before the earliest prescription charged in the Indictment (which dates November 2011).  *See* ECF No. 200.  The first Pryor report discusses a telephone conversation between Defendant Robinson and Agent Pryor on January 11, 2011, during which Defendant Robinson claimed that "someone was using his name on fraudulent prescriptions." ECF No. 308-1, 1. The report also notes that Defendant Robinson reported a "spike in patients from Southern Maryland" approximately sixty days earlier, in late 2010.  *Id.*  And it further indicates that Defendant Robinson explained that he "found that a former patient was sending in other people who tried to obtain pharmaceuticals from him in order to sell in Southern Maryland."  *Id.* at 2.

The second report reflects a meeting that Defendant Robinson had with Agent Pryor and Agent Mark Embry on January 25, 2011, during which Defendant Robinson reiterated his belief that some individuals were engaging in prescription fraud and stated that he had lost approximately 80 patients whom he believed were "pill seekers." ECF No. 308-2, 1. He showed the agents a "legitimate prescription" from his practice, and explained how they were made "on purple paper with a gold emblem."  *Id.* at 2.  The second report also notes that Defendant Robinson told the DEA agents that "he practiced a new method of decompression for pain management."  *Id.* at 1.

In his earlier Motion for a New Trial, Defendant Robinson argued that the Government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to produce both reports to him in advance of trial. The Court concluded that these reports were "favorable" to Defendant Robinson because they show "that Defendant Robinson reported the use of fraudulent prescriptions" and that he told law enforcement that "he had lost approximately 80 patients whom he believed to be 'pill seekers.'" *See* ECF No. 395, 15–17 (internal citations omitted). The Court also found that these reports were "suppressed." *Id.* at 17. However, the Court concluded that Defendant Robinson had failed to establish a *Brady* violation because these reports were not "material." *Id.* The Court discussed several reasons why these reports were not "material," *id.* at 17–22—one of which was that the reports are from early 2011, "significantly prior to the events at issue in the lawsuit dated mid to late 2013." *Id.* at 22. The Court also concluded that Defendant Robinson was not prejudiced by this error because he "*was able to introduce evidence at trial that he reported substance abusers to the authorities.*" *Id.* at 22–23 (emphasis added) (citing portions of trial record).

Despite the Court's earlier ruling, in both of Defendant Robinson's now-pending motions, he argues that the Pryor Reports are "material." However, Defendant Robinson offers *no* evidence or arguments that would alter the Court's earlier conclusion that the Pryor Reports are *not* material. Notably, Defendant Robinson was not charged for writing "fraudulent prescriptions"—the topic of his complaint to Agent Pryor described in the first report. Rather, the issue was whether he "knowingly and intentionally distribute[d] a control substance, that is, oxycodone . . . by writing a prescription of the same, outside the usual course of professional practice and not for a legitimate medical purpose." ECF No. 200, 1. And, as the Court has previously noted, the transactions

charged in the Indictment were from a later period than these reports (as the Court has already noted, *see* ECF No. 395, 22).

Defendant Robinson cites only a statement in an appellate brief by the Government that "at various times between 2011-2013," Defendant Robinson wrote identical prescriptions outside the usual course of professional practice and not for a legitimate medical purpose. *See* Def.'s Mot. to Dismiss at 14 (citing Gov.'s Mem. of Law at 2, D.C. Cir. Case Nos. 20-3071 & 20-3074 (Nov. 16, 2020)). Defendant Robinson claims that this statement shows that "the events that led up to Dr. Robinson's conviction included 2011, which is during the time period of the Pryor reports, making the suppressed favorable reports materially relevant to the events at issue in the trial." *Id.* This conclusory assertion does not demonstrate *how* these Pryor reports are now "material." Again, the government's statement in its brief does not change the fact that the charged conduct was from a later time period than his complaints to Agent Pryor, as the Court has previously noted. ECF No. 395, 22. The earliest prescription charged in the Indictment dates November 2011—months after Defendant Robinson's complaints of "fraudulent prescriptions" to Agent Pryor. *See* ECF No. 200, 3 (Counts 32 and 33).

Defendant Robinson also ignores that the timing of these reports was not the sole reason that the Court found these reports not to be material, *see id.* at 17–22—most notably, because the Court concluded that "even absent the Pryor reports, Defendant Robinson was able to introduce evidence at trial that he reported substance abusers to the authorities." *Id.* at 22 (emphasis added). In its earlier Memorandum Opinion, the Court provided numerous examples of how this issue came up at trial—including in Defendant Robinson's opening and closing arguments (Trial Tr. (July 13, 2017) 730:9–13; Trial Tr. (Aug. 7, 2017) 5117:18–5118:6), through witness testimony (Trial Tr. (July 14, 2017) 968:20–22; 1062:10–13; 1062:5–7, 16–18; Trial Tr. (Aug. 1, 2017)

4422:11–15); and in the undercover video evidence submitted to the jury (Gov.'s Ex. 54 at timestamp 30–44). *Id.* at 22–23. Accordingly, the Court is unpersuaded that the Government's statement in its appellate brief amounts to an admission that these reports are now "material," as Defendant Robinson suggests. Def.'s Mot. to Dismiss at 14.

As with his earlier post-trial motions, Defendant Robinson's current motions suffer from overstatements or misstatements of the information contained in the Pryor Reports regarding the Government's purported knowledge and "approval" of his method of prescribing oxycodone and Defendant's efforts to report individuals seeking prescriptions fraudulently. For example, Defendant Robinson claims that the Pryor Reports indicate the Government had "superior knowledge" of his method of "prescribing of Oxycodone for a legitimate medical purpose as part of his 'new method of decompression for back pain management'" and that the Government *sanctioned* his prescription activities. Def.'s Mot. to Dismiss at 11 (emphasis added); *see also id.* at 24 ("DEA Supervising Agent Pryor was in communication and documenting the government's awareness and explicit sanctioning of Dr. Robinson's prescribing of oxycodone as part of his government supported, supervised medical research[.]"); *id.* at 36 (discussing the "suppression of the DEA awareness and sanctioning of [Defendant's] legitimate supervised medical research study protocol"). Simply put, the Pryor Reports do not contain such information. These reports mention only that Defendant Robinson *told* the DEA that he practiced a "new method" of "decompression" without drawing any conclusions about the propriety of his treatment methods or the oxycodone prescriptions.

Defendant Robinson further contends that these reports demonstrate that he had been "actively working with the DEA against fraudsters." *Id.* at 7. Although the reports do indicate that Defendant Robinson made reports to the DEA regarding his suspicion that certain patients

10

were using "fraudulent prescriptions," the Court has already determined that Defendant Robinson was *not* prejudiced by not having these specific reports in advance of trial because he was able to present evidence regarding his reports to law enforcement during trial.  ECF No. 395, 22–23. Defendant Robinson has offered no new arguments or evidence to change the Court's earlier conclusion that these reports were *not* material to the jury's verdict.

### 2.   CCN Report

Defendant Robinson's arguments also rely on the government's failure to produce the "CCN Report." The CCN Report at issue concerns an incident at Defendant Robinson's clinic on March 28, 2013 involving an individual named Tonica Reid.  The report details that Defendant Robinson received a supposed referral from Ms. Reid, and that he had begun treating her and wrote her "a prescription for oxycodone" when he was informed that there was no record of such a referral from the prescribing medical clinic.  ECF No. 395, 25.  Defendant Robinson then reported Ms. Reid to law enforcement, took back his prescription "in the presence of the reporting officer," and  Ms.  Reid  was  subsequently  "detained  and  transported  to  the  Seventh  District  to  be interviewed[.]"  ECF No. 301-1, 10–12.

Both the DEA and the Metropolitan Police Department ("MPD") wrote reports about the same incident, and Defendant Robinson received a copy of the DEA report before trial.  *See* ECF No. 395, 25–29.  However, Defendant Robinson did not receive the CCN report of the incident from  MPD until after trial.  Although the Court concluded that this CCN report was "favorable" to Defendant Robinson, it also found that the information contained therein was not "suppressed" because the same information was available to him in the DEA report about the same incident.  *Id.* at 26–27.  The Court also concluded that Defendant Robinson failed to establish that the CCN report was "material."  *Id.* at 27.

Defendant Robinson contends that the CCN report demonstrates that "government agents never stopped working with Dr. Robinson in his prescription fraud efforts between the years 2010-2013."  Def.'s Mot. to Dismiss at 6; *see also id.* at 24 ("CCN files reveal[ ] the defendant's four-year, ongoing prescription fraud prevention work with the DEA and other law enforcement agencies[.]").  As the Court has previously concluded, however, "Defendant Robinson fails to identify any information in the withheld CCN report which was not also in the provided report by the DEA." ECF No. 395, 27.  And, as noted above, he was able to present evidence at trial regarding his efforts to report pill seekers.  In addition, there is nothing in the report to support his assertion that he had a working relationship with the DEA.

Defendant Robinson has offered no basis in his present motions to change the Court's conclusion that because Defendant Robinson received the information contained in the CCN Report, the Government's failure to produce it in advance of trial did not prejudice him.

**B.  Defendant's Motion to Dismiss the Indictment or, in the Alternative, for a Mistrial**

Defendant Robinson's Motion to Dismiss, seeks several forms of relief, which appear to include: (1) dismissal of the Indictment; (2) a new trial; and (3) a mistrial.  Defendant Robinson's motion does not explain which remedy he seeks for each of his many arguments.  Accordingly, the Court shall provide the legal framework for each of these requests before addressing the arguments raised in his motion.

**1.  Legal Standards**

The basis for Defendant Robinson's request to dismiss the Indictment is not entirely clear from his pleading, though it appears to stem from allegations of prosecutorial misconduct.  *See* Def.'s Mot. to Dismiss at 2, 43–44.  "The court may dismiss an indictment as a sanction for prosecutorial misconduct . . . only in extreme circumstances." *United States v. Slough*, 679 F.

Supp. 2d 55, 60–61 (D.D.C. 2010) (citing *United States v. Welborn*, 849 F.2d 980, 985 (5th Cir. 1988) (noting that the court's supervisory authority "includes the power to impose the extreme sanction of dismissal with prejudice only in extraordinary circumstances and only where the government's misconduct has prejudiced the defendant"); *United States v. Hattrup*, 763 F.2d 376, 377–78 (9th Cir. 1985) (holding that the defendant's allegations of prosecutorial misconduct did not justify "the harsh remedy of dismissal with prejudice")).   "Dismissal of an indictment with prejudice is the most severe sanction possible. Such dismissal exercised under the guise of 'supervisory power' is impermissible absent a clear basis in fact and law for doing so." *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir. 1992) (internal citations and quotation marks omitted).

As an alternative to dismissal of the indictment, Defendant Robinson styles his motion as a request for a "mistrial," though it appears that in seeking a "mistrial," he is requesting a new trial.[3]   For example, he cites legal authority for the proposition that the Government's "improper" "failure to correct [a] witness' misrepresentation . .  warrants a new trial."  Def.'s Mot. to Dismiss at 26 (citing *United States v. Iverson*, 637 F.2d 799, 802–03 (D.C. Cir. 1980)).   Declaring a "mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor."  *United States v. McLendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004) (internal citation and quotation marks omitted).   The "single most important consideration" in ruling on a motion for a mistrial is "the extent to which the defendant was unfairly prejudiced."  *Id.* (internal citations omitted). In making that determination, the Court

---

[3] In fact, the word "mistrial" appears only three times in the Motion to Dismiss: once in the title of the motion and twice in the "Conclusion" section, in which Defendant Robinson requests that the Court "declare a mistrial." *See* Def.'s Mot. to Dismiss at 1, 81.  Moreover, a "mistrial" is ordinarily a remedy sought after an error during trial, not after a jury verdict has been rendered. *See, e.g.*, *United States v. Wilson*, 434 F.2d 494, 499 (D.C. Cir. 1970).

considers the force of the unfairly prejudicial evidence, whether that force was mitigated by curative instructions, and the weight of the admissible evidence that supports the verdict.  *See id.* (citing *United States v. Eccleston*, 961 F.2d 955, 959–60 (D.C. Cir. 1992)).

Similarly,  to grant a new trial, "the evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."  *United States v. Howard*, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (quoting *United States v. Edmonds*, 765 F. Supp. 1112, 1118 (D.D.C. 1991)).  In making its determination, the district court "weighs the evidence and evaluates the witnesses' credibility and decides whether 'a serious miscarriage of justice may have occurred.'" *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990) (quoting *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982)).  Notably, this "power should be exercised with caution, and is invoked only in those exceptional cases in which the evidence weighs heavily against the verdict." *Edmonds*, 765 F. Supp. at 1118.  The moving party has "the burden of proof that a new trial is justified."  *Id*.  Defendant Robinson asserts that there is "newly discovered evidence." *See, e.g.*, Def.'s Mot. to Dismiss at 6.  However, motions for a new trial  "grounded on newly discovered evidence" must be filed within three years after the jury's verdict. Fed. R. Crim. P. 33(b)(1).  Here, the jury verdict was rendered on August 10, 2017, more than three years before Defendant Robinson filed the pending motions, and therefore his requests for a mistrial or for a new trial are untimely.

### 2.   *Napue* Arguments

Defendant's primary argument in his Motion to Dismiss is that the Government introduced or failed to correct "false" or "misleading" testimony which he contends was "material" to the jury's verdict, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).  Def.'s Mot. to Dismiss at 2, 5.  Defendant Robinson argues that a mistrial, new trial, or dismissal of the indictment based on

alleged prosecutorial misconduct is appropriate.[4] Defendant has failed to demonstrate that any of the testimony he cites is "false" or "misleading" or that the testimony itself was material to the jury verdict.  Accordingly, the Court finds that the requested relief is not appropriate.

"Under *Napue v. Illinois* and its progeny, 'the prosecution's introduction of false testimony' deprives a defendant of a fair trial as required by the Fifth and Sixth Amendments." *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019) (quoting *United States v. Straker*, 800 F.3d 570, 602 (D.C. Cir. 2015) (per curiam)).  The government commits a *Napue* violation when it "introduces false or misleading testimony or allows it to go uncorrected, even though the government knew or should have known that the testimony was false." *Id.* (citations omitted).  However, as the D.C. Circuit has explained, not every use of false or misleading testimony "rises to the level of constitutional error." *United States v. Butler*, 955 F.3d 1052, 1057–58 (D.C. Cir. 2020).  The false evidence must also be "material" to justify a new trial. *Giglio v. United States*, 405 U.S. 150, 154 (1972).  The government's introduction of false testimony is material if the evidence "could . . . in any reasonable likelihood have affected the judgment of the jury." *Ausby*, 916 F.3d at 1092 (internal citations and quotation marks omitted).  The relevant question is whether the false testimony "could have altered the outcome of the case." *United States v. Vega*, 826 F.3d 514, 531 (D.C. Cir. 2016).  The burden of proving materiality lies with the defendant. *See Straker*, 800 F.3d at 603.  "Ultimately, then, the *Napue* materiality standard requires [the defendant] to establish that the "false testimony reasonably could have altered the outcome of his case, thereby undermining confidence in the jury's guilty verdict." *Ausby*, 916 F.3d at 1092.

---

[4] The Court has previously considered Defendant Robinson's claims of prosecutorial misconduct in the context of purported *Brady* violations. *See* ECF No. 395, 10–11, 13–29.  As with its earlier opinion, the Court here "finds no instances of prosecutorial misconduct which would warrant a new trial" or any of the relief requested by Defendant Robinson. *Id.* at 11.

Defendant Robinson's *Napue* arguments are premised on the Pryor Reports and CCN Report.  He contends that testimony of law enforcement agents, pharmacists and a banker was false or misleading because the Government failed to "correct" their testimony to provide information about the Government's (1) knowledge of Defendant Robinson's efforts to assist the DEA by reporting fraudulent pill seekers; and (2) "approval" of his treatment methods, including his identical oxycodone prescriptions.  Putting aside the fact that these records do *not* contain such specific information, as noted *supra* Section II(A), these arguments fail because Defendant Robinson has provided no basis to find that such testimony was false or misleading.

Before addressing the specific examples proffered by Defendant Robinson, however, the Court notes a fundamental issue with Defendant Robinson's *Napue* arguments.  Besides the fact that they rely on significant overstatements or misstatements about the contents of the Pryor Reports, *see supra* Section II(A), his arguments hinge on an assertion that the Government *relied* on these specific Pryor reports in preparing its case for trial—that is, that the Government knew of the information contained therein, and failed to "correct" witnesses who did not testify as to this specific information.  Defendant Robinson offers no basis to conclude that the Government relied on these reports in any manner to prepare its case for trial.  Rather, the uncontroverted record before the Court indicates that, despite "diligent efforts," the Government was unable to locate these reports until several months after the jury rendered its verdict.  *See* ECF No. 308, 2–7.  Accordingly, Defendant Robinson's logic that the Government knew or should have known that certain testimony was "false" or "misleading" based on his misconstruction of the information

contained in the Pryor Reports, which the Government *could not locate* in advance of trial, makes little sense.[5]

Defendant Robinson first contends that the testimony of four pharmacists demonstrates the "materiality and prejudice" suffered by Defendant Robinson as a result of the suppression of the Pryor Reports.   Defendant Robinson contends that the Pryor Reports "detail" that these pharmacists "knew that the prescribing was part of a legitimate research study  protocol" and that Defendant Robinson "assisted with policing of younger patients who were trying to misuse the research study protocol or the prescriptions."  Def.'s Mot. to Dismiss at 26.  Simply put, the Pryor Reports *do not* contain such information about *the pharmacists'* knowledge.

In each excerpt of pharmacist testimony cited by Defendant Robinson, the pharmacist was asked about the "identical" prescriptions he or she received (not about suspected "fraudulent prescriptions"—the topic of the Pryor Reports), or about times he or she stopped filling prescriptions made by Defendant Robinson.  Def.'s Mot. to Dismiss at 21–22, 24–25.  Defendant Robinson concedes that these pharmacists "were unaware" of his "efforts at stopping prescription fraud[.]"  *Id.* at 23.  It is entirely unclear, then, how this testimony by the *pharmacists* about their *own* knowledge of the prescriptions they received from Defendant Robinson was "false" or "misleading" simply because they did not testify to alleged events of which they had no knowledge.

---

[5] Defendant also argues that the Government misled the Court regarding its efforts to locate the Pryor reports.  The Court has already found that "the United States appears to have acted diligently in locating the reports," which were nonetheless "suppressed." Mem. Op. at 17, ECF No. 395. Defendant Robinsons presents no new arguments or evidence that would alter the Court's earlier conclusion that the Government acted in good faith to locate these reports in advance of trial, but nonetheless was unsuccessful.

Next, Defendant Robinson excerpts several portions of trial testimony by undercover agents who participated in investigations of Defendant Robinson in 2013, posing as patients. The agents testified that they were not asked about their medical history, were not given a private meeting or consultation, and were not properly examined for the ailments they identified. Def.'s Mot. to Dismiss at 27–31. Defendant Robinson claims that their testimony was "false" and "the government knew it." *Id.* But beyond these conclusory assertions, Defendant makes *no* effort to demonstrate how this testimony is "false"—much less how the Pryor Reports or CCN Report prove it to be false. Moreover, the videos of the agents' undercover investigations were played at trial, allowing the jury to assess the veracity of the agents' testimony about their visits to Defendant Robinson's office.

Defendant also cites trial testimony by DEA Agent Shirley Powell,[6] regarding whether the DEA investigates patents, and whether she knew of a patent issued for Defendant Robinson's spinal device. Def.'s Mot. to Dismiss at 31. Agent Powell answered that *she* did not know of any patent and that it was not the role of the DEA to investigate patents. Defendant Robinson fails to show how Agent Coats' testimony is false, or, again, how the Pryor Reports or CCN Report contradicts this testimony.

Defendant Robinson next argues that the Government offered "false" testimony of Ms. Apryl Gates, the branch manager of a bank located near Defendant Robinson's office. Ms. Gates testified about individuals who came to the bank seeking money orders and stated that "based on the type of customer that was coming in, it didn't appear that they either worked or lived in the

---

[6] Defendant Robinson incorrectly ascribes the testimony excerpted on page 31 of his Motion to Dismiss to DEA Agent LaTonya Coates.

area." Def.'s Mot. to Dismiss at 33.[7]  Defendant contends that this testimony was offered to show

that most of his patients were "white or Caucasian" despite the location of his office in a

"predominantly African American area."  *Id.*[8] Ms. Gates first testified regarding the "type of

customer" who came to the bank for money orders in response to a question by *defense* counsel.

Trial Tr. (July 18, 2017) 1383:10–22.  The Government then asked Ms. Gates to explain what she

meant by her phrase the "type of customer," to which Ms. Gates responded that based on her

experience and knowledge of her customer base, "it didn't appear" that the individuals coming in

for money orders "either worked or lived in the area."  *Id.* 1399:8–15.  Defendant Robinson fails

to demonstrate how Ms. Gates's testimony was false or misleading in violation of *Napue*.

In addition to failing to offer any basis for the Court to conclude that any of the testimony

he discussed was "false," he also fails to demonstrate how that testimony itself was "material" to

the jury verdict; rather, he appears to argue that the testimony demonstrates that the suppressed

evidence, discussed *supra* Section II(A), was "material."  The Court is not persuaded by Defendant

Robinson's efforts to resuscitate failed *Brady* arguments and recast them as *Napue* violations, and

so the Court shall not re-consider its earlier conclusions that the Pryor Reports and CCN Report

were *not* material.  *See* ECF No. 395.

As a final point, Defendant Robinson cites several examples of *grand jury* testimony which

he contends was false, and which the Government failed to correct.  *See, e.g.*, Def.'s Mot. to

_____

[8] Defendant Robinson cites Ms. Gates's testimony on page 1387 of the trial transcript, but at that point in the proceedings, the jury had been excused from the courtroom.  Ms. Gates did, however, testify in the jury's presence: "[B]ased on the type of customer that was coming in, it didn't appear that they either worked or lived in the area."  Trial Tr. (July 17, 2017) 1399:8–15.

[8] As the Court has previously noted, "[d]uring the trial, no witness testified about the racial composition of Defendant Robinson's patients before the jury . . . the United States did *not* improperly introduce racial evidence."  ECF No. 395, 10.  Defendant Robinson has offered no evidence to alter that conclusion.

Dismiss at 7 (citing grand jury testimony of Robert Long, Jr.); *id.* at 8 (citing grand jury testimony of Kevin Copsey); *id.* at 17–18 (citing grand jury testimony of Karen Taylor); *id.* at 19 (same); *id.* at 37–42 (citing grand jury testimony of Robert Buckler).  This testimony, of course, cannot be said to have been material to the jury verdict.  But assuming Defendant Robinson invokes these examples in support of his request that the Indictment be dismissed, his arguments are not persuasive for the same reasons discussed above—they rely on inaccurate representations of the information contained in the Pryor Report or CCN Report and assert that the testimony was "false" without offering any basis for his contentions. He also fails to demonstrate that any of these purported "false" statements during grand jury proceedings were prejudicial.  *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988) ("We hold that, as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants.").

In sum, the Court concludes that Defendant Robinson has failed to demonstrate that the Government violated *Napue*, or that any of the alleged violations support his requests for a mistrial, a new trial, or dismissal of the Indictment.

### 3.  Entrapment Arguments

In his Motion to Dismiss, Defendant Robinson also argues that the Court's denial of a jury instruction on entrapment was "a reversible error."  Def.'s Mot. to Dismiss at 44.  Although many of the arguments raised by Defendant in his pending motions have been previously considered by the Court in written submissions from the parties, the discussion of an entrapment instruction occurred only orally during jury deliberations.  *See generally* Trial Tr. (Aug. 9, 2017), ECF No. 258.  For this reason, the Court ordered the Government to respond to the arguments regarding entrapment raised by Defendant Robinson in his motion to dismiss.  *See* Minute Order (Apr. 28,

2021).  The Government filed its response on May 5, 2021.  ECF No. 420. Defendant Robinson

filed a reply on May 26, 2021.  ECF No. 422.

The discussion of entrapment first arose during the jury's deliberation in response to the

following juror note:

> If we [the jury] determine all the elements of counts 1,2,3,4 have
> been met, are we nevertheless permitted to find [the defendant] not
> guilty as to these charges because the purpose of these visits was to
> gather evidence.

ECF No, 228, 2. The note refers to the "visits" by undercover law enforcement agents to Defendant

Robinson's medical office, in which the agents posed as patients and presented fake MRIs

generated by the DEA.[9]  *See, e.g.*, ECF No. 290, 5–6.  In response to this note, Defendant

Robinson's trial counsel suggested that "I think what they're asking about is . . . an entrapment

instruction."  Trial Tr. (Aug. 9, 2017) 5289:11–12.  The Court disagreed, *id.* at 5289:13,  but

allowed the parties time to conduct research on the issue and present oral arguments about the

propriety of instructing the jury on entrapment.  After considering the arguments and legal

authority presented by the parties, the Court concluded that an entrapment instruction was not

responsive to the jury's note, nor was it appropriate based on the evidence presented.  *Id.* at

5307:21–5309:11.

Defendant Robinson now argues that an entrapment instruction was required because of

the Government's "knowledge" of how to circumvent his purported fraud detection policies, and

because he relied on the Government's "sanctioning and support" of his treatment protocols,

including his practices for prescribing oxycodone.  *See* Def.'s Mot. to Dismiss at 44, 64.  The

---

[9] Defendant Robinson did not raise an entrapment defense before or during trial. *See* Trial Tr. (Aug
9, 2017) 5289:24–5290:2; 5308:7–13.

Court finds that Defendant Robinson has failed to point to any evidence demonstrating that an entrapment instruction was required.

"A valid entrapment defense has two related elements: government inducement of the crime and a lack of predisposition on the part of the defendant to engage in criminal conduct." *Matthews v. United States*, 485 U.S. 58, 63 (1988). A defendant arguing entrapment must show that "the criminal design originate[d] with the officials of the government, and [that] they implant[ed] in the mind of an innocent person the disposition to commit the alleged offense and induce[d] its commission in order that they may prosecute." *Sorrells v. United States*, 287 U.S. 435, 442 (1932). "At a minimum, this requires a showing that the government agent actually solicited or suggested the criminal conduct." *United States v. Solofa*, 745 F.3d 1226 (D.C. Cir. 2014) (internal citations omitted); *see also United States v. Russell*, 411 U.S. 423, 436 (1973) (government deception does not constitute inducement unless the idea for the crime originated with the government agent).

Defendant Robinson does not point to any evidence on the record suggesting that any government agent solicited or suggested the criminal conduct. Rather, again relying on the Pryor Reports, he argues that the DEA had knowledge of his "prescription fraud prevention methods utilized to catch individuals from the Southern Maryland Drug Ring using fraudulent medical documents" and then used this "knowledge" to circumvent his detection methods. Def.'s Mot. to Dismiss at 45–46. This argument suffers from the same flaw discussed above, namely that this information is *not* included in the Pryor reports. Even the portions of the reports cited by Defendant Robinson do not support his characterization—they merely note that a pharmacist "told him" that someone was using his name on fraudulent prescriptions. These reports certainly do *not* support Defendant Robinson's claim that the Government used information contained therein to

"backdoor" his "good faith prescription fraud prevention mechanisms," particularly regarding his purported process to identify fraudulent MRIs.  Def.'s Mot. to Dismiss at 46.

As the Court noted when discussing the issue of entrapment in response to the juror note, the question for the jury was whether, based on the information provided to Defendant Robinson by the undercover agents (including the MRIs and descriptions of their pain), Defendant Robinson was acting outside the medical practice by prescribing them oxycodone.  *See* Trial Tr. (Aug. 9, 2017) 5309:6–5310:18; 5313:9–53:14.  The Court previously observed that there was no evidence to suggest that the DEA's "lies" induced Defendant Robinson to prescribe oxycodone outside the legitimate practice of medicine.  *Id.* at 5315:9–21.  Rather, the key inquiry was whether giving these agents a prescription—taking as true the information they provided him—was within the medical practice.  *Id.*  Defendant Robinson provides no basis to conclude that the Government solicited or suggested his illegal conduct.  Rather, he focuses on the fact that undercover agents used the "same methods" used by individuals seeking prescriptions illegally to obtain them from Defendant Robinson.  *See* Def.'s Mot. to Dismiss at 48.  Even taking into account the fact that the DEA used fake MRIs and indicated to Defendant Robinson that they were in pain from their claimed (fake) injuries, "not all fraudulent misrepresentations" constitute inducement.  *Solofa*, 745 F.3d at 1230.  Rather, the Supreme Court has recognized that "there are circumstances when the use of deceit is the only practicable law enforcement technique available."  *Russell*, 411 U.S. at 426; *see also Sorrells,* 287 U.S. at 441 ("Artifice and stratagem may be employed to catch those engaged in criminal enterprises.").  Defendant Robinson has failed to provide any evidentiary basis

for concluding that the DEA agents' undercover actions were improper or that they induced him to prescribe oxycodone outside the practice of medicine.[10]

Defendant Robinson contends that he was entrapped "by estoppel," that is, that he "relied upon advice" of the DEA and state law enforcement authorities regarding the propriety of his medical treatment methods (including oxycodone prescriptions) and that the DEA used those same methods to trick him into prescribing him oxycodone. *See, e.g.*, Def.'s Mot. to Dismiss at 67 (citing the Pryor Reports for the proposition that the Government was aware of "his prescribing of Oxycodone as part of his medical research into a 'new method of decompression for pain management'"). The Court agrees with the Government's response on this point: there is simply no support in the record for these propositions. *See* Gov.'s Resp. to Def.'s Mot. to Dismiss at 4.

For these reasons, the Court concludes that it was not "error" to decline to instruct the jury regarding entrapment, and therefore a new trial, mistrial, or dismissal of the Indictment is not warranted based on the Court's decision.

### 4. Arguments Regarding Defendant Robinson's Military Service

Defendant Robinson's final arguments in his Motion to Dismiss relate to his military service. His arguments are difficult to follow. They appear to distill down to an allegation that the Government "intentionally suppressed material and favorable character evidence" regarding his military service, Def.'s Mot. to Dismiss at 69, and that the Government improperly suggested

---

[10] In his Reply, Defendant Robinson claims that the undercover agents "solicited" oxycodone "in writing" by filling out forms describing lower back pain. Def.'s Reply at 5 (citing Trial Tr. (July 20, 2017) 2372:20–2373:14). He argues that testimony by an agent about this form shows that the agents "absolutely requested the drugs or prescriptions" and "this fact was memorialized on the government's undercover video and confirmed by the DEA agents themselves during their trial testimony." *Id.* at 22. The record—including the portions of testimony cited by Defendant Robinson—does not support his claims. The agent did *not* testify that he requested oxycodone; he testified that he completed a form providing a fictional medical history and based on this history, without a thorough medical examination, Defendant Robinson prescribed oxycodone.

that "a black man could not have served and succeeded" in his duties in the military, *id.* at 79.  He provides no support for these assertions.

During trial, the Court issued an Order preventing the Government's use of testimony regarding the nature of Defendant Robinson's military history as non-character evidence. *See* Order, ECF No. 205.  The Government indicated its intent to elicit testimony demonstrating that Defendant Robinson "made certain representations to investigators and patients about his military history" which the Government contended "are false or exaggerated."  *Id.* at 2.  But the Court concluded that these misrepresentations and overstatements were "unrelated to the crimes charged in this case—that is, they do not speak to whether Defendant was acting within the legitimate bounds of his professional practice in prescribing oxycodone."  *Id.*  The Court found that any probative value of this proposed evidence would "be substantially outweighed by the risk of unfairly prejudicing Defendant with the introduction of improper character evidence[.]"  *Id.* at 3. The Court noted, however, that it would revisit the Government's use of this evidence as rebuttal character evidence if Defendant Robinson opened the door to this issue by offering evidence of his military history as character evidence under Rule 404(a)(2).  *Id.* at 3–4.

Defendant Robinson offers no examples of evidence of his military service being inappropriately presented to the jury during trial.  He cites only testimony during grand jury proceedings, *see* Def.'s Mot. to Dismiss at 72–74, and the parties' arguments made to the Court during trial—outside the presence of the jurors—regarding the propriety of introducing this evidence.  *See, e.g.*, *id.* at 69 (citing Trial Tr. (July 18, 2017) 1613-19).  Defendant Robinson fails to demonstrate how he was prejudiced by discussions of his military background in either context.

### C. Defendant's Motion for a *Franks* Hearing

Defendant Robinson filed a separate motion for a *Franks* evidentiary hearing, in which he seeks an evidentiary hearing based on his claim that the the affidavit submitted by DEA Investigator Shirley Powell in support of an application for a search warrant "contained multiple representations that can now, due to newly discovered suppressed favorable Brady evidence, be shown to be false material misrepresentations and contained significant material omissions." Def.'s *Franks* Mot. at 1. The Court disagrees, and so shall deny Defendant Robinson's Motion for an evidentiary hearing.

#### 1. Legal Standard

Under *Franks v. Delaware*, in order to successfully challenge an affidavit, the defendant must show that the false statements in the document were made by the affiant "knowingly and intentionally, or with reckless disregard for the truth" and that the false statements were "necessary to the finding of probable cause." 438 U.S. 154, 155 (1978). Notably, "[a]llegations of negligence or innocent mistake are insufficient." *Id*. at 171; *see also United States v. Lopez*, No. 1:17-CR-269, 2018 WL 1290415, at *10 (N.D. Ohio Mar. 13, 2018), *aff'd*, 769 F. App'x 288 (6th Cir. 2019) (holding a single false statement is insufficient to support a *Franks* hearing); *United States v. West*, 503 F. Supp. 2d 192, 194 (D.D.C. 2007) (refusing a *Franks* hearing where the mistake in the affidavit was small and not material); *United States v. Ali*, 870 F. Supp. 2d 10, 32 (D.D.C. 2012) (denying a *Franks* hearing where potentially negligent omissions in an affidavit were not material).

A movant seeking to obtain a *Franks* hearing "must show that (1) the affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth." *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010) (quoting *United States v. Richardson*,

861 F.2d 291, 293 (D.C. Cir. 1988) (per curiam)).  *Franks* applies to material omissions from

affidavits, as well as false statements.  *United States v. Williams*, 827 F.3d 1134, 1146 (D.C. Cir.

2016); *United States v. Glover*, 681 F.3d 411, 419 (D.C. Cir. 2012)).  An omission is "material"

only if its inclusion in the affidavit would have "defeat[ed] probable cause." *Becton*, 601 F.3d at

597; *United States v. Spencer*, 530 F. 3d 1003, 1007 (D.C. Cir. 2008); *see also Williams*, 827 F.3d

at 1146 ("[N]ot just any omission is enough . . . to require a *Franks* hearing, the omission alleged

must be such that, had the omitted information been provided to the authorizing court, it would

have altered the court's conclusion[.]"); *United States v. Wharton*, 840 F.3d 163 (4th Cir. 2016)

("Even if relevant, information is not material unless its inclusion in the affidavit would defeat

probable cause." (internal quotation marks and citation omitted)).  "To mandate an evidentiary

hearing," the movant's attack on the affidavit supporting the warrant "must be more than

conclusory." *Franks*, 438 U.S. at 171. The defendant must allege "deliberate falsehood of or

reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."

*United States v. Gaston*, 357 F.3d 77, 80 (D.C. Cir. 2004).

    **2.  *Franks* Arguments**

    Defendant Robinson lists twenty-nine examples from the affidavit, contending that these

statements are "materially false and fraudulent" or omitted material information.[11]  Def.'s *Franks*

Mot. at 5–80; *see also id.* at 82.  The Court finds that Defendant Robinson has failed to show that

the statements in Agent Powell's affidavit are false, fraudulent, or misleading, that they were made

with "deliberate or reckless" disregard for the truth, or that they would have altered the magistrate

---

[11] Defendant Robinson includes as one of these purportedly "false" statements a list of vehicles to
be searched and seized. Def.'s *Franks* Mot. at 14–15.  He then argues that "medical records and
personal funds seized" from a Volvo not included on this list were "illegally seized."  *Id.* at 14–
15.  It is unclear how this claim relates to his request for a *Franks* motion, as it does not appear to
suggest that anything about the list of vehicles contained in the affidavit was false.

judge's finding of probable cause.  Rather, Defendant Robinson's arguments rest on precisely the type of "conclusory assertions" insufficient to require an evidentiary hearing.

Defendant Robinson again relies primarily on incorrect characterizations of the information contained in the Pryor Reports in support of his claims that Agent Powell failed to disclose in her affidavit that the Government had "sanctioned" his treatment method, including "his specific prescribing of 30mg of oxycodone" and that the Government "specifically documented" that his prescribing was in the "usual course of professional practice" and "for a legitimate medical purpose."  *See, e.g.*, Def.'s *Franks* Mot. at 7–9, 11, 13, 17–18, 26, 30, 41–42, 46, 59–60, 72.  As with his other arguments, these contentions rely on an inaccurate reporting of the information contained in the Pryor Report and the CCN Report.  Accordingly, to the extent Defendant Robinson relies on inaccurate characterizations of the Government's "sanctioning" of his method, his arguments about material omissions fail.  *See, e.g.*, *id.* at 83.

Defendant Robinson also argues that his efforts to provide the DEA and other law enforcement agencies with information about "pill seekers" was "omitted and should have been included."  *See, e.g.*, *id.* at 10, 16.  The problem with this argument is that the affidavit *does* state that "on or about January 11, 2011" the DEA received "a complaint from ROBINSON in which he claimed that someone used his name to fraudulently obtain narcotics."  *Id.* at 15.  That is, the affidavit *includes* the information from the Pryor Report which Defendant Robinson accuses the Government of intentionally omitting.  *See id.*  The affidavit goes on to say, "This complaint may or may not have been legitimate, or it may have been interposed by ROBINSON to make it appear to law enforcement that ROBINSON was a conscientious health care practitioner otherwise genuinely concerned about drug abuse by prescription fraud."  *Id.* at 15.  Although Defendant Robinson disputes the characterization in the affidavit that his complaint may have been a "ruse,"

the affidavit explicitly conveys to the magistrate judge that it is possible Defendant Robinson was legitimately reporting pill seekers to the DEA as part of the determination of probable cause.

In other examples, Defendant Robinson contends that certain statements in the affidavit are "false" or "misleading," but his arguments fail to support these assertions.  For example, Defendant Robinson cites a statement indicating that Defendant Robinson treated "multiple patients with criminal related backgrounds to include but not limited to, prescription fraud, illicit narcotics, possession of drug paraphernalia and burglary charges." *Id.* at 19.  Notably, Defendant Robinson does not argue that this statement is false, merely that the Government omitted from the affidavit his efforts to police his own practice to prevent prescription drug abuse, *id.* at 20, and omitted that he "treated numerous patients, referred by the Department of Defense and the U.S. Department of Veterans Affairs, who did not have criminal backgrounds." *Id.* at 24.  The statement that Defendant Robinson treated patients with criminal backgrounds does not contradict his claim that he also treated veterans without criminal backgrounds.  As another example, Defendant Robinson contends that it was false for Agent Powell to indicate in the affidavit that the undercover agents who came to his office did not have appointments. *Id.* at 53.  He then excerpts trial testimony from one of the undercover investigators contending that it "clearly states" that agent made an appointment.  *Id.* To the contrary, the cited testimony makes *no mention* of any scheduled appointment. *Id.* at 53–54.

Finally, Defendant Robinson fails to provide the requisite "offer of proof" to support any inference that Agent Powell made any allegedly false or misleading statements with "deliberate falsehood of or reckless disregard for the truth." *Gaston*, 357 F.3d at 80.  Because Defendant Robinson's request for a *Franks* hearing rests on incorrect characterizations of evidence and conclusory assertions, the Court concludes that a *Franks* hearing is not appropriate.

## III.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's [418] Motion to Dismiss Indictment for Violation of Rights Guaranteed to Defendant Pursuant to the Fifth and Sixth Amendments to the United States Constitution or in the Alternative Motion for Mistrial and [417] Motion for *Franks* Evidentiary Hearing.  An appropriate Order accompanies this Memorandum Opinion.

**Date:** May 31, 2021

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
